**Slip Op. 09-67**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| TAIAN ZIYANG FOOD COMPANY, LTD., ET AL., | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Consol. Court No. 05-00399 |
| *Defendant*, | : | |
| | : | |
| and | : | |
| | : | |
| FRESH GARLIC PRODUCERS ASSOCIATION, ET AL., | : | |
| | : | |
| *Defendant-Intervenors*. | : | |

[Granting in part and denying in part Plaintiffs' Motions for Judgment on the Agency Record, and remanding action to agency.]

Dated:  June 29, 2009

White & Case LLP (Adams C. Lee and Jay C. Campbell), for Plaintiff Taian Ziyang Food Company, Ltd.

Bryan Cave LLP (Albert Lo and Kelly A. Slater), for Plaintiff Taian Fook Huat Tong Kee Foodstuffs Co., Ltd.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Bruce M. Mitchell, Paul G. Figueroa, Mark E. Pardo, and Richard A. Burns), for Plaintiffs Zhengzhou Harmoni Spice Co., Ltd., Jinan Yipin Corporation, Ltd., Linshu Dading Private Agricultural Products Co., Ltd., and Sunny Import & Export Co., Ltd.

deKieffer & Horgan (John J. Kenkel, Gregory S. Menegaz and J. Kevin Horgan), for Plaintiff Jinxiang Dong Yun Freezing Storage Co., Ltd.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Mark T. Pittman and Richard P. Schroeder); Scott D. McBride, Arthur Sidney, Jennifer Johnson, and Evangeline D. Keenan, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Kelley Drye & Warren LLP (Michael J. Coursey, Michael R. Kershow, and Adam H. Gordon), for Defendant-Intervenors the Fresh Garlic Producers Association, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc.

## OPINION

RIDGWAY, Judge:

In this consolidated action,[1] the plaintiff Chinese producers and exporters of fresh garlic – Taian Ziyang Food Company, Ltd. ("Ziyang"), Taian Fook Huat Tong Kee Foodstuffs Co., Ltd. ("FHTK"), Zhengzhou Harmoni Spice Co., Ltd. ("Harmoni"), Jinan Yipin Corporation, Ltd. ("Jinan Yipin"), Linshu Dading Private Agricultural Products Co., Ltd. ("Linshu Dading"), Sunny Import & Export Co., Ltd. ("Sunny"),[2] and Jinxiang Dong Yun Freezing Storage Co., Ltd. ("Dong Yun") – contest the final results of the U.S. Department of Commerce's ninth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China ("PRC"). *See Fresh Garlic from the People's Republic of China: Final Results of Antidumping Duty*

---

[1]Ziyang, FHTK, the GDLSK Plaintiffs, Dong Yun, and the Domestic Producers each initiated actions contesting the Final Results. Their five separate suits were consolidated into the present action.

[2]Plaintiffs Harmoni, Jinan Yipin, Linshu Dading, and Sunny are collectively referred to herein as the "GDLSK Plaintiffs."

Administrative Review, 70 Fed. Reg. 34,082 (June 13, 2005) ("Final Results"); Issues and Decision

Memorandum for the Administrative Review of the Antidumping Duty Order on Fresh Garlic from

the People's Republic of China (June 6, 2005) (Pub. Doc. No. 348) ("Decision Memorandum");

Notice of Amended Final Results of Antidumping Duty Administrative Review: Garlic from the

People's Republic of China, 70 Fed. Reg. 56,639 (Sept. 28, 2005) ("Amended Final Results").[3]

Pending before the Court are four separate Motions for Judgment on the Agency Record, in which

the Chinese Producers contest various different aspects of the Final Results.[4]

Ziyang challenges Commerce's application of "facts available" with "adverse inferences"

in calculating Ziyang's dumping margin. *See generally* Memorandum of Points and Authorities in

Support of Plaintiff Taian Ziyang Food Company, Ltd.'s CIT Rule 56.2 Motion for Judgment Upon

---

[3]Because this action was voluntarily remanded to Commerce for recalculation of the labor wage rate, two administrative records have been filed with the court – the initial administrative record (comprising the information on which the agency's Final Results were based), and the supplemental administrative record (on which the Remand Results were based).

Moreover, because confidential information is included in both administrative records, there are two versions of each – a public version and a confidential version. The public versions of the records consist of copies of all documents in the record of this action, with confidential information redacted. The confidential versions consist of complete, unredacted copies of only those documents that include confidential information.

Documents in the public version of the initial and supplemental administrative records are numbered sequentially, and are cited herein as "Pub. Doc. No. ____." Documents in the confidential version of the initial and supplemental records are also numbered sequentially, but differently from the public version. Documents in the confidential version of the initial and supplemental administrative records are cited as "Conf. Doc. No. ____."

[4]Plaintiffs as a group are referred to herein as "the Chinese Producers." All garlic producers from the PRC involved in the underlying administrative review, including those producers not participating in the present action, are referred to as "respondents."

the Agency Record ("Ziyang Brief"); Reply Brief of Plaintiff Taian Ziyang Food Company, Ltd.,

("Ziyang Reply Brief"); Supplemental Brief of Plaintiff Taian Ziyang Food Company, Ltd. ("Ziyang

Supplemental Brief").[5]

FHTK similarly disputes Commerce's application of adverse facts available, as well as

Commerce's valuation of garlic seed as a factor of production. *See generally* Brief of Taian Fook

Huat Tong Kee Foodstuffs in Support of Rule 56.2 Motion for Judgment on the Agency Record

("FHTK Brief"); Reply Brief of Plaintiff Taian Fook Huat Tong Kee Foodstuffs Co., Ltd. ("FHTK

Reply Brief").

The GDLSK Plaintiffs contest Commerce's valuation of garlic seed, the inclusion of water

as a factor of production, the calculation of the labor rate, the valuation of garlic seed from a

producer's own crops as a factor of production, the valuation of several post-harvesting factors of

production (*i.e.*, cardboard cartons, plastic jars, and ocean freight), and the valuation of cold storage.

---

[5]As a matter of practice:

> Commerce uses the shorthand term "adverse facts available" to refer to two separate procedures. Specifically, the Department uses "facts otherwise available" under 19 U.S.C. § 1677e(a) when needed information is unavailable on the record or otherwise deficient according to § 1677e(a). *See* 19 U.S.C. § 1677e(a). When selecting from among the facts otherwise available, Commerce uses inferences adverse to a party that fails to cooperate by not acting to the best of its ability in responding to the Department's requests for information. *See id*. § 1677e(b).

Jinan Yipin Corporation, Ltd. v. United States, 31 CIT ____, ____ n.7, 526 F. Supp. 2d 1347, 1353 n.7 (2007).

The application of facts otherwise available and the application of adverse inferences are discussed below, in section III.A. *See* section III.A, *infra*. Their combined application is generally referred to herein as "adverse facts available."

*See generally* Brief in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("GDLSK Brief"); Reply Brief in Support of GDLSK Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("GDLSK Reply Brief"); Supplemental Brief in Support of GDLSK Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("GDLSK Supplemental Brief"); Response to Defendant's Supplemental Brief ("GDLSK Supplemental Response Brief").

Dong Yun challenges Commerce's inclusion of water and land as factors of production, the calculation of the labor rate and the selection of the financial ratios. *See generally* Memorandum in Support of Plaintiff Dong Yun's Rule 56.2 Motion for Judgment Upon the Agency Record ("Dong Yun Brief"); Plaintiff's Reply Brief to Defendant's Memorandum in Response to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Dong Yun Reply Brief"); Letter Memorandum from Counsel for Dong Yun to Clerk of the Court (May 16, 2008) ("Dong Yun Supplemental Brief"); Jinxiang Dong Yun Freezing Storage Co. Ltd., Response to Defendant's Supplemental Brief of May 16, 2008 ("Dong Yun Supplemental Response Brief").

Defendant-Intervenors the Fresh Garlic Producers Association, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively, the "Domestic Producers") oppose the Chinese Producers' motions and urge that the Final Results be sustained in their entirety. *See generally* Defendant-Intervenors' Brief in Response to Plaintiffs' Motions for Judgment on the Administrative Record ("Domestic Producers Response Brief"); Defendant-Intervenors' Rebuttal to Plaintiffs' Supplemental Briefs ("Domestic Producers Rebuttal Brief").

The Government, in turn, maintains that the Final Results should be sustained in all respects,

save two.  *See* Defendant's Memorandum in Opposition to Plaintiffs' Rule 56.2 Motions for

Judgment Upon the Agency Record ("Def. Response Brief"); Defendant's Surreply to Dong Yun's

Reply to the Response to Its Rule 56.2 Motion for Judgment Upon the Agency Record ("Def.

Surreply Brief"); Defendant's Supplemental Brief ("Def. Supplemental Brief"); Defendant's

Rebuttal to Plaintiffs' Supplemental Briefs ("Def. Rebuttal Brief").  First, the Government requests

that the issue of valuing garlic seed from a producer's own crop be remanded, so that Commerce

may address the arguments of Harmoni and Jinan Yipin.  *See* Def. Response Brief at 69-71.  In

addition, the Government requests a remand to permit Commerce to apply a new labor rate to Dong

Yun.  *See* Def. Response Brief at 2, 112-13.

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[6]  As detailed more fully below, the

Motion for Judgment on the Agency Record filed by Ziyang must be denied, while the Motions for

Judgment on the Agency Record filed by FHTK, the GDLSK Plaintiffs and Dong Yun are granted

in part and denied in part.

## I.  Standard of Review

A final determination by Commerce in an antidumping case must be upheld, except to the

extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* <u>Elkem Metals Co. v. United States</u>,

468 F.3d 795, 800 (Fed. Cir. 2006).  Substantial evidence is "more than a mere scintilla"; rather, it

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

[6]All citations to federal statutes are to the 2000 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2002 edition of the Code of Federal Regulations.

Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (*quoting* Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting* Universal Camera, 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).

On the other hand, the mere fact that it may be possible to draw two inconsistent conclusions from evidence in the record does not prevent Commerce's determination from being supported by substantial evidence.  *See* Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).  Finally, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  However, "the path of Commerce's decision must be reasonably discernable," to support judicial review. *Id*.

## II. **Background**

The underlying antidumping order here at issue, covering imports of fresh garlic from the PRC, dates back to 1994.  *See* Antidumping Duty Order: Fresh Garlic From the People's Republic of China, 59 Fed. Reg. 59,209 (Nov. 16, 1994) ("Antidumping Order").  The administrative review which is the subject of this action – the ninth such review – began in November 2003, when Commerce gave notice of the opportunity to request a review of the Antidumping Order for the

period November 1, 2002 through October 31, 2003 (known as the "period of review" or "POR").

*See generally* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;

Opportunity To Request Administrative Review, 68 Fed. Reg. 62,279 (Nov. 3, 2003). Commerce

initiated the administrative review the following month. *See generally* Initiation of Antidumping

and Countervailing Duty Administrative Reviews, 68 Fed. Reg. 74,550 (Dec. 24, 2003).

Commerce subsequently issued its Preliminary Results, and invited comments. *See generally*

Fresh Garlic from the People's Republic of China: Preliminary Results of Antidumping Duty

Administrative Review and Rescission in Part, 69 Fed. Reg. 70,638 (Dec. 7, 2004) ("Preliminary

Results").[7] Commerce also conducted verifications and "took the unusual step of inviting the

interested parties to submit argument regarding issues raised in the Preliminary Results, specifically

regarding the [intermediate input] methodology applied in the Preliminary Results and the relative

impact on yield from the [factors of production] used in the production of garlic." Decision

Memorandum at 3.[8]

Following briefing and oral argument before the agency, Commerce published the Final

Results of the administrative review. *See generally* Final Results, 70 Fed. Reg. 34,082. In the Final

Results, Commerce decided, *inter alia*, (1) to apply adverse facts available to Ziyang's and FHTK's

---

[7]In the Preliminary Results, Commerce calculated dumping margins of 61.43% for Ziyang, 90.27% for FHTK, 41.28% for Harmoni, 36.75% for Jinan Yipin, 58.26% for Linshu Dading, 27.24% for Sunny, and 101.51% for Dong Yun. *See* Preliminary Results, 69 Fed. Reg. at 70,643.

[8]Commerce ultimately declined to apply the intermediate input methodology in the Final Results, reserving it for the tenth administrative review of fresh garlic from the PRC. *See* Zhengzhou Harmoni Spice Co. v. United States, 33 CIT ____, ____, 2009 WL 1321025 * 1-9 (2009).

growing and harvesting factors of production (including, *inter alia*, garlic seed, water, and labor), (2) to calculate the surrogate value of garlic seed using pricing data from the National Horticultural Research and Development Foundation ("NHRDF"), (3) to calculate the surrogate labor wage rate using Commerce's standard regression model, (4) to assign a surrogate value to irrigation water, (5) to apply a surrogate value for garlic seed to certain producers that grew their own seed, (6) to apply a surrogate value for cold storage, (7) to use import statistics rather than domestic price quotes for the surrogate valuation of cardboard cartons, (8) to use import statistics rather than domestic price quotes for the surrogate valuation of plastic jars and lids, (9) to rely on Maersk freight shipping rates for the surrogate valuation of ocean freight, (10) to apply a surrogate value for land, and (11) to exclude certain companies from the financial ratio calculation, to exclude losses from the profit calculation, and to include certain costs in the financial ratios that were not incurred by all respondents. *See generally* Decision Memorandum.

The actions consolidated here ensued. In the meantime, the parties requested that Commerce correct certain ministerial errors. At the request of the Government, this matter was remanded to the agency for that purpose. *See* Defendant's Consent Motion for Leave to Publish Amended Final Results Correcting Ministerial Errors; Order Granting Defendant's Consent Motion; *see also* Amended Final Results, 70 Fed. Reg. 56,639. Based on those corrections, Commerce recalculated the dumping margins for five of the Chinese Producers. *See* Amended Final Results, 70 Fed. Reg. at 56,640.[9]

---

[9]Commerce calculated amended dumping margins of 15.09% for Ziyang, 19.68% for FHTK, 14.20% for Harmoni, 15.92% for Jinan Yipin, and 10.78% for Linshu Dading. *See* Amended Final Results, 70 Fed. Reg. at 56,640.

In addition, the Government requested and was granted a voluntary remand to determine whether Commerce had miscalculated the labor wage rate by erroneously omitting certain data. *See* Defendant's Partial Consent Motion for Voluntary Remand; Order Granting Defendant's Partial Consent Motion; *see also* Final Results of Redetermination Pursuant to Court Remand ("Remand Results").[10]  On remand, Commerce determined to include the omitted data, and recalculated the dumping margins for six of the Chinese Producers. *See* Remand Results at 1-2, 18-19.[11]

### III. Analysis

In their motions for judgment upon the agency record, the Chinese Producers advance numerous claims contesting the Final Results. Ziyang and FHTK contend that Commerce erred by applying adverse facts available to their growing and harvesting factors of production. FHTK and the GDLSK Plaintiffs argue that Commerce erred in selecting a surrogate value for garlic seed. The GDLSK Plaintiffs contend that Commerce erred by applying a surrogate value for purchased garlic seed to certain producers who grew their own seed, that Commerce erred in the calculation of the surrogate labor wage rate, and that Commerce erred in the surrogate valuation of irrigation water, cold storage, cardboard cartons, plastic jars, and ocean freight. Dong Yun asserts that Commerce erred in calculating a separate surrogate value for land as a factor of production, that Commerce erred in the valuation of irrigation water, and that Commerce miscalculated the surrogate labor wage

---

[10]This issue is distinct from the challenge to the labor rate methodology raised by the GDLSK Plaintiffs and Dong Yun.

[11]In the Remand Results, Commerce recalculated dumping margins at 12.58% for Ziyang, 15.75% for FHTK, 8.79% for Harmoni, 13.21% for Jinan Yipin, 7.97% for Linshu Dading, and 9.17% for Sunny. *See* Remand Results at 19.

rate and surrogate financial ratios.

Each of the parties' individual claims is discussed in turn below. For the reasons detailed there, Ziyang's Motion for Judgment on the Agency Record is denied. On the other hand, the Motions for Judgment on the Agency Record by FHTK, Dong Yun and the GDLSK Plaintiffs are granted in part.

## A.  Adverse Facts Available

Ziyang and FHTK object to Commerce's application of adverse facts available to their growing and harvesting factors of production.[12] Both Ziyang and FHTK claim that their conduct in the administrative review did not warrant Commerce's application of facts available. Further, both parties assert that the additional requirement for the application of an adverse inference – that Commerce find a party failed to cooperate by acting to the best of its ability to comply with a request for information – was not established with substantial evidence and was arbitrarily applied. *See generally* Ziyang Brief at 1-39; Ziyang Reply Brief at 1-15; Ziyang Supplemental Brief at 1-6; FHTK Brief at 13-37; FHTK Reply Brief at 1-15. *But see* Def. Response Brief at 1-59; Def. Rebuttal Brief at 1-3, 7-15; Domestic Producers Response Brief at 1-3, 8-23. As discussed below, however, the objections of Ziyang and FHTK are wide of the mark.

When goods are produced in a non-market economy ("NME") country such as the PRC, Commerce presumes that factors of production are under state control and that home market sales

---

[12]In this case, the growing and harvesting factors of production include, *inter alia*, garlic seed, water, and labor. *See* Preliminary Results, 69 Fed. Reg. at 70,643.

are not reliable indicators of normal value. *See* 19 U.S.C. §§ 1677(18)(A), (C), 1677b.[13]

Accordingly, Commerce calculates normal value by isolating each factor of production in the

production process in the NME country and assigning to it a value from a surrogate market economy

country – in this case, India – using the "best available information." *See* 19 U.S.C. § 1677b(c)(1).

In essence, Commerce creates a "hypothetical" market value to approximate the production

experience in the NME country. *See* Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377-

78 (Fed. Cir. 1999). The statutory factors of production include, but are not limited to, labor, raw

materials, energy and other utilities, and representative capital cost, including depreciation. *See* 19

U.S.C. § 1677b(c)(3). Commerce adds to the total factors of production an estimated amount for

general expenses and profit, plus the cost of containers, coverings, and other expenses. *See* 19

U.S.C. § 1677b(c)(1).

To determine what factors of production are required for the subject merchandise, an

antidumping questionnaire is issued to all respondents, as well as to those exporters and producers

requesting treatment as voluntary respondents. *See* Antidumping Manual, Chap. 4 at 14-15 (Dept.

of Commerce Jan. 22, 1998) ("AD Manual").[14] The antidumping questionnaire is designed to elicit

---

[13]Dumping occurs when goods are imported into the U.S. and sold at a price lower than their "normal value" – *i.e.*, the foreign market value of the subject merchandise. 19 U.S.C. §§ 1673, 1677(34). Normal value is calculated using either the exporting market price (*i.e.*, the price in the "home market" where the goods are produced), or the cost of production of the goods. 19 U.S.C. § 1677b. The difference between the normal value of the goods and the U.S. price is the "dumping margin." 19 U.S.C. § 1677(35). When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin may be imposed to offset the dumping. 19 U.S.C. § 1673(2)(B).

[14]Generally, the antidumping questionnaire consists of five sections, numbered A through E, plus several appendices. AD Manual, Chap. 4 at 2-8. Section A requires respondents to submit

all information necessary to determine whether a respondent is dumping and, if so, to calculate the

dumping margin.  AD Manual, Chap. 6 at 11.

        Where Commerce is unable to obtain all of the necessary information from a respondent,

however, the agency may use "facts available"as a substitute.  19 U.S.C. § 1677e(a);[15] 19 C.F.R. §

_____

general information about their corporate structure and business practices, as well as information
concerning the allegedly dumped goods.  AD Manual, Chap. 4 at 2.  Section B requires respondents
to list sales transactions of the goods in the appropriate foreign market (either the exporting "home
country" market or the third country market), in order to determine the normal value of the goods.
AD Manual, Chap. 4 at 3.  Section C requires respondents to list U.S. sales transactions, for use in
determining the U.S. price against which normal value is compared.  AD Manual, Chap. 4 at 6.
Section D solicits information on the costs of producing the goods.

        In NME cases, such as the instant review, "the respondents are always required to respond
to a specially-tailored version of this section so that [Commerce] can determine the *factors of
production* to which surrogate values are applied."  AD Manual, Chap. 6 at 6-7.  Section E seeks
information about value added in the U.S. to the goods, prior to delivery to unaffiliated U.S.
customers.  AD Manual, Chap. 4 at 7.  Commerce regulations state that for the final results of an
administrative review, a submission of factual information is due no later than "140 days after the
last day of the anniversary month."  19 C.F.R. § 351.301(b)(2).

        [15]Specifically, 19 U.S.C. § 1677e(a) provides:

        (a) In general. If- -

                (1) necessary information is not available on the record, or
                (2) an interested party or any other person- -

                        (A) withholds information that has been requested by the
                        administering authority or the Commission under this title,
                        (B) fails to provide such information by the deadlines for submission
                        of the information or in the form and manner requested, subject to
                        subsections (c)(1) and (e) of section [19 U.S.C. § 1677m],
                        (C) significantly impedes a proceeding under this title, or
                        (D) provides such information but the information cannot be verified
                        as provided in section [19 U.S.C. 1677m(i)], the administering
                        authority and the Commission shall, subject to section [19 U.S.C.
                        1677m(d)], use the facts otherwise available in reaching the

351.308.[16]  Thus, for example, Commerce may use facts available where a respondent withholds

information or fails to provide it on time or in the form requested, or where the information provided

the respondent cannot be verified.  19 U.S.C. § 1677e(a)(2); 19 C.F.R. § 351.308(a).  Moreover,

where a respondent affirmatively "fail[s] to cooperate by not acting to the best of its ability" in

responding to the agency's requests for information, Commerce may resort to "adverse facts

available," by applying an inference that is adverse to that respondent in selecting among the "facts

available."  19 U.S.C. § 1677e(b);[17] 19 C.F.R. § 351.308(a);[18] *See also* AD Manual, Chap. 6 at 14-

_____

applicable determination under this title.

19 U.S.C. § 1677e(a).

[16]19 C.F.R. § 351.308(a) provides that, the "Secretary may make determinations on the basis of the facts available whenever necessary information is not available on the record, an interested party or any other person withholds or fails to provide information requested in a timely manner and in the form required or significantly impedes a proceeding, or the Secretary is unable to verify submitted information."

19 C.F.R. § 351.308(a).

[17]Specifically, 19 U.S.C. § 1677e(b) provides:

(b) Adverse inferences.  If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.  Such adverse inference may include reliance on information derived from –

    (1) the petition,
    (2) a final determination in the investigation under this title,
    (3) any previous review under [19 U.S.C. § 1675] or determination under [19 U.S.C. § 1675b], or
    (4) any other information placed on the record.

16.  When it is warranted, Commerce may use "facts available" or "adverse facts available" as a substitute for all or part of the information required to calculate a respondent's dumping margin. *See* 19 U.S.C. § 1677e; 19 C.F.R. § 351.308.

In the administrative review at issue, Ziyang and FHTK submitted responses to Commerce's standard questionnaire, supplemental questionnaires and requests for information concerning the companies' reported factors of production.[19]  In the Final Results, Commerce applied adverse facts available to both Ziyang's and FHTK's growing and harvesting factors of production, after finding that the two parties "did not provide reliable and whole information and did not act to the best of their ability in reporting factors of production data."  *See* Final Results, 70 Fed. Reg. at 34,084; Decision Memorandum at 59-63.  Commerce concluded:

> . . . [W]ithin the meaning of [19 U.S.C. § 1677e(a)], both FHTK and Ziyang have failed to provide necessary accurate information in response to the Department's questionnaires.  The lack of this necessary data impeded the conduct of the administrative review.  We conclude that the information regarding [factors of production] provided by FHTK and Ziyang is not reliable or usable and that, therefore, the use of facts otherwise available is appropriate.

19 U.S.C. § 1677e(b).

[18]Specifically, "If the Secretary finds that an interested party 'has failed to cooperate by not acting to the best of its ability to comply with a request for information,' the Secretary may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  *See* 19 C.F.R. § 351.308(a).

[19]*See generally* Ziyang Section D Response (Pub. Doc. No. 74); FHTK Section D Response (Pub. Doc. No. 73); Ziyang First Supplemental Questionnaire (Pub. Doc. No. 131); FHTK First Supplemental Questionnaire (Pub. Doc. No. 130); Ziyang Second Supplemental Questionnaire (Pub. Doc. No. 181); FHTK Second Supplemental Questionnaire (Pub. Doc. No. 210); Ziyang Third Supplemental Questionnaire (Pub. Doc. No. 201); Ziyang Third Party Submission (Pub. Doc. No. 255); FHTK Third Party Submission (Pub. Doc. No. 256); Ziyang and FHTK Intermediate Input and Factors of Production Response (Pub. Doc. No. 290).

> . . . [W]ithin the meaning of [19 U.S.C. § 1677e(b)], FHTK and Ziyang failed to cooperate by not acting to the best of their abilities in complying with the Department's requests for information for certain [factors of production] and that the use of [adverse facts available] is appropriate. FHTK and Ziyang's responses to the Department's questions concerning herbicide and polyethylene film (PE) film contained significant omissions, mischaracterizations, and overall lack of clarity.
>
> For the Department to calculate an accurate margin in an NME proceeding, respondents must provide the Department with correct responses to its questionnaires. The Department has no confidence in the reliability of FHTK's and Ziyang's reported growing and harvesting [factors of production]. Despite numerous opportunities to provide factual information or argument to support their reported [factors of production], FHTK and Ziyang did not act to the best of their respective abilities in providing information on the record . . . . Accordingly, we find that the application of an adverse inference is warranted in the selection of facts available.

Decision Memorandum at 61-62.

As a preliminary matter, Ziyang and FHTK assert that Commerce changed its method of valuing factors of production in this review, without justification and without a sufficiently reasoned explanation. *See* Ziyang Brief at 12-15; Ziyang Reply Brief at 1-7; FHTK Brief at 17-20; FHTK Reply Brief at 9-12. Ziyang argues that, in prior reviews of fresh garlic from the PRC, Commerce calculated normal value using a respondent's submitted data concerning factor usage and relied on the verification process to confirm the accuracy of the reported data. *See* Ziyang Brief at 12; Ziyang Reply Brief at 2.[20] According to Ziyang and FHTK, in the current review, Commerce changed its methodology to compare, or "benchmark," individual respondents' factors of production data against

---

[20]*See also* Issues and Decision Memorandum for the New Shipper Review of the Antidumping Duty Order on Fresh Garlic from the PRC: Jinxiang Shanyang Freezing Storage Co., Ltd., and Wangtun Fresh Vegetable Factory, 2004 WL 3524433 (Sept. 30, 2004), at comment 4; Fresh Garlic From the PRC: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews, 69 Fed. Reg. 33,626 (June 16, 2004); Issues and Decision Memorandum for the Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the PRC, 2004 WL 3524395 (June 16, 2004), at comment 8.

the data of other respondents.  *See* Ziyang Brief at 12-15; Ziyang Reply Brief at 3; FHTK Brief at 17-20; FHTK Reply Brief at 6-8.

This argument amounts to a claim that, in reviewing the information provided by one respondent, Commerce cannot consider information provided by other respondents.  But, as the Government properly points out, "Commerce is required [to] consider all significant, relevant information on the record."  *See* Def. Response Brief at 28; 19 U.S.C. § 1675(a).  Moreover, as the Government notes, there was in fact no real change in methodologies:  "[F]ar from a change in practice, Commerce fully reviewed the facts in the administrative record and addressed individual party comments, as is required by 19 U.S.C. § 1675(a)."  *See* Def. Response Brief at 28 (*citing* Decision Memorandum at 59-63).

In the Preliminary Results, Commerce compared all of the Chinese Producers' reported factors of production data to certain guidelines set forth in two Chinese articles, to assess the reliability of the reported data.  *See* Preliminary Results, 69 Fed. Reg. at 70,642.[21]  But, thereafter, Commerce concluded that the specific benchmarks in the Chinese articles were not reliable.  As a result, in the Final Results, Commerce employed a different methodology, analyzing the Chinese Producers' reported factors of production as a whole.  In that process, the data of Ziyang and FHTK stood out as inconsistent with the data reported by other Chinese Producers.  *See* Decision Memorandum at 59-63.

---

[21]*See* "Garlic Production Technology Regulations" and "Environmentally Safe Garlic Production Technology Regulations," included with Memorandum to File re: Research on Chinese Garlic Production and Costs (Nov. 29, 2004); Decision Memorandum at 2 n.4 (*citing* Research on Chinese Garlic Production and Costs (Conf. Doc. No. 69)).

Ziyang and FHTK assert that it is unrealistic to benchmark factors of production, and contend that – because Commerce found the benchmark methodology unreliable in the Preliminary Results  – Commerce's continued use of benchmarking in the Final Results was not supported by record evidence and was inconsistent with Commerce's own statements.  *See* Ziyang Brief at 12-15; Ziyang Reply Brief at 1-7; FHTK Brief at 17-20; FHTK Brief at 17-20; FHTK Reply Brief at 10-11; *see also* Preliminary Results, 69 Fed. Reg. at 70,642.

But Ziyang and FHTK either misunderstand or misrepresent the methodology that Commerce used in reaching the Final Results.  As noted above, in the Final Results, Commerce *did not* rely on the Chinese articles to establish benchmark parameters for factors of production data. Nor did Commerce require data on individual factors of production to fall within certain specified ranges.  Indeed, the Final Results expressly disclaimed benchmarking.  Commerce concluded:

> The record of this particular administrative review does not support the usage of objective benchmarks in this segment of the proceeding.  Thus, we have determined not to rely on the benchmarks used in the Preliminary Results for the final results of this review.

Decision Memorandum at 10-11.  As the Final Results explained, Commerce instead took a "holistic look at the entire growing process – that is, the collective whole of all growing and harvesting [factors of production] in relation to the overall yield – in order to determine whether such data [made] sense, and [were] reliable, for purposes of calculating normal value."  *See* Decision Memorandum at 10; Def. Response Brief at 27.

For purposes of the Final Results, Commerce's analysis thus focused on observed discrepancies in the respondents' reported data as a whole.  Commerce noted, for example, that respondents could achieve the same yield with varying levels of herbicide and labor – that is, more

herbicide to kill weeds would require less labor to pull weeds, and vice versa. *See* Decision Memorandum at 10. Using this holistic approach, Commerce reasonably determined that an explanation was required where a respondent that reported using zero herbicide and extremely low levels of labor achieved the same yields as other respondents using herbicide and average levels of labor. Commerce carefully reviewed the facts on the record, including the other respondents' data as a whole, and made a studied determination that the factors of production data reported by Ziyang and FHTK were not reliable. *See* Def. Response Brief at 28, 51-52; *see also* Decision Memorandum at 17.

Commerce adequately explained the purpose and reasoning behind the methodology employed to analyze the respondents' factors of production, as discussed in greater detail below. *See* Def. Response Brief at 17-18; Domestic Producers  Response Brief at 11; Decision Memorandum at 10-13; *see generally* Ziyang AFA Memorandum (Pub. Doc. No. 357; Conf. Doc. No. 119); FHTK AFA Memorandum (Pub. Doc. No. 357; Conf. Doc. No. 118). The claims of Ziyang and FHTK to the contrary are lacking in merit.

1. Facts Available

Ziyang and FHTK argue that Commerce erred on several grounds in its determination to use facts available to value their growing and harvesting factors of production. *See* 19 U.S.C. §1677e(a). Initially, Ziyang and FHTK rehash their claims that Commerce's use of benchmarking to evaluate  their reported factors of production was arbitrary, and they maintain that any conclusions reached using the methodology were not supported by substantial evidence. Ziyang and FHTK also deny withholding information from Commerce, and insist that they provided data in the

form and manner requested by the agency. Ziyang and FHTK similarly deny that their actions impeded the administrative review, or that they provided unverifiable information. Ziyang argues in the alternative that – if the information submitted *was* deficient or proved to be an impediment – Commerce improperly failed to notifiy Ziyang of that fact.

Ziyang and FHTK maintain that the usage rates for factors of production in garlic cultivation vary for a variety of reasons. They contend that Commerce's conclusion that their reported rates of usage "were not reasonably within a range established by the other respondents' data, some of which was unverified" was not supported by substantial evidence. *See* Ziyang Brief at 15; *see also* FHTK Brief at 18-20. As documented in the Final Results, however, Commerce identified significant discrepancies between the usage rates submitted by Ziyang and FHTK and those of other respondents – discrepancies which Ziyang and FHTK failed to satisfactorily explain, despite repeated opportunities to do so. *See* Decision Memorandum at 3; Def. Response Brief at 23. Ziyang's and FHTK's arguments to the contrary are baseless.

In the review at issue, Ziyang and FHTK reported no use of herbicides or pesticides, claiming that plastic polyethylene ("PE") film was sufficient to prevent weeds. But Commerce noted that "all nine respondents use [PE] film to cover the ground during the production process and yet many other companies still applied herbicides and pesticides." *See* Def. Response Brief at 21; *see also* Modification of Factors of Production Memorandum (Conf. Doc. No. 79), at 5. Thus, as the Government points out, Commerce reasonably determined that "it did not seem credible, given that all nine respondents reported using the same type of [PE] film, that Ziyang would not use herbicides or pesticides." *See* Def. Response Brief at 21.

Moreover, Commerce's determination that Ziyang's factors of production were unreliable was not based solely on Ziyang's failure to report the use of herbicide-impregnated PE film. Commerce also analyzed Ziyang's high overall garlic yield in comparison to the company's relatively low usage rates for various factors of production, including, *inter alia*, seed, water, and labor. *See* Def. Response Brief at 24-27; Ziyang AFA Memorandum (Pub. Doc. No. 357), at 11. For example, Commerce observed that Ziyang's and FHTK's claimed water consumption was considerably lower than that of other respondents with farms less than 42 kilometers away. *See* Def. Response Brief at 21; Preliminary China Cost Memorandum (Conf. Doc. No. 69), Exh. 3.[22] Indeed, the Government points out that Dr. Voss (retained by FHTK and Ziyang as a garlic expert) stated that "FHTK's reported water rate was 'very little' and, although it was 'possible' to use such little water, 'it would probably take rare circumstances.'" Def. Response Brief at 44 (*quoting* FHTK Third Party Submission (Conf. Doc. No. 85), Exh. 22; FHTK AFA Memorandum (Pub. Doc. No. 356), at 7.

Both Ziyang and FHTK had the opportunity to explain the discrepancies in their reported data. After issuing its initial antidumping questionnaire, Commerce sent several supplemental questionnaires and also a request for third party independent data to Ziyang and FHTK. Decision Memorandum at 60-61. However, Ziyang's and FHTK's submissions did not directly respond to Commerce's request to explain the factors of production information, nor did the submissions

---

[22]In fact, Ziyang's own expert, "Dr. Ronald Voss, 'could not ascertain a reasonable explanation for the reasons why Ziyang's water usage differed dramatically from other respondents whose farms were located less than 42 [kilometers] away.'" Def. Response Brief at 25 (*quoting* Ziyang AFA Memorandum (Pub. Doc. No. 357), at 6-7); *see also* Def. Response Brief at 26, n.3.

explain Ziyang's and FHTK's reported factor input levels or the relationship of the reported factor

inputs to the reported yield. *See* Ziyang AFA Memorandum (Pub. Doc. No. 357), at 5; FHTK AFA

Memorandum (Pub. Doc. No. 356), at 5. Thus, as Ziyang and FHTK "failed to answer Commerce's

concerns about the basic reliability of their [factors of production] data," Commerce's determination

that the reported factors of production data was unreliable is sustained. *See* Domestic Producers

Response Brief at 19.

Ziyang and FHTK also claim that they did not withhold information from Commerce in the

administrative review, pursuant to 19 U.S.C. § 1677e(a)(1)(A). Ziyang asserts that if Commerce

was lacking information, Commerce had the affirmative duty under 19 U.S.C. § 1677m(d) to inform

Ziyang of that fact.[23] At issue is Ziyang's disclosure that it used herbicide laced PE film as a factor

---

[23]Specifically, 19 U.S.C. § 1677m(d) provides:

(d) Deficient submissions

> If the administering authority or the Commission determines that a response
> to a request for information under this subtitle does not comply with the
> request, the administering authority or the Commission (as the case may be)
> shall promptly inform the person submitting the response of the nature of the
> deficiency and shall, to the extent practicable, provide that person with an
> opportunity to remedy or explain the deficiency in light of the time limits
> established for the completion of investigation or reviews under this subtitle.
> If that person submits further information in response to such deficiency and
> either–
>
>> (1) the administering authority or the Commission (as the case may
>> be) finds that such response is not satisfactory, or
>> (2) such response is not submitted within the applicable time limits,
>> then the administering authority or the Commission (as the case may
>> be) may, subject to subsection (e) of this section, disregard all or part
>> of the original and subsequent responses.

of production, after repeatedly denying that any herbicide was used, and the contradictory responses

to herbicide use submitted by FHTK.[24]  In the initial questionnaire, Commerce instructed Ziyang to

report all the factors of production used in the cultivation of garlic.  Ziyang reported that no

herbicide was used.  After finally disclosing the use of herbicide after the Preliminary Results were

already issued, Ziyang attempted to justify its misrepresentation by stating that herbicide

impregnated plastic film is not specifically identified on the questionnaire as a factor of production

and therefore Ziyang was not at fault for not reporting.  *See* Ziyang Brief at 17-19; Ziyang Reply

Brief at 7-9.  Ziyang insists that it answered the questionnaires in the form and manner requested

by Commerce, which treated herbicide and PE film as separate factors of production.  Ziyang Brief

at 17-18; *see* Commerce Questionnaire (Pub. Doc. No. 26), at App. V7, V9-V17.  Ziyang argues

that, "Defendant and [the Domestic Producers] refuse to acknowledge that [Commerce's]

questionnaire defined 'herbicide' and 'plastic cover' as distinct [factors of production]."  Ziyang

Reply Brief at 8.  Furthermore, "[a]lthough Ziyang used plastic film that contained herbicide

blended into the film, Ziyang reasonably recorded this item as 'plastic cover' in [Commerce's]

worksheet, because that was the most fitting categorization."  Ziyang Brief at 18; Ziyang Reply Brief

at 8; Ziyang Section D Response (Pub. Doc. No. 94; Conf. Doc. No. 8), Exh. 7.

    But, as the Government points out, it is the respondent's obligation to provide truthful and

accurate information.  Def. Response Brief at 30 (*citing* Gourmet Equip. Corp. v. United States, 24

_____

19 U.S.C. § 1677m(d).

    [24]FHTK continues to deny that it used any herbicide as part of its garlic growing processes.
FHTK Brief at 14-17; FHTK Reply Brief at 5.

CIT 572, 574 (2000); <u>Kaiyuan Group v. United States</u>, 28 CIT 698, 720, 343 F. Supp. 2d 1289, 1310 (2004); <u>Firth Rixon Special Steels Ltd. v. United States</u>, 27 CIT 873, 883-84 (2003); <u>Atlantic Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1560 (Fed. Cir. 1994); <u>Gulf States v. United States</u>, 21 CIT 1013, 1040, 981 F. Supp. 630, 653 (1997)).  Respondents must identify the factors of production for the particular merchandise – in a timely manner and without mischaracterization – so that Commerce can select appropriate surrogate values and calculate accurate dumping margins.  *See* Def. Response Brief at 29-31.  Commerce's questionnaire called for a "complete and detailed narrative response[]" to the factors of production used in growing garlic, which Ziyang failed to provide.  Def. Response Brief at 19; *see also* Commerce Questionnaire (Pub. Doc. No. 26), at 19.  And, as the Domestic Producers emphasize, even Ziyang's eventual disclosure that it used herbicide PE film was confusing, because Ziyang notified Commerce "that it used herbicide laced plastic film – in four short sentences – within a 600 page document, and devoted an additional four pages more of non-chemical approaches to weed control."  *See* Domestic Producers Response Brief at 17;  Ziyang AFA Memorandum (Pub. Doc. No. 357), at 10.  In essence, Ziyang proposes that using herbicide film does not qualify as a use of herbicide.  *See* Domestic Producers Response Brief at 17-18, Ziyang AFA Memorandum (Pub. Doc. No. 357), at 10.  This argument has no merit.  Because Ziyang was obligated to report the use of herbicide and failed to do so in a non-obfuscating and timely manner, Commerce's conclusion that Ziyang withheld information was reasonable.  Def. Response Brief at 24; Decision Memorandum at 60-62.

In a last attempt to justify the failure to report herbicide PE film to Commerce, Ziyang argues that it did not fail to provide information to Commerce under 19 U.S.C. § 1677e(a)(2)(B), because

Commerce, through the wording of the questionnaires, failed to communicate the question it wanted answered and thus never gave Ziyang a chance to respond. *See* Ziyang Brief at 21; Ziyang Reply Brief at 7-8; *see* 19 U.S.C. § 1677e(a)(2)(B). Ziyang states that, "[u]nder 19 U.S.C. § 1677m(d), [Commerce] must give respondents an opportunity to remedy or to explain deficiencies in their submissions prior to resorting to facts available in a final determination." Ziyang Brief at 21-22 (*citing* SKF USA Inc. v. United States, 29 CIT 969, 979-980, 391 F. Supp. 2d 1327, 1336-37 (2005); Citic Trading Co. Ltd. v. United States, 27 CIT 356, 370-71 (2003)); Ziyang Reply Brief at 9. Ziyang claims that instead of being informed about the deficiency, Commerce "kept silent, and left the false impression that it would continue to value plastic film using the method from prior reviews." Ziyang Brief at 22. However, as the Government persuasively argues, there was no way Commerce could know about Ziyang's use of herbicide film unless Ziyang reported it, which Ziyang failed to do in the three questionnaires issued by Commerce. Def. Response Brief at 29-30. Until "Ziyang placed Exh. 27 of its 600 page third-party submission on the record, after the Preliminary Results were issued, and after all questionnaire responses had been filed with Commerce, there was no evidence that Ziyang, or any company, used a product like polyethylene film laced with herbicide." Def. Response Brief at 30; Ziyang AFA Memorandum (Pub. Doc. No. 357), at 11.

But the Government zeroes in on the flaw in Ziyang's underlying argument – that, "[i]n essence, Ziyang's contention is that although Commerce asked if it used polyethylene film and herbicide, it never specifically asked if it 'used polyethylene film laced with herbicide,' making Commerce at fault for its inaccurate reporting." Def. Response Brief at 29. As stated above, the questionnaire called for a "complete and detailed narrative response . . . " for the factors of

production used in growing garlic – which Ziyang failed to provide when it did not list herbicide PE film as a factor of production. Def. Response Brief at 19; Commerce Questionnaire (Pub. Doc. No. 26), at D2. The Government also notes that Ziyang's suggested surrogate value submission for plastic film was comparable to the values of regular PE film, which provided no indication that Ziyang was using a specialized film. Def. Response Brief at 20; FHTK and Ziyang Surrogate Data Submission (Pub. Doc. No. 154), Exh. 9. Indeed, "Commerce could not have informed Ziyang that information was missing from its harvest of production data when it did not know that the information submitted by Ziyang in the New Shipper Review and its various questionnaire responses was incorrect." Def. Response Brief at 33-34. As the Government points out, "Ziyang was the only party with knowledge of its use of herbicide-laced polyethylene film and it failed to provide that information in a timely or accurate manner." Def. Response Brief at 31. Thus, Commerce's conclusion that Ziyang withheld information was reasonable and based on substantial evidence.

For its part, FHTK argues that "the record contains no evidence that FHTK was dishonest in any of its submissions or that Commerce uncovered any evidence of dishonesty at any point during the proceeding." FHTK Reply Brief at 5.[25] However, like Ziyang, FHTK provided confusing answers to Commerce's inquiries concerning the use of herbicide. *See* FHTK AFA Memorandum (Pub. Doc. No. 356), at 7-10. Despite FHTK's denial that any herbicide was used, and that only regular PE film with additional labor for hand weeding was necessary, Commerce noted that

---

[25]FHTK did reference the use of "weeding film" (a Chinese industry term for herbicide impregnated PE film) in an attachment to its Third Party Submission, a letter from a Chinese garlic production expert that consulted with FHTK. FHTK AFA Memorandum (Pub. Doc. No. 356), at 9, nn. 8-9.

FHTK's labor rates were less than that reported by respondents that *did* use herbicides. FHTK AFA Memorandum (Pub. Doc. No. 356), 8-11 (emphasis added). Furthermore, FHTK attempted to demonstrate the reliability of its reported factors of production by providing information to Commerce about herbicide laced PE film as an alternative to regular herbicide use – but simultaneously assert that such a description is not a "veiled admission" of herbicide use. *See* FHTK Brief at 17.

But FHTK's argument misses the point. Commerce reasonably determined that FHTK's reported factors of production were unreliable because FHTK did not provide an adequate answer to Commerce's inquiry about FHTK's herbicide use, providing only generalized non-specific answers and suggested alternatives to herbicide use that did not address FHTK's actual methods or Commerce's concerns about reliability. *See* FHTK AFA Memorandum (Pub. Doc. No. 356), at 11.

FHTK claims the fact that their "yield is different from the yields reported by other respondents does not constitute a valid basis upon which to reject FHTK's [factors of production] data." FHTK Brief at 22. However, Commerce did not deny the fact that yields vary; rather, Commerce focused on the interplay of various factors of production and questioned how FHTK achieved such a high yield despite the low or extremely low inputs of raw materials. *See* FHTK AFA Memorandum (Pub. Doc. No. 356), at 6. Because FHTK responded to Commerce's request for information concerning yields with a "broad discussion," containing "little, if any, information specific to the conditions at FHTK," which "did little to explain how FHTK's reported yield was impacted by factor input levels," Commerce reasonably determined that FHTK's factors of production could not be relied upon for the calculation of normal value. FHTK AFA Memorandum

at 6.

Ziyang next contends that, even if its submissions were flawed, Commerce's resort to facts available violated 19 U.S.C. § 1677m(e), which requires the consideration of imperfect information if certain criteria are met.[26]  Ziyang Brief at 22 (*citing* Borden Inc. v. United States, 22 CIT 233, 262-63, 4 F. Supp. 2d 1221, 1246 (1998); Ziyang Reply Brief at 10.  Ziyang claims that it met the requirements prescribed by 19 U.S.C. § 1677m(e).  But, as stated above, Ziyang failed to list herbicide PE film in the initial questionnaire issued by Commerce, and in subsequent questionnaires, Ziyang continued to deny the use of herbicide in its garlic cultivation.  Only after the time period for reporting factors of production data closed and the Preliminary Results were published, did Ziyang disclose the use of the herbicide film.  As Commerce correctly determined, Ziyang's specific response was not placed on the record by the deadlines set forth by the agency to allow for surrogate value submissions and comments.

Ziyang and FHTK also challenge Commerce's analysis relevant to the second criterion of

---

[26]Specifically, 19 U.S.C. § 1677m(e) provides that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by Commerce, if:

(1) the information is submitted by the deadline established for its submission,
(2) the information can be verified,
(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

§ 1677m(e), that information must be verifiable. Ziyang Brief at 16, 22-23; FHTK Brief at 33-37;

FHTK Reply Brief at 12. Ziyang notes that Commerce previously verified Ziyang's factors of

production rates in the semi-contemporaneous New Shipper Review.[27] Ziyang Brief at 16, 22-23.

Ziyang asserts that Commerce's conclusion in the current administrative review, that the reported

factors of production could not have been verified, "is impossible to accept." *See* Ziyang Brief at

23; *see also* Ziyang Brief at 16 (stating the verification from the New Shipper Review was firm

evidence of the accuracy of Ziyang's factors of production data (*citing* Mitsubishi Materials Corp.

v. United States, 17 CIT 301, 319, 820 F. Supp. 608, 624 (1993))). However, Commerce did not

ignore contrary evidence as Ziyang contends. In fact, Commerce "recognize[d] that Ziyang

requested verification on several occasions," but noted that "[v]erification is not an exercise in

clarifying or reconciling contradictory, unclear, or mischaracterized information provided by a

respondent," and "[t]aken in their entirety over the course of the proceeding, . . . we believe the on-

site verification of Ziyang's response could not have resolved the discrepancies." *See* Ziyang AFA

Memorandum (Pub. Doc. No. 357), at 15-16; Def. Response Brief at 32*; see also* FHTK AFA

Memorandum (Pub. Doc. No. 356), at 15. The Government explains that verification of Ziyang's

books and records would "not necessarily indicate . . . that Ziyang's [factors of production] were

accurate," which was the central cause of concern for Commerce. *See* Def. Response Brief at 31-32.

Furthermore, unless a domestic party makes a request for verification, a verification has not been

---

[27]The period of review for the New Shipper Review covered November 1, 2002 through April 30, 2003, overlapping with the instant administrative review (which covered November 1, 2002 through October 31, 2003). Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty New Shipper Reviews, 69 Fed. Reg. 46,498 (Aug. 3, 2004).

performed in the two prior reviews or Commerce determines good cause exists, verification is not required in an administrative review.[28] 19 U.S.C. § 1677m(i); *see also* Domestic Producers Response Brief at 21.

While Commerce accepted Ziyang's factors of production in the New Shipper Review, Commerce "did not have the opportunity in the new shipper review to compare Ziyang's reported factors of production with several other respondents, as it did in this review." Def. Response Brief at 31. It was the Commerce's comparison of data submitted from all respondents that sent up red flags concerning Ziyang's (and FHTK's) relatively high garlic yield – produced from unusually low growing and harvesting factors of production. Furthermore, the Government points out that, "the very fact that Commerce *did* verify Ziyang's books and records in the new shipper review, and did not discover, or even suspect, that Ziyang used a specialized herbicide-impregnated film, undermines this argument." Def. Response Brief at 31-32. Commerce's determination not to verify Ziyang and FHTK was reasonable given the record evidence in this review, and Commerce has

---

[28]Specifically, 19 U.S.C. § 1677m(i) provides that Commerce shall verify all information relied upon in making:

(1) a final determination in an investigation,
(2) a revocation under section 1675(d) of this title, and
(3) a final determination in a review under section 1675(a) of this title, if–

(A) verification is timely requested by an interested party as defined in section 1677(9)(C), (D), (E), (F), or (G) of this title, and
(B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

19 U.S.C. § 1677m(i).

provided a sufficient explanation of the rationale behind that decision.

Ziyang next asserts that the information submitted was not so confusing or unreliable, so as to violate the third criterion of § 1677m(e) – that submitted information not be so incomplete that it cannot be used as a reliable basis for reaching the applicable determination. However, as stated *supra*, Commerce explained that the low factors of production usage rates submitted by Ziyang were questionable because of Ziyang's high yield. Then, only after Ziyang could not explain how the yield was achieved, and later disclosed the use of herbicide PE film, did Commerce determine Ziyang's factors of production were unreliable. Therefore, because Ziyang's reported factors of production data was unreliable as a basis to determine the dumping margin, Ziyang failed to satisfy the third criterion.

Ziyang also contends that it "did its best to report information related to plastic film and herbicide in the form and manner requested by [Commerce]," fulfilling the fourth provision of § 1677m(e) to act to the best of its ability in providing information. Ziyang Brief at 24. However, as discussed above, Commerce found that Ziyang "failed to report all its factors and provided seemingly unreasonable data and contradictory statements throughout the proceeding." Ziyang AFA Memorandum (Pub. Doc. No. 357), at 16. Further, when asked to provide an explanation for the high yield despite low factors of production usage rates, Ziyang provided "explanations [that] were wholly confusing and often irrelevant, submitting hundreds of pages to the record that did not speak to the primary purpose of [Commerce's] requests to explain yield and factors input levels in the context of Ziyang's production." Ziyang AFA Memorandum (Pub. Doc. No. 357), at 16. Ziyang contends that Commerce "simply failed to communicate its confusion to Ziyang" regarding the

herbicide PE film – and that Commerce cannot blame Ziyang for its confusion. Ziyang Brief at 24. But, one is hard pressed to find any ambiguity in the instructions for completing Commerce's factors of production questionnaire, which state, "If you have questions regarding how to compute the factors of the subject merchandise, please contact [Commerce] . . . . [P]rovide complete and detailed narrative responses . . . . Provide a detailed description of the production process utilized for the production of the subject merchandise . . . . If you are unable to complete any part of the worksheet, please explain in detail why you are unable to do so." Commerce Questionnaire (Pub. Doc. No. 26), at D1-D2; Ziyang Section C and D Questionnaire Responses (Conf. Doc. No. 8), at D17; *see also* Domestic Producers Response Brief at 17-19.

For the last criterion of § 1677m(e), Ziyang disputes Commerce's claim that it could not use the submitted information on factors of production without undue difficulties. Ziyang charges that Commerce found Ziyang's factors of production data to be invalid based on a faulty comparison to other respondents' data, despite the fact that some of Ziyang's data had been previously verified in the New Shipper Review. *See* Ziyang Brief at 25. But again, Ziyang's arguments lack merit. Commerce "operates under statutory deadlines by which it must publish its findings, analyses and calculations," and Commerce "could not continue to grant additional opportunities to Ziyang to continually update and modify information – without undue difficulties to [Commerce] and its ability to conduct a meaningful thorough analysis." Ziyang AFA Memorandum (Pub. Doc. No. 357), at 16. The unreliable information submitted by Ziyang could not have been used without undue difficulties – in fact, it could not have been used at all.

Ziyang also contests Commerce's conclusion that Ziyang obstructed the conduct of the

administrative review under 19 U.S.C. § 1677e(a)(2)(C). *See* Ziyang Brief at 20; Ziyang Reply Brief at 9. Ziyang mistakenly contends that, "[i]f Commerce wanted to obtain a specific surrogate value for herbicide treated plastic film, the record contains no support for Commerce's claim that Ziyang impeded its ability to do so, because Ziyang reported its use of this plastic film at the first opportunity." Ziyang Brief at 20. As the Government underscores, Commerce had insufficient time to value herbicide PE film because of the delay in learning that Ziyang used that product – a delay actually caused by Ziyang through the confusing manner in which it reported the use of herbicide PE film. In Ziyang's Third Party Submission, where Ziyang claims that it reported the use of herbicide PE film, Ziyang supplied several conflicting statements. Ziyang devoted four pages of the submission to herbicide alternatives, consistent with Ziyang's prior submissions stating that no herbicide was used. Ziyang also stated that "research indicates that it is not necessary to use herbicide or pesticide in garlic production to produce a commercially viable crop," and that "[p]lastic films "provide non-chemical alternatives for control of insects, diseases, and weeds." Ziyang AFA Memorandum (Pub. Doc. No. 357), at 9-10 (*quoting* Ziyang Third Party Submission (Pub. Doc. No. 255), at 13, 15). Then, on page 22 of the 600 plus page document, Commerce noted one sentence stating that, "Ziyang used weeding film during (the) garlic planting period. Exhibit 27 includes information and a manual for weeding film from the producer." Ziyang Third Party Submission (Pub. Doc. No. 255), at 22. This is the extent of Ziyang's *admission* to Commerce that it used herbicide film.

In the Ziyang AFA Memorandum, Commerce stated that it found it misleading that Ziyang would devote four pages to a discussion of alternatives to herbicide or pesticide, followed by four

sentences and an exhibit reference which discreetly acknowledged the use of herbicide impregnated

PE film. *See* Ziyang AFA Memorandum (Pub. Doc. No. 357), at 10. In addition, this "admission"

surfaced more than eleven months after Ziyang's original questionnaire responses were submitted

to Commerce, after the close of the period for reporting factors of production usage levels, and

despite Ziyang's submission of a surrogate value for PE film consistent with non-specialized or

ordinary PE film. Ziyang AFA Memorandum (Pub. Doc. No. 357), at 16; *see also* Def. Response

Brief at 20 (*referencing* FHTK and Ziyang Surrogate Data Submission (Pub. Doc. No. 154), Exh.

9)). By not reporting its use of herbicide until after the close of the time-frame to do so, and burying

that fact within a 600 page document, Ziyang hamstrung Commerce's ability to value a necessary

factor of production. *See* Def. Response Brief at 24. Likewise, Ziyang's argument that Commerce

was required by statute to provide Ziyang the opportunity to present new information about its use

of herbicide PE film – after the period for submitting factors of production data expired and after

repeatedly denying any herbicide was used – is baseless.

Further, in concluding that Ziyang impeded the administrative review, Commerce did not

rely solely on Ziyang's failure to report the use of herbicide PE film. Def. Response Brief at 23-27.

Commerce also questioned Ziyang's factors of production usage rates for seed, water and labor in

relation to the garlic yield Ziyang achieved. Def. Response Brief at 24-25. Commerce gave Ziyang

multiple opportunities to explain how Ziyang's low usage rates for the reported factors of production

produced an above average yield, *i.e.*, the validity of the submitted data, but failed to do so. *See*

Decision Memorandum at 60-61; Def. Response Brief at 33-34. However, instead of cooperating,

as the Domestic Producers point out, "Ziyang chose to swamp the record with confusing and

irrelevant secondary data in an attempt to explain how different farmers' production experience can vary, but without directly addressing their own experience." Domestic Producers Response Brief at 19.

Ziyang did not provide the reliable factors of production data that Commerce needs to calculate accurate dumping margins in NME proceedings. *See* Ziyang AFA Memorandum (Pub. Doc. No. 357), at 16. As a result, Commerce reasonably determined that "Ziyang withheld or did not provide complete and reliable information to [Commerce] pertaining to various [factors of production] in the form and manner requested by [Commerce]. The lack of this necessary data impeded the conduct of the administrative review." Decision Memorandum at 61; *see also* Def. Response Brief at 23-24. For all the preceding reasons, Commerce's determination to apply facts available to Ziyang's and FHTK's growing and harvesting factors of production is sustained.

## 2. Adverse Inferences

Ziyang and FHTK contest Commerce's application of adverse inferences when selecting from among the facts available to value their factors of production. *See* Ziyang Brief at 25-31; Ziyang Reply Brief at 12-15; Ziyang Supplemental Brief at 3-4; FHTK Brief at 29-33; FHTK Reply Brief at 2-9.[29] Both Ziyang and FHTK allege that Commerce's conclusion that neither cooperated to the best of their ability is unsupported by substantial evidence and otherwise contrary to law. *See* Ziyang Brief at 25; Ziyang Reply Brief at 12; Ziyang Supplemental Brief at 3-4; FHTK Brief at 29-30; FHTK Reply Brief at 2-3. Ziyang and FHTK assert that they complied with all of Commerce's

---

[29]Commerce calculated a dumping margin of 12.58% for Ziyang and 15.75% for FHTK. *See* Amended Final Results, 70 Fed. Reg. at 56,640; Remand Results at 19.

requests for information and that some of the requested information was beyond the scope of what a reasonable importer would keep as normal business records, making the request impossible to fulfill. *See* Ziyang Brief at 25-31; Ziyang Reply Brief at 12-15; Ziyang Supplemental Brief at 3-4; FHTK Brief at 29-33; FHTK Reply Brief at 2-9. Ziyang also contends that Commerce's selection of adverse facts is contrary to law. For the reasons that follow, Commerce's determination to apply partial adverse facts to Ziyang and FHTK is sustained.

The application of adverse inferences can only occur after Commerce first determines that the use of facts available are appropriate under 19 U.S.C. § 1677e(a). As explained in section III.A.1 above, Commerce's determination to use facts available to value Ziyang's and FHTK's factors of production is sustained. Consequently, to apply an adverse inference to the facts available, Commerce must make an additional finding that a party has failed to act to the best of its ability when complying with a request for information from Commerce.[30]

Ziyang and FHTK challenge Commerce's finding that they failed to cooperate to the best of their ability with the reporting of factors of production. Both Ziyang and FHTK rely on the standard set forth by the Federal Circuit in Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003). Ziyang Brief at 25-31; Ziyang Reply Brief at 12-15; Ziyang Supplemental Brief at 3; FHTK Reply Brief at 3-4. The Nippon court preliminarily determined that 19 U.S.C. § 1677e(b) does not expressly define "best of its ability." Nippon, 337 F.3d at 1382. However, after analyzing

---

[30]19 U.S.C. § 1677e(a) provides that if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], [Commerce], in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *See* 19 U.S.C. § 1677e(a).

the plain meaning of the phrase, the court stated that under the "best of its ability" standard, a

respondent is required to do the maximum it is able to do. Nippon, 337 F.3d at 1382. Further, the

court held that to draw an adverse inference, Commerce must demonstrate:

> [A]n objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations.
>
> Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

Nippon, 337 F.3d at 1382-83; *see also* Ziyang Brief at 26; Ziyang Reply Brief at 12-13. Ziyang

asserts that Commerce did not make the second, subjective, showing with regard to the reporting

of herbicide PE film – that Commerce did not show Ziyang failed to put forth its maximum efforts

in providing information to Commerce. Ziyang Brief at 26; Ziyang Reply Brief at 14. With regard

to Ziyang's factors of production, Ziyang contends that Commerce failed to meet both the objective

and subjective requirements of the Nippon test. Ziyang Brief at 29-31; Ziyang Reply Brief at 13.

Ziyang unconvincingly argues that Commerce's initial questionnaire instructions

distinguished herbicide and PE film as separate factors of production, justifying Ziyang's failure to

report the use of herbicide PE film and demonstrating that Ziyang gave maximum effort to respond

to Commerce's questionnaire. Ziyang Brief at 27-28. Ziyang stresses that the first supplemental

questionnaire only sought confirmation of the use of PE film and the thickness of the film, which

Ziyang provided. Ziyang states that the second supplemental questionnaire, asking Ziyang to verify

the non-use of herbicide, was answered consistently with the prior questionnaires – that Ziyang did

not use herbicide as a factor of production. Ziyang Brief at 27. However, as discussed in section III.A.1, this argument lacks credibility, as Commerce requested a complete and detailed description of Ziyang's garlic cultivation processes and instructed Ziyang to inquire about any problems encountered while complying with that directive. Further, when asked in the second questionnaire whether it used herbicide, Ziyang unequivocally stated that, "Ziyang confirms that it does not use any herbicide or pesticide in the production of the subject merchandise." *See* Ziyang Second Supplemental Questionnaire (Pub. Doc. No. 193), at 7. Ziyang's subsequent admission that it used herbicide PE film directly contradicts this statement to Commerce. An adverse inference may be drawn "under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made . . ." Nippon, 337 F.3d at 1383. Clearly, Commerce was reasonably entitled to expect Ziyang to report the use of herbicide if herbicide was used. Ziyang's arguments to the contrary are meritless.

Ziyang and FHTK claim that Commerce's request that they explain their factors of production in relation to yield required information beyond the scope of their normal business records. Ziyang Brief at 29-31; Ziyang Reply Brief at 13; Ziyang Supplemental Brief at 3; FHTK Brief at 31-32; FHTK Reply Brief at 11. Both Ziyang and FHTK point out that hundreds of pages of material were placed on the record in response to Commerce's request – but neither Ziyang nor FHTK highlight any specific information in the submissions regarding their specific practices or procedures that resulted in such high yields despite the low factor inputs. Decision Memorandum at 62-63; Ziyang AFA Memorandum (Pub. Doc. No. 357), at 17; FHTK AFA Memorandum (Pub. Doc. No. 356), at 16. Ziyang and FHTK seem to suggest the submission of voluminous amounts

of general non-responsive data is synonymous with the submission of relevant answers specific to

the question asked, which is obviously not the case. *See* NSK Ltd., v. United States, 481 F.3d 1355,

1361 (Fed. Cir. 2007) (finding it reasonable for Commerce to determine that a respondent did not

provide a legitimate attempt to provide a full and complete answer when the response submitted was

unrelated to the question). Further undermining Ziyang's and FHTK's supposition is the fact that

some of the information supplied either contradicted previous responses or was completely

unusable.[31] Ziyang and FHTK, as exporters of goods to the United States, are expected to keep

records of its business operations and procedures for the cultivation of garlic and to apply maximum

efforts to provide Commerce with full and complete answers. *See* Nippon, 337 F.3d at 1382.

Further, as the Federal Circuit stated, while the best of ability "standard does not require perfection

---

[31]The Government emphasizes that Ziyang and FHTK actually provided expert information in their Third Party Submissions which contradicted the veracity of Ziyang's and FHTK's reported factors of production, and both parties also submitted additional information that could not be used. Def. Response Brief at 26, 44; Ziyang AFA Memorandum (Pub. Doc. No. 357), at 11-12; FHTK AFA Memorandum (Pub. Doc. No. 356), at 10-11. To illustrate a contradiction, the Government notes that Ziyang's hired expert stated that garlic cultivation without the use of herbicide was possible, but that it would require an increase in hand weeding – yet Ziyang's labor usage rate was lower than those respondents that did use herbicide. Ziyang AFA Memorandum (Pub. Doc. No. 357), at 11-12.

Additionally, the Government underscores the fact that "Commerce could not rely on many of [the expert's] statements because he: (1) relied upon a dataset that was not placed on the record; (2) admitted all of his experience applied only to California growing and harvesting procedures; and (3) admitted that he had no personal knowledge of Ziyang's own growing or harvesting procedures." Def. Response Brief at 26 n.3 (*citing* Ziyang AFA Memorandum (Pub. Doc. No. 357), at 3-4). Similarly, for FHTK, the Government notes that the hired expert (the same individual employed by Ziyang) utilized a dataset for his analysis that was different than that submitted to Commerce by FHTK, indicated an inability to perform certain analyses because of missing information, and admitted he had little knowledge of FHTK's growing and harvesting experience. *See* Def. Response Brief at 44-45.

and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with rules and regulations that apply to the import activities undertaken." Nippon, 337 F.3d at 1382. Commerce requested specific information about production methods or practices to explain Ziyang's and FHTK's high yields and low factors of production rates. Decision Memorandum at 60-62. Ziyang and FHTK unsuccessfully attempt to recharacterize Commerce's inquiry solely as an investigation of how other respondents operate their garlic farms, but as discussed *supra*, that was not the case.

Ziyang and FHTK also attempt to show that Commerce failed to make the requisite statutory showing that Ziyang and FHTK did not cooperate to the best of their abilities in reporting factors of production information. Ziyang Brief at 29; Ziyang Reply Brief at 13-14; Ziyang Supplemental Brief at 3-4; FHTK Brief at 29-33; FHTK Reply Brief at 8-9. Ziyang and FHTK contend that Commerce cannot demonstrate that Ziyang and FHTK failed to put forth maximum efforts to investigate and obtain the requested information from its records. Ziyang Brief at 30-31; Ziyang Reply Brief at 13-14; Ziyang Supplemental Brief at 3-4; FHTK Brief at 29-33; FHTK Reply Brief at 9-11. Yet, when given the opportunity in the Third Party Submission to assuage Commerce's concerns about the factors of production, Ziyang and FHTK only provided information describing the wide variation of garlic inputs and yields throughout the world, including the United States, which Commerce found convincing for the point that a wide variation of garlic production practices exist internationally – but did not address the specifics of Ziyang's and FHTK's actual production processes. Ziyang AFA Memorandum (Pub. Doc. No. 357), at 5; FHTK AFA Memorandum (Pub. Doc. No. 356), at 5. Contrary to Ziyang's and FHTK's assertions, the information "did not directly

respond to [Commerce's] . . . request to explain the [factors of production] information for respondents and the conditions unique to respondents within the PRC.  Specifically, the information did not explain Ziyang's nor FHTK's reported factors input levels, or their relationship to its reported yield."  Ziyang AFA Memorandum  (Pub. Doc. No. 357), at 5; FHTK AFA Memorandum (Pub. Doc. No. 356), at 5.

The Government emphasizes that Commerce did not reject Ziyang's data because Ziyang did not report information about other respondents' data.  Rather, Commerce found Ziyang's data unreliable because Ziyang did not explain how *it* achieved an above average yield despite having below average factors of production usage rates for seed, water, and labor.  *See* Def. Response Brief at 23-26; Decision Memorandum at 59-63; *see also* section III.A.1, *supra*.  Likewise, FHTK's submissions were non-specific to FHTK and did not explain the above average garlic yield in light of the below average factors of production rates.  Commerce reasonably determined that "FHTK's responses to [Commerce's] questions concerning factors-of-production focused on general variation in production, but provided limited useful information in the context of FHTK's production process."  FHTK AFA Memorandum (Pub. Doc. No. 356), at 16.

Contrary to Ziyang's and FHTK's assertions, Commerce did establish the two requirements to apply adverse facts available, as required under the statute and illustrated in Nippon.  First, Commerce requested company specific information on growing procedures and processes which are the type of information required to be kept by importers under the antidumping laws.  *See* Nippon, 337 F.3d at 1384.  Second, Commerce determined that the Ziyang and FHTK were able, but failed to fully investigate and obtain the requested information from their records.  *See* Nippon, 337 F.3d

at 1384. Commerce reasonably determined that Ziyang's and FHTK's reported factors of production were unreliable, thus Ziyang and FHTK failed to produce requested information within their control that was critical to the calculation of an accurate margin. *See* Decision Memorandum at 62. Both parties had multiple opportunities to provide the requested information and failed to do so in Commerce's determination, justifying the use of adverse inferences. Decision Memorandum at 62-63; *see* NSK Ltd., v. United States, 481 F.3d 1355, 1359 (Fed. Cir. 2007) (finding that respondent's failure to provide usable data or explain why the data was not inaccurate or distortive, despite two requests, justified Commerce's conclusion that respondent had not acted to the best of its ability to comply with Commerce's request).

Next, Ziyang contests Commerce's selection of adverse facts as being unsupported by substantial evidence and contrary to law. Ziyang Brief at 31-33; Ziyang Reply Brief at 15; Ziyang Supplemental Brief at 4. Ziyang claims that Commerce's selection of adverse facts bore no rational relationship to Ziyang's actual rates. Ziyang Brief at 31; Ziyang Reply Brief at 15; Ziyang Supplemental Brief at 4. However, Ziyang's argument fails because Commerce did not abuse its discretion in selecting which adverse facts to apply and reasonably selected only those adverse facts related to the factors of production that Commerce found unreliable.

The selection of adverse facts is governed by 19 U.S.C. § 1677e(b), which states that after concluding an adverse inference is warranted, Commerce may select adverse facts from "(1) the petition, (2) a final determination in the investigation under this title, (3) any previous review under 19 U.S.C. § 1675 or determination under 19 U.S.C. § 1675b or (4) any other information placed on the record." *See* 19 U.S.C. § 1677e(b). When applying an adverse inference to the facts available,

Commerce "must select non-aberrant facts rationally related to what they are used to calculate." Ziyang Brief at 31 (*quoting* Polyethylene Retail Carrier Bag Committee v. United States, 29 CIT 1418, 1424 (1996)). The Federal Circuit has stated that "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." Ziyang Brief at 31 (*quoting* F.lli De Cecco, 216 F.3d at 1032. The adverse facts available rate is thus intended "to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F.lli De Cecco, 216 F.3d at 1032.

In this case, as Commerce found Ziyang's and FHTK's reported data on seed, fertilizer, plastic film, herbicide, water and labor to be unreliable, Commerce assigned the highest usage rates for these factors of production from among the respondents to Ziyang and FHTK. Decision Memorandum at 62-63. The Government underscores that Commerce applied "facts available only to Ziyang's [and FHTK's] harvest factors of production – and only to those harvest factors of production that were used by Ziyang [and FHTK] (*i.e.*, not pesticides)." Def. Response Brief at 35. Ziyang complains that Commerce did not explain how these adverse facts were rationally related to Ziyang's usage rates,  however, Commerce stated that the rates were chosen to "address satisfactorily their insufficient and/or confusing submissions and provide for a result that 'would not benefit [these companies] from [their] lack of cooperation.'" Decision Memorandum at 62 (*quoting* NSK Ltd. v. United States, 25 CIT 583, 618, 170 F. Supp. 2d 1280, 1312 (2001). As the Federal Circuit notes, "Commerce is in the best position, based on its expert knowledge of the market and the individuals respondent, to select adverse facts that will create the proper deterrent to non-

cooperation with its investigations and assure a reasonable margin." F.lli De Cecco, 216 F.3d at 1032. Furthermore, Commerce did rely on Ziyang's and FHTK's reported sales data and corporate structure information for the calculation of normal value and only applied partial adverse facts to the specific factors of production Commerce found unreliable, because "[t]he Courts have expressed a preference for [Commerce] to use partial adverse facts available if [Commerce] believes the respondent has only failed to comply in one respect." Decision Memorandum at 63.

Ziyang cites several cases for the proposition that adverse facts should only be chosen to create a proper deterrent and determine dumping margins accurately, but without doing so punitively. Ziyang Supplemental Brief at 4 (*citing* Jinan Yipin Corporation, Ltd. v. United States, 31 CIT ___, ___, 526 F. Supp. 2d 1347, 1366 (2007); China Kingdom Import & Export Co., Ltd. v. United States, 31 CIT ___, ___, ___, 507 F. Supp. 2d 1337, 1361-62, 1364 (2007); Gerber Food (Yunnan) Co., Ltd. v. United States, 31 CIT ___, ___, 491 F. Supp. 2d 1326, 1348 (2007)). But the cases cited by Ziyang are distinguishable or present different factual scenarios. In Jinan Yipin, the court determined Commerce's use of available facts was in error, negating the applicability of adverse facts entirely; similarly in China Kingdom, the court held that Commerce's use of available facts was unwarranted and Commerce's selection of total adverse facts, despite having reliable information available, was contrary to law; and in Gerber Food, the issue was Commerce's use of the China-wide rate (*i.e.*, total adverse facts) to a company determined not to be under government control. *See* Jinan Yipin, 31 CIT at ____, 526 F. Supp. 2d at 1361; China Kingdom, 31 CIT at ___, 507 F. Supp. 2d at 1361-62; Gerber Food, 31 CIT at ___, 491 F. Supp. 2d at 1348-53.

Commerce stated the reasoning behind its selection of adverse facts – the rates chosen were

the highest rates reported from the nine respondents for the specific factors in the current administrative review – and Commerce only selected rates for the factors reported by Ziyang and FHTK that Commerce found to be unreliable. Decision Memorandum at 63. The Federal Circuit has held that "we are convinced that is within Commerce's discretion to choose which sources and facts it will rely on to support an adverse inference when a respondent has been shown to be uncooperative." F.lli De Cecco, 216 F.3d at 1032. Ziyang has presented no evidence that Commerce abused this discretion. Contrary to Ziyang's claim, Commerce reasonably calculated a dumping margin only using adverse facts for the unreliable factors of production, and selected the adverse facts from the record compiled in this review.

Ziyang mounts a last ditch attack on Commerce, alleging biased and arbitrary actions. *See* Ziyang Brief at 33-39. Ziyang asserts that Commerce refused to consider relevant documents and actively or passively stifled Ziyang's attempts to provide accurate timely information. Ziyang Brief at 33-39. Ziyang's assertions are meritless. The Government must be presumed to have acted in good faith. *See*, *e.g.*, Clemmons v. West, 206 F.3d 1401, 1403-04 (Fed. Cir. 2000) (*citing* Sanders v. United States Postal Serv., 801 F.2d 1328, 1331 (Fed. Cir. 1986)). To overcome that presumption, the proof must be "almost irrefragable." Clemmons v. West, 206 F.3d at 1403-04; *see also* Galen Medical Assoc., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). But, Ziyang has not presented any evidence to substantiate its assertions of bias on the part of Commerce. As the Federal Circuit has stated, "[u]nsubstantiated suspicions and allegations are not enough." Spezzaferro v. Federal Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986). In Ziyang's Motion for Leave to Supplement the Administrative Record, Ziyang alleges that Commerce "impermissibly

excluded from the administrative record" several documents that supported the reliability of Ziyang's reported information. *See* Motion for Leave to Supplement the Administrative Record Before the Court. The Government points out that Commerce rejected the documents "in accordance with its regulations and longstanding practice," because the submissions were "untimely and unsolicited during the administrative review." *See* Defendant's Response to Plaintiff's Motion for Leave to Supplement the Administrative Record Before the Court. Ziyang's Motion to Supplement was granted in part to determine whether Commerce's decision to exclude Ziyang's submissions was proper, stating that "because, as even Defendant concedes, agency decisions to exclude information from the administrative record must be judicially reviewable." *See* Order Granting in Part and Denying in Part Ziyang's Motion for Leave to Supplement the Administrative Record (*citing* Defendant's Surreply to Plaintiff's Motion to Supplement the Administrative Record Before the Court); *see also* Recording of Oral Argument at 1:59:30 (Feb. 2, 2007). Thus, the narrow issue presented is whether Commerce impermissibly rejected Ziyang's submissions as untimely filed or unsolicited material. As Commerce's actions were proper and in accordance with law, Ziyang's Motion to Supplement must be denied.

Commerce's regulations provide deadlines for the submission of factual information. Specifically, "[f]or the final results of an administrative review . . . a submission of factual information is due no later than . . . 140 days after the last day of the anniversary month." *See* 19 C.F.R. § 351.301(b)(2). However, the agency may afford additional opportunities for parties to respond on the record, by identifying time limits for responses, the specific information requested, and the manner in which the party must submit the information. *See* 19 C.F.R. § 351.301(c)(2). In

this case, the undisputed deadline for the submission of factual information was January 6, 2005.

On March 22, 2005, Commerce requested comments on certain factual information already on the

record of this review. *See* Letter To All Interested Parties (March 22, 2005) (Pub. Doc. No. 289)

at 2. Commerce stated that "[n]o new factual information will be accepted" and comments are

requested only on "the use of the intermediate-product methodology applied in the Preliminary

Results; and . . . the relative impact on yield from the factors of production . . ." *Id*.

A thorough review of the three documents at issue from Ziyang reveals the submission of

either written argument not requested by Commerce or new factual information provided after the

March 22, 2005 deadline. *See* Letter from White & Case to Dep't of Commerce (April 7, 2005),

Letter from White & Case to Dep't of Commerce (April 14, 2005), Letter from White & Case to

Dep't of Commerce (April 18, 2005) (Confidential Appendix II Accompanying Memorandum of

Points and Authorities in Support of Plaintiff Taian Ziyang Food Company, Ltd.'s CIT Rule 56.2

Motion for Judgment Upon the Agency Record), at Tab 1-3.

Ziyang asserts that written argument may be submitted at any time prior to the issuance of

the Final Results. *See* Ziyang's Sur-Reply to Defendant's Response to Ziyang's Motion for Leave

to Supplement the Administrative Record Before the Court, at 8-9. Ziyang selectively cites the first

sentence of 19 C.F.R. § 351.309(a), stating that "[w]ritten argument may be submitted during the

course of an antidumping or countervailing duty proceeding." 19 C.F.R. § 351.309(a). But the

following sentence, and indeed the rest of the regulation, outlines the procedures for filing *case

briefs* and *rebuttal briefs*: "[t]his section sets forth the time limits for submission of case and rebuttal

briefs and provides guidance on what should be contained in these documents . . . the Secretary will

consider written arguments in case or rebuttal briefs filed within the time limits in this section."
19 C.F.R. §§ 351.309(a), (b). Ziyang also contests Commerce's rejection of the April 14, 2005
submission on the grounds that there was no new information in the letter. *See* Ziyang's Sur-Reply
to Defendant's Response to Ziyang's Motion for Leave to Supplement the Administrative Record
Before the Court, at 10-11. However, there was new information in the submission, because the
letter "summarized key aspects of [a] meeting" which occurred one week earlier, and the letter was
submitted before Commerce placed its statutorily mandated *ex parte* meeting memorandum on the
record. *See* Meeting with Taian Ziyang Food Co., Ltd. and Pure Produce, LLC. (May 5, 2005) (Pub.
Doc. No. 323); *see also* 19 U.S.C. § 1677f(a)(3). As Ziyang's submissions to Commerce contained
either unsolicited material or untimely factual information, Commerce's rejection of the submissions
was reasonable.

For these reasons, Commerce's determination to apply adverse facts available to Ziyang's
and FHTK's factors of production was adequately justified, and must be sustained.

### B. Valuation of Garlic Seed

FHTK and the GDLSK Plaintiffs maintain that Commerce improperly valued respondents'
garlic seed input. FHTK and the GDLSK Plaintiffs contend that Commerce erred by using pricing
data taken from India's National Horticultural Research and Development Foundation ("NHRDF")
for three "high-yield" garlic varieties grown in India, when it should have used data placed on the
record by the respondents during the administrative review.[32] Two of the GDLSK Plaintiffs

---

[32]Specifically either the country-wide data from the Agricultural Marketing Information
Network ("Agmarknet") submitted by FHTK, or the Indian import data covering Indian garlic

(Harmoni and Jinan Yipin) also claim that Commerce improperly assigned a surrogate value for purchased garlic seed when they actually grew their own seed.[33] *See generally* GDLSK Brief at 24-28; GDLSK Supplemental Brief at 5-6; GDLSK Supplemental Response Brief at 10-11; FHTK Brief at 37-41; FHTK Reply Brief at 13-15. *But see* Def. Response Brief at 69-78; Def. Supplemental Brief at 18-25; Domestic Producer Response Brief at 32-36; Domestic Producer Rebuttal Brief. For the reasons that follow, Commerce's determination on this issue must be remanded.

As summarized above, in NME cases, Commerce must construct a surrogate value for each factor of production, basing those values on "the best available information" from an appropriate market economy country or countries – in this case, India. *See* 19 U.S.C. § 1677b(c)(1). Because the statute does not define "best available information," Commerce is granted broad discretion to determine such information "in a reasonable manner on a case-by-case basis." *See* Rhodia, Inc. v. United States, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001). However, Commerce's discretion is "curtailed by the purpose of the statute, *i.e.*, to construct the product's normal value as it would have been if the NME country were a market economy country." Rhodia, 25 CIT at 1286, 185 F. Supp. 2d at 1351 (*citing* Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999)).

In the instant case, Commerce initially valued the respondents' garlic seed using the average price of three "high-yield" varieties of garlic taken from the NHRDF pricing information. *See*

---

imports during the period of review submitted by the GDLSK Plaintiffs. *See* GDLSK Brief at 24; FHTK Brief at 40.

[33]The Government requests a voluntary remand on this issue. *See* Def. Response Brief at 69-71.

Decision Memorandum at 19; Preliminary Results at 69 Fed. Reg. at 70,643; *see also* Preliminary

Factors Valuation Memorandum (Pub. Doc. No. 226), at 2-3.[34] Commerce found that the physical

characteristics of the three varieties (*i.e.*, their bulb size and the number of cloves per bulb) closely

matched the characteristics of the respondents' garlic. *See* Decision Memorandum at 19;

Preliminary Factors Valuation Memorandum (Pub. Doc. No. 226), at 2. After the Preliminary

Results issued, the respondents submitted other data for Commerce's consideration – specifically,

data from the Agricultural Marketing Information Network ("Agmarknet"), and Indian import

statistics. *See* Decision Memorandum at 14-16. In addition, some respondents urged Commerce

to value their garlic seed using their reported factors of production, because they grew their garlic

using self-produced garlic seed (*i.e.*, seed retained from prior harvests). See Decision Memorandum

at 16.

In the Final Results, Commerce once again valued garlic seed using the NHRDF data. *See*

Decision Memorandum at 19. Commerce found that the respondents grew and exported to the U.S.

a "high-quality and high-yield garlic, while the garlic grown and sold in the general Indian market

is predominantly low-quality and low-yield varieties with a large number of cloves per bulb." *See*

Decision Memorandum at 20. Commerce rejected the Agmarknet data as unreliable, finding that

the data provided "little specificity with respect to the product reflected by that data," and

"appear[ed] to reflect prices of a product that is of a quality inferior to that used by the PRC garlic

producers." *See* Decision Memorandum at 20. Similarly, Commerce found the Indian import data

---

[34]The specific "high-yield" varieties were Agrifound Parvati, Yamuna Safed-3, and
Agrifound White. *See* Decision Memorandum at 19.

unreliable, stating that it was "considerably less product-specific and thus [did] not allow [the agency] to ascertain the quality or nature of the garlic products (*i.e.*, bulbs, loose cloves, etc.) entered under the applicable Indian Harmonized Tariff Schedule . . . category." *See* Decision Memorandum at 20. Commerce further concluded that seed must be valued even if a respondent grows garlic with seed retained from a previous harvest. *See* Decision Memorandum at 21.

As FHTK and the GDLSK Plaintiffs contend, Commerce has failed to establish that its chosen dataset – the NHRDF data – adequately approximates the respondents' production experience. *See* GDLSK Reply Brief at 12; FHTK Brief at 39, 41.

First, Commerce assertedly placed great value on the representativeness of the surrogate data. But Commerce failed to establish that the NHRDF data are sufficiently representative of the garlic seed used by the respondents. *See* Decision Memorandum at 19-20; FHTK Brief at 39. Neither Commerce nor the Domestic Producers (on whose submission Commerce relied) provided a complete description of the "high-yield" varieties represented in the NHRDF data. *See* Decision Memorandum at 19-21; Preliminary Factors Valuation Memorandum (Pub. Doc. No. 226), at 2-3; Domestic Producers' Surrogate Value Submission (Pub. Doc. No. 156), Exh. 4. Commerce's Preliminary Factors Valuation Memorandum stated merely that: (1) "the Agrifound Parvati and Yamuna Safed-3 varieties of garlic closely matched the subject merchandise in terms of bulb diameter and number-of-cloves-per-bulb" in a recent new shipper review; and (2) "the price list in the NHRDF Newsletter permits [the agency] to distinguish the three high-yield varieties from the traditional varieties of Indian garlic and establishes the similarities of the three varieties to the merchandise under review." *See* Preliminary Factors Valuation Memorandum at 2-3 (internal

quotation marks and citation omitted). Such vague descriptions are patently insufficient. Further, Commerce's reliance upon a past new shipper review, which only considered two of three garlic varieties at issue, is an inadequate basis for Commerce's finding of similarity in this case.

The Government and the Domestic Producers emphasize that the FHTK and the GDLSK Plaintiffs "[do] not dispute the size and number of cloves within a garlic bulb influences the price of garlic," or "that the administrative record demonstrates the respondents grow and export high-quality and high-yield garlic, while garlic grown and sold in the general Indian market is predominately low-quality and low yield." *See* Def. Response Brief at 75; *see also* Domestic Producers Response Brief at 34 ("the linchpin of the Department's analysis was its finding – which was not disputed by any of the respondents – that the 'subject merchandise' . . . was high-yield, high-quality garlic"); Decision Memorandum at 20 ("respondents have never denied . . . that their garlic qualifies as high-yield or high-quality"). The Government similarly asserts that "common sense dictates that NHRDF would charge more for higher-yield, high-quality garlic like [the NHRDF varieties utilized by Commerce]" and, in turn, that these high-yield, high-quality varieties are comparable to the respondents' garlic. *See* Def. Response Brief at 76. However, simplistic reasoning – "high-price-equals-large-bulb" – is also inadequate to establish that Commerce's chosen surrogates are adequately representative of the respondents' garlic. A more thorough and factually-grounded demonstration of representativeness is required.

FHTK faults the NHRDF data for being overly narrow and derived from an insufficient number of market transactions. *See* FHTK Brief at 38-40. According to the Government, in an effort to ensure representativeness, Commerce made a trade-off and focused on the physical

characteristics of the surrogate garlic, sacrificing to some extent the agency's general preference for prices derived from numerous transactions. *See* Def. Response Brief at 76. As discussed above, however, Commerce has failed to demonstrate that the surrogate garlic adequately approximates the respondents' product. Commerce's asserted justification for using data from a limited region and from a limited number of transactions therefore falters. *See* Decision Memorandum at 20-21.Commerce based its valuation of garlic seed on the best available information." Jinan Yipin, 31 CIT at ____, 526 F. Supp. 2d at 1372 (internal quotation marks and citation omitted); *see* GDLSK Supplemental Brief at 6; GDLSK Supplemental Response Brief at 10-11.

FHTK and the GDLSK Plaintiffs further criticize Commerce for rejecting their proposed datasets – the Indian import data and Agmarknet data. *See* FHTK Brief at 37-38, 40-41; FHTK Reply Brief at 13-15; *see also* GDLSK Brief at 24-25; GDLSK Reply Brief at 12-13. Commerce concluded that the information provided would not allow the agency "to ascertain the quality or nature of the garlic" represented in the datasets proposed by the respondents. *See* Decision Memorandum at 20. But Commerce must revisit this matter, too, on remand.

Lastly, the GDLSK Plaintiffs maintain that Commerce erred when it refused to value Harmoni's and Jinan Yipin's garlic seed based on their actual growing costs, and instead used a surrogate value for garlic seed. *See* GDLSK Brief at 26. During the administrative review, Harmoni and Jinan Yipin placed information on the record establishing that they used garlic seed from the prior year's inventory, rather than purchasing seed. *See* Decision Memorandum at 16. The companies provided Commerce with a garlic production breakdown from the prior harvest, which had been submitted in the previous administrative review. *See* Decision Memorandum at 16. Citing

Pacific Giant, Commerce concluded that seed must be valued even when a respondent uses retained seed, because Commerce "must focus on the quantity of inputs used by the PRC producers in valuing [factors of production], rather than on the costs associated with these factors." *See* Decision Memorandum at 21 (*citing* Pacific Giant, Inc. v. United States, 26 CIT 894, 223 F. Supp. 2d 1336 (2002)).  Now claiming that Commerce misapplied its intermediate input methodology in its valuation of garlic seed, the GDLSK Plaintiffs request that Commerce value the factors of production utilized by Harmoni and Jinan Yipin to self-produce their garlic seed. *See* GDLSK Brief at 28.

According to the Government, the GDLSK Plaintiffs made conflicting statements in their administrative case brief concerning the valuation of Harmoni's and Jinan Yipin's garlic seed, and Commerce was unable to value their garlic-seed input.  *See* Def. Response Brief at 71.  However, with the GDLSK Plaintiffs' arguments clarified, the Government now requests that the matter be remanded to permit Commerce to fully respond to the request to value garlic seed for Harmoni and Jinan Yipin using their reported factors of production of seed.  *See* Def. Response Brief at 71.  The Government explains that a remand is necessary to allow Commerce to analyze the record, consider the parties' arguments, and take such action as may be appropriate as a result of the agency's analysis.  *See* Def. Response Brief at 71.

As summarized above, Commerce's analysis of the valuation of garlic seed was flawed in a number of key respects.  Remand is warranted to remedy those flaws in general, and will permit Commerce to properly address the specific circumstances of Harmoni and Jinan as well.

### C.  Valuation of Water

The GDLSK Plaintiffs and Dong Yun protest the surrogate value that Commerce assigned

for the irrigation water used in their cultivation of garlic.  *See generally* GDLSK Brief at 3, 19-24;

GDLSK Reply Brief at 10-12; GDLSK Supplemental Brief at 3-5; GDLSK Supplemental Response

Brief at 11-12; Dong Yun Brief at 4, 10-14; Dong Yun Reply Brief at 1-8; Dong Yun Supplemental

Brief at 2; Dong Yun Supplemental Response Brief at 6.  *But see* Def. Response Brief at 62-69; Def.

Supplemental Brief at 22-25; Domestic Producers Response Brief at 4-5, 30-32.

In the course of the administrative review, the respondents were required to report to

Commerce the volume of water used to irrigate their garlic crops.  In addition to that information,

however, various respondents – including the GDLSK Plaintiffs and Dong Yun – reported that they

did not pay for their irrigation water, because it was drawn from nearby rivers or wells on their land.

Further, at least some of those respondents provided the agency with information on the amount of

electricity or diesel fuel consumed in pumping the water from its source into their fields.  The

respondents also placed on the record documentation from various sources indicating that farmers

in India do not pay for irrigation water obtained from rivers and wells on their land.

On the basis of the record that they compiled, the GDLSK Plaintiffs and Dong Yun, among

others, argued in their case briefs that Commerce should not assign a value to irrigation water itself,

because the record evidence demonstrated that they did not incur a cost for the water (other than the

cost of pumping it), and because the record evidence indicated that similarly-situated farmers in

India also did not pay for irrigation water.  Instead, they asserted that irrigation water should be

valued based on the cost of the electricity or diesel fuel consumed in pumping the water from its

source into the field. Certain respondents, including Dong Yun, argued in the alternative that separately valuing irrigation water would amount to double counting, reasoning that the cost of water was already reflected in the financial statements that Commerce used to calculate the surrogate financial ratios in this case. *See generally* Decision Memorandum at 22-24 (summarizing respondents' evidence and arguments).

In the Final Results, Commerce rejected the respondents' arguments, and – indeed – even refused to value irrigation water based on "agrarian" rates. *See* Decision Memorandum at 25-26. Stating that "agrarian water rates for irrigation are highly subsidized by the Indian Government," Commerce assigned a surrogate value based on higher, non-agrarian "industrial" rates instead. *Id*. The GDLSK Plaintiffs and Dong Yun here attack Commerce's determination on numerous fronts, successfully challenging the agency both on the law and the facts.

The GDLSK Plaintiffs and Dong Yun emphasize that it is undisputed that they did not pay for the water used to irrigate their garlic crops, because the water was drawn from nearby rivers or wells on their land. *See* Decision Memorandum at 22-23. Moreover, they assert that there is ample uncontroverted record evidence indicating that the situation of Indian farmers is no different. *See* GDLSK Brief at 20; Dong Yun Brief at 10.[35] The Government and the Domestic Producers

---

[35]*See*, *e.g.*, Letter to Commerce from Counsel for Dong Yun (Jan. 6, 2005) (Pub. Doc. No. 247) (including two e-mail messages from officials of the Indian Ministry of Rural Development, as well as an e-mail message from an official at the U.S. Embassy in New Delhi); Hongda Comments on Value of Water in India (Jan. 6, 2005) (Pub. Doc. No. 248) (including information from two experts from Indian Ministry of Rural Development, the World Bank, and the International Water Management Institute); *see generally* Dong Yun Reply Brief at 2-5, 7-8 (analyzing record evidence on cost of water in India, and addressing asserted misrepresentations by Commerce, the Government, and the Domestic Producers).

nevertheless contend that Commerce properly valued the respondents' irrigation water, relying on

Pacific Giant.  *See* Decision Memorandum at 25 (*citing* Pacific Giant, Inc. v. United States, 26 CIT

894, 896, 904-05, 223 F. Supp. 2d 1336, 1339, 1346 (2002)); Def. Response Brief at 68; Def.

Supplemental Brief at 25; Domestic Producers Response Brief at 4-5, 31-32.

Pacific Giant addressed Commerce's treatment of water usage as a factor of production in

the production of freshwater crawfish tail meat in China.  The plaintiff respondents there argued that,

because some producers did not incur a cost for water, Commerce erred by assigning a value to it.

The Pacific Giant court upheld Commerce's determination to value water in that case, stating that

the statute "plainly focuses upon the quantity of inputs for factors of production rather than the costs

associated with them."  Pacific Giant, 26 CIT at 904, 223 F. Supp. 2d at 1346.

The GDLSK Plaintiffs and Dong Yun argue that the facts and the record in this case are

distinguishable from those in Pacific Giant.  *See* GDLSK Brief at 23; GDLSK Reply Brief at 11;

Dong Yun Supplemental Response Brief at 6.[36]  In addition, they argue that Commerce's reading

---

[36]The GDLSK Plaintiffs point out, for example, that "there was no argument or record evidence offered [in Pacific Giant] to show that water obtained in a comparable market economy country for a similar use would be free."  GDLSK Brief at 23; *see also* GDLSK Reply Brief at 11 (same); Dong Yun Supplemental Response Brief at 6 (same).  As the GDLSK Plaintiffs note, "[t]his is a key distinction because the cost of obtaining the material input in China [the NME country] is not relevant under the statute. . . . [T]he issue is whether or not the input can be obtained at no cost in a market economy environment."  *See* GDLSK Brief at 23.

Similarly, the GDLSK Plaintiffs note that, unlike the record in this case, "the administrative record in Pacific Giant contained no information regarding the energy used to pump the water, so the court could not consider the merits of valuing the energy used to obtain the water rather than placing a value on the water itself."  *See* GDLSK Supplemental Brief at 4 n.1 (*citing* Anshan Iron & Steel Co. v. United States, 27 CIT 1234, 1239-40 (2003)); GDLSK Supplemental Response Brief at 12 (same).

of Pacific Giant is at odds with Rhodia, which explains that the purpose of the surrogate value

methodology is "to construct [a] product's normal value as it would have been if the NME country

were a market economy country." *See* Rhodia, Inc. v. United States, 25 CIT 1278, 1286, 185 F.

Supp. 2d 1343, 1351 (2001); *see also* Rhodia, Inc. v. United States, 26 CIT 1107, 1113-14, 240 F.

Supp. 2d 1247, 1253-54 (2002); GDLSK Brief at 22; GDLSK Reply Brief at 11-12; Dong Yun Brief

at 12; Dong Yun Reply Brief at 7; *see generally* Jinan Yipin Corp., Ltd. v. United States, 31 CIT

____, ____ & n.13, 526 F. Supp. 2d 1347, 1373-76 & n.13 (2007) (reviewing, *inter alia*,

Commerce's reading of Pacific Giant, and rejecting agency's narrow construction of statute as

"inconsistent with the breadth of discretion indicated by the plain meaning of the provision";

remanding issue with instructions that agency "reconsider its surrogate value analysis for water

use").

　　　According to the GDLSK Plaintiffs and Dong Yun, the statute requires Commerce to

consider *both* the quantity of an input consumed *and* its value in a comparable market economy

country. *See* GDLSK Brief at 21-23; GDLSK Reply Brief at 11; *see also* Dong Yun Reply Brief

at 6-7. In defense of its position, Commerce emphasizes 19 U.S.C. § 1677b(c)(3), which provides

that the "factors of production" that are to be valued in an NME case include the "quantities of raw

materials employed." *See* Decision Memorandum at 25. But Commerce apparently ignores the

language of the very next paragraph of the same statutory provision, which specifies that the factors

of production are to be valued based on "*the prices or costs of* [*the*] *factors*" in the chosen

comparable market economy country. *See* 19 U.S.C. § 1677b(c)(4) (emphasis added). Similarly,

Commerce ignores the statutory language which mandates that Commerce is to value factors of

production on the basis of "the best available information regarding *the values of such factors* in a market economy country or countries considered to be appropriate."  *See* 19 U.S.C. § 1677b(c)(1)(B) (emphasis added).  Nowhere in the Final Results has Commerce sought to reconcile its reading of <u>Pacific Giant</u>, and its determination on the valuation of water in this case, with the plain language of 19 U.S.C. § 1677b(c)(1)(B) and § 1677b(c)(4).[37]

As Dong Yun observes, although Commerce may be required to value irrigation water as a factor of production in this case, nothing in <u>Pacific Giant</u> indicates that the value assigned to a factor of production necessarily must be a *positive* value.  *See*, *e.g.*, Dong Yun Brief at 12.  If the record establishes that farmers in India – like the Chinese garlic producers in this case – do not pay for irrigation water drawn from nearby rivers or wells on their land, it is not clear how Commerce here can assign to water a surrogate value greater than zero.  Any other outcome would appear to contravene both the plain language and the basic intent of the statute, as summarized above.

As the statute clearly instructs, and as the courts have consistently reaffirmed, factors of production are to be valued based on their cost or price in the selected market economy country,[38]

---

[37]In addition to "quantities of raw materials employed," another factor of production specified in the statute is "amounts of energy and other utilities consumed."  *See* 19 U.S.C. § 1677b(c)(3).  The court in <u>Jinan Yipin</u> expressly instructed Commerce in that case to consider valuing the energy costs incurred in pumping irrigation water, in lieu of valuing the water itself.  *See* <u>Jinan Yipin</u>, 31 CIT at ____, 526 F. Supp. 2d at 1374-76.  Although the record here included data on the costs of electricity and diesel fuel consumed in pumping the respondents' irrigation water from its source into the field, Commerce nevertheless failed to address the statute's reference to "amounts of energy and other utilities consumed," and failed to consider the claim of the respondents here that the agency should value the energy costs of pumping irrigation water, rather than the water itself.

[38]As Dong Yun underscores, "Commerce, itself, chose India as the most appropriate surrogate country for factor values" in this case.  *See* Dong Yun Reply Brief at 4.

to reflect what the producer's costs would be if the NME country were a market economy environment. The GDLSK Plaintiffs and Dong Yun thus make a compelling argument that, if record evidence establishes that an input may be obtained at no cost in a market economy environment,[39] it is improper and distortive to assign a positive value to that particular factor of production. Nothing in Commerce's Final Results undermines the persuasiveness of their case.

Commerce's seemingly unduly narrow reading of the law is compounded by the Government's strained interpretation of the record facts. *See generally*, *e.g.*, Dong Yun Reply Brief at 2-5, 7-8. For example, the Government argues:

> Commerce acknowledged that Indian farmers do not have to pay for water from wells they own . . . . It is undisputed that Dong Yun and the GDLSK plaintiffs lease rather than own the land they use to grow garlic. . . . To the extent that Indian farmers use water from their own wells on their own land to irrigate their garlic, Dong Yun's and the GDLSK Plantiffs' arguments are erroneous because Chinese farmers do not own the water on or around the land where they grow garlic.

Def. Response Brief at 65. Dong Yun vigorously disputes the Government's assertions concerning the state of the evidence.

Dong Yun accuses the Government of seriously "misconstru[ing] the facts on the record." Dong Yun Reply Brief at 1-2. Dong Yun argues that the Government wrongly suggests that the status of an Indian farmer – as a landowner *versus* a renter – is significant. Dong Yun maintains

---

[39]In its brief, the Government argues that "domestic [U.S.] garlic producers, as well as producers in other countries . . . have to purchase the water used to irrigate their crops." *See* Def. Response Brief at 67. Dong Yun objects that "[t]here is no record evidence of this vague assertion." *See* Dong Yun Reply Brief at 4. In any event, as noted above, Dong Yun aptly points out that it was Commerce that chose India as the appropriate surrogate country here. *Id.* And, moreover, as Dong Yun further observes, "[t]he antidumping laws were not designed or intended to eliminate any and all competitive advantages in the marketplace." *See* Dong Yun Brief at 12-13.

that, to the contrary, the evidence demonstrates that "Indian farmers (regardless of whether they are landowners or renters of land) do not pay for water obtained from their own farmland." *See* Dong Yun Reply Brief at 2; *see also id*. at 3 (noting that "[t]he record simply shows that farmers having wells on their farmland do not incur any cost for water," and stating that record evidence "applied to *all* farmers who have wells located on their farmland – not merely to "some" – and applied to [all such] farmers regardless of their ownership interest (or lack thereof) in the land"), 4 (stating that "[t]he record is clear that water rights are simply part of the value of owning or renting the land itself," and that the evidence demonstrates that "farmers obtaining water from wells located on their own farmland pay nothing ($0.0)" for irrigation water).

As Dong Yun puts it, "some [Indian] farmers have wells and do not pay for water, and other farmers do not have wells and have to pay for water." *See* Dong Yun Reply Brief at 3. In other words, according to Dong Yun, the key issue is whether an Indian farmer has access to water on the land that he farms; whether the farmer is the owner of the property is irrelevant. Dong Yun thus contends that – like the GDLSK Plaintiffs and Dong Yun itself, who lease land with access to a source of irrigation water – Indian farmers who grow their crops on land with access to a source of water also do not pay for that water, whether they own the land or not.

The parties similarly take the Government to task for its suggestion that water located on Indian farmland is subsidized by the Indian government. Dong Yun states flatly: "There is no record evidence that well water in India is subsidized. Specifically, there is no record evidence of the government of India (1) controlling the price of well water, (2) controlling the output decisions of well users, or (3) [controlling] the allocation of well water in India . . . . More importantly, there is

no record evidence that the government of India legally should charge separately for well water and then forego part or all of that charge, *i.e.*, subsidize the cost of well water." *See* Dong Yun Reply Brief at 7-8; *see generally id*. at 2-8 (responding to Government's arguments concerning subsidization by Indian government); *see also* GDLSK Reply Brief at 12 (arguing that "[the] assertion that the record indicates that well water or river water in India are 'government subsidized' is entirely false"). All in all, the plaintiff garlic producers' analysis of the record evidence serves only to further undermine Commerce's determination.[40]

Apart from their argument that irrigation water should be assigned a value of zero because similarly-situated Indian farmers do not pay for their water, Dong Yun and the GDLSK Plaintiffs also maintain that Commerce's valuation of irrigation water here effectively constituted double counting. They contend that irrigation water costs were already reflected in the surrogate value for factory overhead that Commerce derived from the financial statements of the Indian tea producers selected as surrogates for purposes of calculating the respondents' financial ratios in this case. *See*,

---

[40]Dong Yun protests that, in effect, "the government presents an entirely new argument (not based on facts in the review) in its Response Brief." *See* Dong Yun Reply Brief at 8; *see also id*. at 5 (arguing that "the entire basis of the [Government's] Response Brief . . . is predicated on 'facts' that are not in the record," and objecting that Commerce "made its decision on water based on 'facts' that are not in the record of the underlying review"). Dong Yun argues that much of the Government's case therefore should not be allowed to stand. *See* Dong Yun Reply Brief at 8.

Dong Yun's concerns are well taken. Much of the Government's argument is not reflected to any degree in the Final Results. Thus, it arguably constitutes impermissible *post hoc* rationalization. *See*, *e.g.*, NEC Home Elecs., Ltd. v. United States, 54 F.3d 736, 743 (Fed. Cir. 1995). As Dong Yun emphasizes, "[a]ll parties must have an opportunity to respond to facts and arguments" such as those the Government advances for the first time in this forum. *See* Dong Yun Reply Brief at 8. The remand of this matter (ordered below) should afford all parties an appropriate opportunity to clarify the record.

*e.g.*, Dong Yun Brief at 13-14; GDLSK Supplemental Brief at 3-4; *see generally* section III.J, *infra* (discussing Commerce's derivation of surrogate financial ratios). Commerce's treatment of this argument is also flawed.

Commerce's discussion of the point in the Final Results consumed a mere two lines: "[T]he Department finds no evidence in the selected surrogate financial statements to suggest that the Indian surrogate tea companies incur a cost for water. Nor is there any evidence on the record that irrigation water is essential to the production of tea in India." *See* Decision Memorandum at 25. Virtually the exact same language was found wanting in <u>Jinan Yipin</u>. The court there remanded the matter to the agency, based in part on the court's conclusion that "Commerce presumed, without making actual findings of fact, that [the surrogate Indian tea producer's] financial statement did not include water . . . and that the cultivation of tea in India does not require irrigation, and there appears to be no record evidence upon which such findings of fact could have been based." *See* <u>Jinan Yipin</u>, 31 CIT at ____, 526 F. Supp. 2d at 1373, 1375-76. The same result must obtain here. *See* GDLSK Supplemental Brief at 3-4.

As their ultimate argument in the alternative (and their last resort), the GDLSK Plaintiffs and Dong Yun protest Commerce's decision to use industrial (non-agrarian) rates to value irrigation water here. *See*, *e.g.*, GDLSK Brief at 23 (disputing "Commerce's decision to apply a surrogate value for industrial water to irrigation water that is obtained at no cost in India"); Dong Yun Reply Brief at 4 (criticizing Commerce for "persist[ing] in not only valuing water in this review, but in

using non-agricultural water prices to do so").[41]  The GDLSK Plaintiffs object that "applying a surrogate value to . . . free irrigation water based on a price for *industrial water* in India is contrary to the plain language of the statute."  *See* GDLSK Brief at 22.

As noted above, Commerce sought to justify its use of industrial rates by stating in the Final Results that "agrarian water rates for irrigation are highly subsidized by the Indian Government." *See* Decision Memorandum at 25.  Commerce reasoned that valuing a factor of production "using a rate known to be subsidized is not consistent with the purpose of [the NME provisions of the statute]."  *Id*.  As discussed above, however, Commerce failed to adequately evaluate the record evidence on the cost of water in India – including the evidence on the nature and extent of government subsidization, if any.  The foundation for Commerce's rate determination thus collapses like a house of cards.

In sum, here – as in Jinan Yipin – "the method by which Commerce addressed the question of irrigation water lacks essential findings of fact and instead relies on mere assumptions, which find

---

[41]*See also* GDLSK Brief at 20 (protesting Commerce's decision to "disregard[  ] the arguments made by the GDLSK [Plaintiffs] and appl[y] a surrogate value for water based on a 'non-agrarian' rate for industrial water in India"); GDLSK Supplemental Brief at 5 (noting Jinan Yipin court's criticism of Commerce for assuming that Indian farmers "typically irrigate their . . . crops using water supplied by municipal utilities, at costs associated with such utilities"); Dong Yun Brief at 12 (arguing that "the value of $0.0 for well water in India was far superior to the values obtained by Commerce for municipal water, industrial water, etc."), 13 (stating that "[i]n selecting the surrogate value for water from sources for municipal water, industrial water or any other type of metered water, Commerce did not use the 'best available information'"); Dong Yun Reply Brief at 3 (asserting lack of record evidence to support Commerce's claim that "agrarian water rates for irrigation are highly subsidized by the Indian Government"), 5 (objecting to Commerce's use of data that was, *inter alia*, "for non-agricultural use"), 6 (critiquing Commerce's decision to base rate on "non-agricultural water valued in part of only one state within India"), 7-8 (arguing at length that "[t]here is no record evidence that well water in India is subsidized").

no apparent support in record evidence." *See* <u>Jinan Yipin</u>, 31 CIT at \_\_\_\_, 526 F. Supp. 2d at 1375. Moreover, Commerce's legal analysis is flawed and incomplete, and the Final Results "do[ ] not include a rational explanation for the choice that Commerce made" in this case. *Id*. Accordingly, as in <u>Jinan Yipin</u>, this matter must be remanded to Commerce. On remand, Commerce shall reconsider its surrogate value analysis for water use (reopening the record, if appropriate), and shall detail its rationale for selecting from among the possible methods of valuing this factor (as supported by substantial evidence in the record), explaining why the valuation method that it chooses yields the most accurate dumping margin possible.

### D.  Wage Rate Calculation

The GDLSK Plaintiffs and Dong Yun take issue with Commerce's valuation of respondents' labor costs.[42] The GDLSK Plaintiffs and Dong Yun first assert a facial challenge to Commerce's wage rate regulation, asserting that Commerce's regression-based wage rate methodology violates the plain language of the antidumping statute. The GDLSK Plaintiffs and Dong Yun also make an as-applied challenge, taking issue with the dataset Commerce used when calculating respondents' labor cost pursuant to the regression-based methodology. The GDLSK Plaintiffs and Dong Yun assert that Commerce should have based its regression-based wage rate calculation on either: (1) publicly-available, country-wide Indian data; or (2) a larger selection of countries meeting Commerce's selection criteria. *See generally* GDLSK Brief at 11-18; GDLSK Reply Brief at 1-5; GDLSK Supplemental Brief at 1-3; GDLSK Supplemental Response Brief at 1-9; Dong Yun Brief

---

[42]Only the GDLSK Plaintiffs and Dong Yun challenge Commerce's wage rate calculation.

at 16-20; Dong Yun Reply Brief at 8-11; Dong Yun Supplemental Response Brief at 1-5; Dong Yun

Supplemental Brief at 2-4. *But see* Def. Response Brief at 112-21; Def. Rebuttal Brief at 4-7; Def.

Supplemental Brief at 3-14; Domestic Producers Response Brief at 23-30. For the reasons that

follow, this issue is remanded to Commerce for further consideration.

When constructing the normal value of a product from an NME country, Commerce must

determine the "hours of labor required" as a factor of production. *See* 19 U.S.C. § 1677b(c)(3).

Like other factors of production, Commerce is directed to value labor "utiliz[ing], to the extent

possible, the prices or costs of factors of production in one or more market economy countries that

are[:] (A) at a level of economic development comparable to that of the nonmarket economy

country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). In

doing so, Commerce essentially creates a "hypothetical" market value to approximate the production

experience in the NME country. *See* Nation Ford, 166 F.3d at 1377-78. Commerce, however,

values an NME-country producer's cost of labor differently from the valuation of other factors of

production. *See* Dorbest v. United States, 30 CIT 1671, 1703, 462 F. Supp. 2d 1262, 1291 (2006),

*appeal docketed*, No. 2009-1257, -1266 (Fed. Cir. Mar. 20, 2009) ("Dorbest I") (*citing* 19 C.F.R.

§ 351.408(c)(3) (2003)); *see also* Decision Memorandum at 50.[43]

Commerce has found that, "in calculating wage rates, an analysis different in some aspects

---

[43]Commerce is permitted to depart from typical surrogate valuation and to value factors of production according to source data outside of the data from the chosen surrogate country – provided that the "methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1381-82 (Fed. Cir. 2001) ("we have specifically held that Commerce may depart from surrogate values when there are other methods of determining the 'best available information' regarding the values of the factors of production").

from valuing other [factors of production is] warranted in light of [the agency's] concerns about wide variances in wage rates between comparable economies." *See* Decision Memorandum at 50. Thus, when valuing the cost of labor in NME country cases, Commerce departs from traditional factor of production valuation and employs "regression-based wage rates reflective of the observed relationship between wages and national income" in a variety of market economy countries. *See* 19 C.F.R. § 351.408(c)(3); *see also* Dorbest I, 30 CIT at 1703, 462 F. Supp. 2d at 1291. Pursuant to this regression-based methodology, "Commerce determines the relationship between countries' per capita Gross National Product ('GNI') and their wage rates" and "approximates the wage rate of the PRC by using the PRC's GNI as the variable in the equation that was the result of the regression." Dorbest I, 30 CIT at 1703-04, 462 F. Supp. 2d at 1291 (internal quotation marks and citations omitted); *see also* Remand Results at 3. Unlike its valuation of other factors of production in an NME case, Commerce bases its surrogate wage rate on data from a broad "basket" of countries, and does not limit itself to market economy countries at a level of economic development comparable to the NME country in question. *See* Dorbest I, 30 CIT at 1706, 462 F. Supp. 2d at 1293.[44]

[44]The Domestic Producers explain that Commerce initially adopted the regression-based methodology because of the "great variation in the wage rates of the market economy countries that [Commerce] typically treats as being economically comparable." *See* Domestic Producers Response Brief at 26 (*quoting* Antidumping Duties; Countervailing Duties; Proposed Rule, 61 Fed. Reg. 7308, 7345 (Feb. 27, 1996) ("Proposed Rule") (emphasis omitted); *see also* Def. Response Brief at 118 ("Commerce adopted the labor wage rate regression methodology . . . to arrive at a more accurate labor wage rate."). According to Domestic Producers, in an effort to enhance accuracy and predictability, Commerce produces "the average wage to be applied in any NME proceeding" each year pursuant to the regression-based analysis and based on "the wage rates and per capita GDP of approximately 45 market economy countries." *See id.* (*quoting* Proposed Rule, 61 Fed. Reg. at 7345) (internal quotation marks omitted). The Government submits that "[t]his approach is fully consistent with [the statute] because the use of prices or costs from multiple market economy countries allows for more accurate results given the variability of wage rates in countries with

In the Final Results of the present case, Commerce "used the 2004-revised expected wage rate of $0.93 per hour as a surrogate for PRC labor costs, which [Commerce] derived using its regression-based methodology for the determination of wage rates for the PRC." *See* Decision Memorandum at 54. The Government, however, subsequently sought voluntary remand for the limited purpose of re-examining and correcting the labor rate calculation to comply with other remand determinations involving imported products from the PRC. *See* Remand Results at 1. Remand was granted and in the Remand Results, Commerce stated that it had recalculated a new wage rate of $0.85 per hour using the correct up-to-date 2004 wage rates. *See* Remand Results at 2, 18-19.

The GDLSK Plaintiffs and Dong Yun now contend that Commerce's application of a regression-based labor rate calculation to value labor as a factor of production is not in accordance with 19 U.S.C. § 1677b(c)(4). *See* GDLSK Brief at 11-18; GDLSK Reply Brief at 1-5; GDLSK Supplemental Brief at 1-3; GDLSK Supplemental Response Brief at 1-9; Dong Yun Brief at 18-19; Dong Yun Reply Brief at 9-11. The GDLSK Plaintiffs and Dong Yun argue that the regression-based wage rate methodology facially violates the statute's direct and specific instruction to derive surrogate values from market-economy-country data that is (1) economically comparable, and (2) based on significantly comparable merchandise. *See* GDLSK Brief at 12 (*citing* 19 U.S.C. § 1677b(c)(4)) GDLSK Reply Brief at 2-3; Dong Yun Brief at 16-17. As the GDLSK Plaintiffs note, Commerce's regression-based rate was calculated using data from numerous non-comparable, non-

similar per capita GNI." *See* Def. Response Brief at 118 (*citing* Proposed Rule, 61 Fed. Reg. at 7345).

producer countries (*e.g.*, Austria, Belgium, Japan, Norway), and excluded data from other countries meeting Commerce's regression analysis criteria. *See* GDLSK Brief at 12, 15-18; GDLSK Supplemental Response Brief at 1-3; Dong Yun Brief at 16-17. Moreover, Dong Yun points out that Commerce's resulting wage rate – \$0.85 per hour following remand – is "more than 500 percent higher than that of India," an economically comparable country, which, according to Dong Yun, has a wage rate of \$0.14 per hour. *See* Dong Yun Brief at 17; Dong Yun Reply Brief at 11. Finally, the GDLSK Plaintiffs also claim that Commerce's use of China's GNI in its wage rate calculation, runs counter to the statute because it injects NME-country data into the calculation of the *surrogate* wage rate. *See* GDLSK Brief at 12-13.

This court considered similar claims in Allied Pacific II, and concluded that, in determining the surrogate wage rate according to its regulation and its methodology, Commerce failed to satisfy both the "economic comparability" criterion and the "significant producer" criterion of § 1677b(c)(4). *See* Allied Pacific Food (Dalian) Co. v. United States, 32 CIT ____, ____, 587 F. Supp. 2d 1330, 1351-61 (2008) ("Allied Pacific II") (*citing* 19 U.S.C. § 1677b(c)(4)). Allied Pacific II faulted the regulation for essentially precluding consideration of any investigation-specific information, and thus found it contrary to Congress' plain statutory mandate. *See* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1356.[45] The same reasoning is applicable in the present case, and

[45]The Allied Pacific II court recognized that none of the Court of Appeals cases that have recognized Commerce's wide discretion – in general factor of production valuation and to deviate from normal surrogate valuation in the interest of greater accuracy in dumping-margin calculations – actually support Commerce's regression methodology as prescribed by 19 C.F.R. § 351.408(c)(3). *See* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1359–61 (discussing, *inter alia*, Shakeproof, 268 F.3d 1376; Nation Ford Chem. Co. v. United States, 166 F.3d 1373 (Fed. Cir. 1999); Lasko MetalProds., Inc. v. United States, 43 F.3d 1442 (Fed. Cir. 1994)). As Allied Pacific

the GDLSK Plaintiffs and Dong Yun successfully undermine Commerce's reasoning and conclusion.    The antidumping statute requires surrogate valuation to be based on data from economically comparable market economy countries, and based on significantly comparable merchandise. *See* 19 U.S.C. § 1677b(c)(4); *see also* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1356-57. The reason for such a requirement is obvious – Commerce is tasked with choosing a *surrogate* representative of respondents' production experience, and is essentially required to create a "hypothetical" market value to approximate the production experience in the NME country. *See* Nation Ford, 166 F.3d at 1377-78. The regression-based wage rate methodology, however, does not satisfy those aims, and Commerce's explanation for while deviation from the norm is necessary in this area is unconvincing.

As the GDLSK Plaintiffs and Dong Yun state (and Allied Pacific II found), the Department's procedure unacceptably "pays no heed to § 1677b(c)(4), the second criterion of which is investigation-specific, and does not permit the Secretary to determine the best available labor cost information with respect to the particular investigation being conducted." *See* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1356-57; GDLSK Reply Brief at 3 (use of "a regulation that alleges to permit Commerce to disregard the plain language of the statue should be rejected"). Because Commerce's regression-based wage rate methodology does not meet the requisite statutory criteria – *i.e.*, the comparable level of economic development as the subject country criterion and the

_____

II noted, these cases did not hold or suggest that Commerce is permitted to "adopt a methodology, by regulation or otherwise, under which Commerce cannot consider labor costs in one or more surrogate countries that potentially are better [sources of] information than the country-wide labor cost information that the regulation, and methodology implementing it, requires Commerce to use." *See* Allied Pacific II, 32 CIT at ____, 587 F. Supp. 2d at 1360.

producer of comparable merchandise criterion – the regulation authorizing such a methodology –

19 C.F.R. § 351.408(c)(3) – is inconsistent with the statutory mandate, and thus does not survive the

GDLSK Plaintiff's and Dong Yun's facial challenge under Chevron U.S.A. Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837, 842-44 (1984) ("regulations are given controlling weight unless they

are arbitrary, capricious, or manifestly contrary to the statute").  Although the antidumping statute

affords Commerce wide discretion, and "does not preclude consideration of pricing or costs beyond

the surrogate country if necessary," Commerce must, at the very least, explain that necessity *and*

support its decision to utilize the particular methodology and dissimilar information (*i.e.*, that which

is "beyond" comparable market-economy-country data).  *See* Nation Ford, 166 F.3d at 1378 n.5.

Here, Commerce did neither.

Additionally, as the GDLSK Plaintiffs point out, Commerce's incorporation of China's

"unreliable" GNI data in its calculation of respondents' labor cost runs counter to the basic premise

of surrogate valuation.  *See* GDLSK Brief at 12-13.  As the GDLSK Plaintiffs note, the agency's

"entire non-market economy methodology is predicated upon the theory that prices and other

economic data from China are unusable because they are not market-driven and are therefore

unreliable."  GDLSK Brief at 13.  Thus, because Commerce uses "unreliable," non-market-driven

Chinese data, "this wage rate calculation is in conflict with the underlying premise for the entire

surrogate value policy and statutory provisions."  *Id.*  The Government attempts to defend the

agency's procedure by asserting that "[u]sing China's GNI in the regression analysis . . . provides

a seed of data that is tied to China which constitutes the 'best information available' to derive a

comparable market economy labor wage rate."  Def. Response Brief at 120-21 (*quoting* 19 U.S.C.

§ 1677b(c)(1)).  That "seed," however, does not blossom into a "best available information" tree. As stated above, one of the primary deficiencies with the regression-based analysis is the fact that it is not investigation-specific.  Attempting to make the calculation country-specific (though still ignoring the investigation-specific requirement) by using inherently flawed data does not remedy the regulation's statutory infirmity.

For these reasons, Commerce's use of the regression-based wage rate methodology cannot be sustained.

Finally, the GDLSK Plaintiffs and Dong Yun challenge the dataset used in calculating the regression-based wage rate as-applied in the present case.  The GDLSK Plaintiffs and Dong Yun first contend that, given that India was the chosen surrogate market economy country in the present case, Commerce should have used the publicly available, country-wide wage rate data for India – as it had when valuing respondents' other inputs – to value respondents' labor costs.  *See* GDLSK Brief at 11-15; Dong Yun Brief at 17.  Alternatively, the GDLSK Plaintiffs and Dong Yun assert that Commerce's data selection was over inclusive (included data from numerous non-comparable, non-producer countries), and excluded data from a substantial number of countries (22) that satisfied Commerce's selection criteria.  *See* GDLSK Brief at 12, 15-18; GDLSK Reply Brief at 1-5; GDLSK Supplemental Brief at 1-3; GDLSK Supplemental Response Brief at 1-9; Dong Yun Brief at 16-20; Dong Yun Reply Brief at 8-11; Dong Yun Supplemental Brief at 2-4; Dong Yun Supplemental Response Brief at 1-5.  The GDLSK Plaintiffs argue that the exclusion of these 22 countries inflated the resulting calculation, which would have otherwise been approximately $0.56 per hour, rather than $0.85 per hour.  *See* GDLSK Brief at 16.

Commerce failed to adequately consider these claims in both the Decision Memorandum and the Remand Results, perfunctorily stating that the methodology by which Commerce valued respondents' labor cost was justified because it is the methodology by which Commerce values respondent labor costs. *See* Decision Memorandum at 54; Remand Results at 15-18. For example, in the Decision Memorandum, Commerce dismissed the GDLSK Plaintiffs insistence on using only Indian data merely as "contrary to the Department's regulations." *See* Decision Memorandum at 54. And in the Remand Results, Commerce stressed that "[t]he purpose of the voluntary remand was not to make changes to an established methodology that the Department has employed for several years, but to correct inadvertent departures from its normal methodology[.]" Remand Results at 15. Rather than respond to respondents' claims, Commerce merely summarily stated the supposed attributes of the "long-established" regression-based methodology, and that any changes to the methodology should be subject to public comment. *See* Remand Results at 15-18. Such general statements are unresponsive to the claims the GDLSK Plaintiffs made twice before Commerce and reiterate here.

Given that this matter is remanded to Commerce to reconsider the validity of its regression-based wage rate methodology, there is no need to here reach the merits of the challenge to the dataset Commerce utilized in its regression-based calculation.[46] Although dependent on the outcome of Commerce's overall consideration of the regression-based methodology, Commerce should remain mindful of the GDLSK Plaintiffs' and Dong Yun's challenge to its dataset, and avail itself

---

[46]As noted, however, Commerce failed to adequately respond to the parties' various challenges in the Decision Memorandum or the Remand Results.

of the  opportunity to consider the implications of the parties' arguments and authorities, as well as any other relevant developments (as appropriate).[47]

In sum, in the absence of sufficient evidence and adequate explanation and justification to support Commerce's use of its regression-based methodology to calculate the applicable wage rate here, and in light of the agency's failure to properly consider the respondents' objections during the administrative review, this matter must be remanded to Commerce for further consideration.[48]

### E.  Valuation of Leased Land

Dong Yun disputes Commerce's decision to calculate a surrogate value for leased land, asserting that it constitutes unlawful double counting, because – according to Dong Yun – the surrogate financial statements that Commerce used to calculate surrogate financial ratios in this case already included rent and lease payments as part of "selling, general, and administrative" ("SG&A") expenses.  *See generally* Dong Yun Brief at 3-4, 8-10; Dong Yun Reply Brief at 11-13.[49]  *But see* Def. Response Brief at 78-82; Def. Surreply Brief; Domestic Producers Response Brief at 38.  As discussed below, Dong Yun's argument is not without merit.

---

[47]*See*, *e.g.*, Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716 (Oct. 19, 2006); *see also* Def.'s Supplemental Brief at 6-7 (acknowledging that Commerce modified "the criteria it use[s] to determine the countries utilized in its calculations" following the present determination.).

[48]Because this issue is being remanded to Commerce for reconsideration, the limited issue of the application of modified calculations from the Remand Results to Dong Yun, which the Government requested be remanded to Commerce, need not be addressed.  *See* Def. Response Brief at 112-13.

[49]Commerce's calculation of the surrogate financial ratios is discussed in greater detail in section III.J, below.

Dong Yun argues that land lease costs are already accounted for under the "'rent' line item that appears in the financial statements of Parry Agro and [other surrogates] on the record."[50] *See* Decision Memorandum at 27; *see also* Dong Yun Brief at 9; Dong Yun Reply Brief at 12 (observing that "every single financial statement used by Commerce contained a cost for rent"). Dong Yun further notes that, in prior administrative determinations, Commerce has consistently presumed that broad line items in financial statements – like "rent" – include all types of lease expenses, absent compelling evidence to the contrary. *See* Dong Yun Brief at 9 (*citing* Final Results of the Antidumping Duty New Shipper Review and Administrative Reviews on Certain Preserved Mushrooms from PRC, 69 Fed. Reg. 54,635 (Sept. 9, 2004) and accompanying Issues and Decision Memorandum, 2004 WL 3524426, at comment 3; Notice of Final Determination of Sales at Less than Fair Value: Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China, 69 Fed. Reg. 70,997 (Dec. 8, 2004) and accompanying Issues and Decision Memorandum, 2004 WL 3524464, at comment 9).

In the Preliminary Results, Commerce used the financial statements of two companies, Parry Agro Ltd. and Mahabaleshwar Honey Producers Co-operative Society Ltd., to value SG&A and overhead expenses. *See* Def. Response Brief at 79. Finding no evidence in the surrogate financial statements or elsewhere in the record to indicate that any of the surrogate companies included land

---

[50]Dong Yun initially argued that the term "lease-rent" in Parry Agro's financial statement also included land lease payments. *See* Dong Yun Brief at 8. However, Dong Yun now concedes that the term "lease-rent" refers exclusively to the rental of factories, not land. *See* Dong Yun Reply Brief at 12. Dong Yun nevertheless emphasizes that, apart from that one item which is no longer in dispute, "there are many more items for not only Parry Agro, but for *each* of the other companies' financial statements used by Commerce, which the government has not refuted." Dong Yun Reply Brief at 12.

lease payments in their SG&A and overhead expenses, Commerce calculated a separate factor of

production value for land lease payments using the Punjab State Development Report, which had

been used to value leased land in previous administrative reviews. *See* Def. Response Brief at 79-

80; Decision Memorandum at 28. In the Final Results, Commerce modified its SG&A and overhead

expense calculations using the 2003-2004 financial statements of Parry Agro and Dhunseri Tea

Company, and the 2002-03 and 2003-04 financial statements of a third Indian company, Moran Tea

Company Ltd. *See* Def. Response Brief at 79-80. Commerce continued to value land lease

payments separately using a value derived from the Punjab State Development Report. *See* Def.

Response Brief at 79-80.

The Government maintains that there is no record evidence that any of the surrogate

companies included land lease payments in their SG&A and overhead expenses. *See* Def. Response

Brief at 80. In addition, the Government disputes Dong Yun's reading of Preserved Mushrooms and

Warmwater Shrimp. According to the Government, those determinations merely indicate that,

where a surrogate financial statement does not contain a line item encompassing a given factor of

production, Commerce will separately value the cost of that factor of production. *See* Def. Response

Brief at 81 (*citing* Preserved Mushrooms, 2004 WL 3524426, at comment 3; Warmwater Shrimp,

2004 WL 3524464, at comment 9). Similarly, the Government cites Pacific Giant for the

proposition that Commerce may reasonably calculate a separate value for a factor of production

where it is unsure whether that factor of production has been included in a company's overhead

costs. *See* Def. Response Brief at 81-82 (*citing* Pacific Giant, Inc. v. United States , 26 CIT 894,

905, 223 F. Supp. 2d 1336, 1346 (2002)). The Government thus asserts that Commerce's valuation

of leased land in this case was in accordance with law, and in line with prior agency practice.

The Government further contends that Commerce's determination is supported by substantial evidence in the record. The Government points to evidence in the record indicating that all three surrogate companies owned their land, and argues that, "[a]bsent an indication that the surrogate companies leased their land, Commerce cannot simply assume that the surrogate would include land lease expenditures in its overhead expenses." *See* Def. Response Brief at 80. But Dong Yun counters by highlighting line items in the financial statements of both Dhunseri and Moran, which Dong Yun contends establish that each of the surrogates did incur land lease expenditures, *i.e.*, costs for "leasehold land" and "Land (leasehold) and Development," respectively. *See* Dong Yun Reply Brief at 12-13.

The Government states that Commerce's prior practice has been to assume that the separate valuation of a factor of production will not constitute double counting unless evidence from a surrogate's financial statement proves otherwise. *See* Def. Response Brief at 81-82. To the contrary, however, in both Warmwater Shrimp and Preserved Mushrooms, Commerce appeared to assume the opposite – that is, Commerce seemed to assume that, where a surrogate's financial statement contains a broad line item encompassing a factor of production, that factor of production is accounted for, and valuing the factor of production separately *would* produce double counting. *See* Warmwater Shrimp, 2004 WL 3524464, at comment 9; Preserved Mushrooms, 2004 WL 3524426, at comment 3.

In Warmwater Shrimp, Commerce concluded that land leasing costs were accounted for in a surrogate financial statement under circumstances nearly identical to those in this case. *See*

Warmwater Shrimp, 2004 WL 3524464, at comment 9. As Dong Yun points out, the surrogate financial statement there included line items for both "lease rent" and "rent" expenses. Commerce determined that, "[a]lthough the[ ] line items might include a variety of lease expenses," there was "no basis on the record to conclude that all types of lease expense (i.e., machinery, land, etc.) would not be included in one or both of the[ ] line items." *See* Warmwater Shrimp, 2004 WL 3524464, at comment 9. Similarly, in Preserved Mushrooms, Commerce once again concluded that – given line items for both "lease rent" and "rent" – there was "no basis to conclude that all types of lease expenses would not be included in one or both of these line items." Preserved Mushrooms, 2004 WL 3524426, at comment 3. These determinations give weight to Dong Yun's claim that Commerce's past practice has been to assume that land lease payments are accounted for by appropriate broad line items, such as "lease rent" and "rent," in surrogates' financial statements. *See* Dong Yun Brief at 9.

Invoking Pacific Giant, the Government claims that Commerce has the discretion to determine that a factor of production is not accounted for in a company's overhead expenses where evidence pointing in either direction is lacking. *See* Def. Response Brief at 81-82 (*citing* Pacific Giant, 26 CIT at 905, 223 F. Supp. 2d at 1346). But Pacific Giant is readily distinguished on its facts, and does not speak to the situation presented here, where Commerce seemingly – in effect – turned its back on past practice.

To be sure, Commerce is entitled to depart from prior practice, and to make factual findings concerning surrogate financial statements, provided that it explains its rationale and supports its determination with substantial evidence. Here, however, Commerce offered only vague reasoning

that appears to be in direct conflict with the record.

Specifically, Commerce determined that land lease costs were not accounted for in the surrogate financial ratios in this case because the surrogates' financial statements included a line item for land in their "fixed assets" schedules, and because the surrogate companies listed zero depreciation for land. *See* Decision Memorandum at 27; Def. Response Brief at 80. Both the Government and the Domestic Producers interpret that information to mean that – unlike Dong Yun – the three surrogate companies (Parry Agro, Dhunseri, and Moran) own the fields where they grow their product, and do not account for land costs in their financial statements. *See* Def. Response Brief at 80; Domestic Producers Response Brief at 38. The Government claims that, "[a]bsent an indication that the surrogate companies leased their land, Commerce cannot simply assume that the surrogate would include land lease expenditures in its overhead expenses." *See* Def. Response Brief at 80. But that is precisely the point – there were several such "indications" here.

Commerce apparently either overlooked or ignored specific, concrete evidence which seems to indicate that the surrogate companies did in fact lease some portion of the land that they cultivated. For example, as noted above, the financial statements for Dhunseri and Moran include line items for "leasehold land" and "Land(leasehold) and Development," respectively. *See* Dong Yun Reply Brief at 12-13. Even the evidence cited by Commerce seems to suggest that the surrogate companies leased some portion of their land: The "fixed asset" line item for land in each of the companies' financial statements explicitly includes both "Freehold" and "Leasehold" property. *See* Dong Yun Brief at Appendix 3. This evidence would appear to flatly contradict the Government's assertion that "[n]o evidence in [the] administrative record indicates that . . . any of

the surrogate companies included land lease payments in their SG&A and overhead expenses." *See* Def. Response Brief at 78; *see also* Decision Memorandum at 28.

In short, Commerce here failed to acknowledge – much less explain and justify – its seeming departure from agency past practice. Moreover, Commerce failed to reconcile its determination that the surrogate companies did not lease land with record evidence that appears to indicate to the contrary. Under the circumstances, remand is warranted for further consideration.

## F. Cold Storage

According to the GDLSK Plaintiffs, the financial statements of the Indian tea companies that Commerce used to calculate the surrogate financial ratios in this case already reflected expenditures for climate-controlled storage, an ostensibly essential aspect of the tea production process.[51] The GDLSK Plaintiffs assert that those expenditures are comparable to their expenses for cold storage for fresh garlic,[52] and argue that Commerce's application of a separate surrogate value for cold storage therefore resulted in "illegal" and "impermissible" double counting. In addition, the GDLSK Plaintiffs challenge Commerce's determination to separately value cold storage on the ground that it is not supported by substantial evidence. *See generally* GDLSK Brief at 42-48; GDLSK Reply Brief at 18-20. *But see* Def. Response Brief at 88-95; Domestic Producers Response Brief at 6-7, 36-37. As summarized below, however, the GDLSK Plaintiffs' arguments do not carry the day.

---

[51]Commerce's calculation of the surrogate financial ratios is discussed in greater detail in section III.J, below.

[52]After harvesting, fresh garlic is temporarily placed in a dry storage facility. Later, the garlic is moved to cold storage, where it remains until it is transported for sale. *See* Def. Response Brief at 88 (citation omitted).

The GDLSK Plaintiffs highlight the fact that Commerce's decision to use the financial statements of Indian tea producers to calculate surrogate financial ratios in this case was based on the "similarities between the tea and garlic industries." *See* GDLSK Brief at 42; *see also* Decision Memorandum at 32.[53] But, in its calculations for the Preliminary Results, Commerce included a separate surrogate value for the cold storage of fresh garlic, dependent on whether respondents used on-site or off-site facilities. *See* GDLSK Brief at 42; Def. Response Brief at 89. After the Preliminary Results issued, the GDLSK Plaintiffs submitted what they characterize as "a wealth of information" in an attempt to "show[ ] how one of the many similarities between the garlic and tea production processes is the need to keep both agricultural products in climate controlled storage facilities prior to sale." *See* GDLSK Brief at 42. Drawing on the information that they had placed on the record, the GDLSK Plaintiffs raised their "double counting" argument in their case brief filed with Commerce. *See id*. But the GDLSK Plaintiffs' efforts were to no avail. Commerce rejected their claims of double counting, and continued to value cold storage separately as a factor of production for purposes of the Final Results. *See* Decision Memorandum at 44-49.

As their threshold argument here, the GDLSK Plaintiffs assert that – because Commerce determined that the Indian tea companies' financial statements were an appropriate surrogate for the respondent garlic producers' financial statements – Commerce "in essence conclud[ed] that the tea producers' production process, overhead and administrative expenses are comparable to those

---

[53]Specifically, Commerce concluded in the Final Results that "the tea industry is comparable and representative of the financial experience of the PRC respondent companies 'because it produced and processed a product that was not highly processed or preserved prior to its sale.'" Decision Memorandum at 31 (*quoting* Preliminary Results).

incurred by [the] garlic producers." *See* GDLSK Brief at 44.

The GDLSK Plaintiffs read far too much into Commerce's selection of the tea companies as surrogates. As the Domestic Producers correctly point out, "[Commerce] is seldom – if ever – blessed with reliable, publicly-available surrogate value information for the very industry that is under investigation, particularly for the purpose of valuing financial ratios. . . . That [Commerce] concluded that . . . [the] tea company data was 'the *best available* information' for valuing the . . . respondents' financial ratios . . . does not at all 'presume[] that these ratios capture *all* the factory overhead costs, including the costs incidental to . . . storage.'" Domestic Producers Response Brief at 36-37 (*quoting* GDLSK Brief at 44); *see also* Def. Response Brief at 92-93.[54]

Indeed, contrary to the GDLSK Plaintiffs' implication, it is far from clear that the tea companies' financial statements reflected the costs of climate-controlled storage, because it is not clear from the record that the tea companies even used such storage. The essence of the GDLSK Plaintiffs' case is their claim that Commerce valued cold storage separately notwithstanding "record evidence demonstrat[ing] that the[] costs of [cold storage] can be assumed to be included in the financial ratios" derived from the Indian tea producers' financial statements. *See* GDLSK Brief at 45. But, contrary to the GLDSK Plaintiffs' assertions, the "record evidence" of the tea companies' use of climate-controlled storage is, at best, scant. *See generally* Decision Memorandum at 47; Def.

---

[54]The Government states that "when it is unclear whether a surrogate company has treated an expenditure as an overhead or SG&A [selling, general and administrative] expense, Commerce must look to the descriptive line items in the surrogates' financial statements. . . . If no line item exists for an expenditure which is significant to the valuation of a product's factors of production, Commerce presumes that the expenditure is not included in the surrogate's overhead expenses and includes an additional value for that factor of production in its calculations." Def. Response Brief at 93-94 (citations omitted).

Response Brief at 93; Domestic Producers Response Brief at 6, 37.

Not one of the Indian tea producers' financial statements included a separate line item for temperature or humidity control, or otherwise even hinted at the use of special equipment or facilities for such a purpose. *See* Decision Memorandum at 47; Def. Response Brief at 91; Domestic Producers Response Brief at 6, 37. The GDLSK Plaintiffs' principal evidence included information from a website called "teaauction.com," describing the tea production processes of certain Indian tea producers; promotional materials from "Bry-Air," a producer of tea dehumidifiers; and an article discussing the importance of monitoring humidity during the process of drying tea. *See* GDLSK Brief at 47. In the Final Results, Commerce acknowledged that "it may be true that humidity is . . . important . . . for maintaining quality control in tea products." Decision Memorandum at 47. But, as Commerce pointed out, there is no evidence on the record establishing that any special equipment is *required* for that purpose. *Id*. (noting that "there is no . . . requirement . . . that temperature and humidity must be monitored using certain equipment"); *see also* Domestic Producers Response Brief at 37 n.8. Other information supplied by the GDLSK Plaintiffs also "[did] not include any reference to temperature- or humidity-control equipment." *Id*.

The GDLSK Plaintiffs emphasize that the "Bry-Air" website listed as customers of that company two of the Indian tea producers that Commerce used as surrogates here. *See* GDLSK Reply Brief at 18; *see also* GDLSK Brief at 45-46. However, as Commerce noted in the Final Results, there is no record evidence indicating "specifically the circumstances or types of tea products that would require such equipment." Decision Memorandum at 47. Nor is there "substantiating evidence on the record to identify whether the Indian tea companies named on the

website actually, or currently, use the Bry-Air equipment," or any evidence at all as to "whether

Parry Agro [the third surrogate Indian tea producer, which was not named on the Bry-Air website]

uses such equipment." *Id*.

Under these circumstances, it cannot be said that Commerce erred in refusing to find that the

Indian tea producers' financial statements reflected the costs of climate-controlled storage. But, in

any event, as Commerce further noted, even if the Indian tea producers' financial statements actually

*did* reflect the costs of climate-controlled storage, the record here is essentially devoid of evidence

to permit Commerce "to conclude that the costs to run and maintain [that] type of equipment are,

in fact, comparable to the cold storage facilities" used by the respondents in this case. *See* Decision

Memorandum at 47. As the Domestic Producers put it:

> These are two very different technologies . . . , and there is no evidence of record that
> the costs associated with the two different technologies are "comparable" – and
> every reason to assume that "cold storage facilities" are, in fact, more expensive to
> operate than "temperature and humidity control equipment."

Domestic Producers Response Brief at 37; *see also id*. at 6; Def. Response Brief at 92-94.

In sum, Commerce's determination to apply a separate surrogate value for the cold storage

of respondents' fresh garlic was supported by substantial evidence in the record, and otherwise in

accordance with law. The GDLSK Plaintiffs' claims to the contrary must be rejected, and

Commerce's determination accordingly sustained.


G.  Valuation of Cartons

The GDLSK Plaintiffs next dispute Commerce's calculation of surrogate values for certain

packing inputs – specifically, the surrogate values for cardboard cartons used to pack and ship the

respondents' garlic (discussed here) and for plastic jars (analyzed in section III.H, below).

The GDLSK Plaintiffs argue that Commerce erred in basing the surrogate value for cardboard cartons on Indian import data for Harmonized Tariff System ("HTS") subheading 4819.1001, which covers boxes made of corrugated paper and paperboard. The GDLSK Plaintiffs contend that Commerce instead should have used the price quotes for domestic Indian boxes that they (the GDLSK Plaintiffs) submitted for the agency's consideration. *See generally* GDLSK Brief at 3, 28-40; GDLSK Reply Brief at 13-16; GDLSK Supplemental Brief at 7-9; GDLSK Supplemental Response Brief at 12-14. *But see* Def. Response Brief at 13-14, 96-101; Def. Supplemental Brief at 26-29; Domestic Producers Response Brief at 8, 39.[55]

As discussed below, the domestic Indian box price quotes submitted by the GDLSK Plaintiffs were not without problems. Nevertheless, Commerce failed to adequately explain its conclusion that Indian import statistics for HTS subheading 4819.1001 were "the best information available" to the agency. Nor did Commerce properly support its decision to use those data by reference to substantial evidence in the record.

During the administrative review, the GDLSK Plaintiffs submitted four price quotes from Indian box manufacturers for cartons "similar in dimensions and construction to the boxes used for shipping garlic," which were contemporaneous with the period of review. *See* Preliminary Factors Valuation Memorandum (Pub. Doc. No. 226), at 9; GDLSK Brief at 28. But, in the Preliminary Results, Commerce rejected those domestic Indian price quotes and instead chose to value cartons

_____

[55]The Domestic Producers did not brief the substantive merits of this issue, and simply urge that Commerce's determination be sustained.

based on Indian import statistics for HTS subheading 4819.1001, which Commerce obtained from the World Trade Atlas – the same data that the agency had used to value cartons in previous administrative reviews. *See* Preliminary Results, 69 Fed. Reg. at 70,643; Def. Response Brief at 96; *see also* Preliminary Factors Valuation Memorandum (Pub. Doc. No. 226), at 9.

After the Preliminary Results issued, the GDLSK Plaintiffs submitted trade intelligence data from Infodrive India indicating that HTS subheading 4819.1001 covers a wide range of products, including gift, specialty,  and other non-packing boxes. *See* GDLSK Respondents' Second Surrogate Value Submission (Pub. Doc. No. 258), Exh. 2; *see also* GDLSK Brief at 29; GDLSK Supplemental Brief at 7.[56] In the Final Results, Commerce nevertheless continued to rely upon the Indian import statistics for HTS subheading 4819.1001, rather than the domestic Indian price quotes that the GDLSK Plaintiffs had submitted. *See* Decision Memorandum at 38-41.

As noted elsewhere, Commerce is entitled to a measure of latitude and substantial discretion in selecting the information that it relies upon in reaching its determinations. Still, Commerce "must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c) – to obtain the most accurate dumping margins possible," an objective "achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents." Shangdong Huarong Gen. Corp. v. United States, 25 CIT 834, 838, 159 F. Supp. 2d 714, 719 (2001) (citation omitted); *see also* Guangdong Chem. Imp. & Exp. Corp. v. United States, 30 CIT 85, 96, 414 F. Supp. 2d 1300, 1310-11 (2006) (explaining that

---

[56]Infodrive India is a service that "compile[s] and disseminate[s] official import statistics." Zhejiang, 32 CIT at ____ n.7, 2008 WL 2410210 * 6 n.7.

Commerce has great discretion in selection of data sources for use in administrative review; role of court is to determine whether agency's choice of data was reasonable) (*citing* <u>Nation Ford</u>, 166 F.3d at 1377).

Based on the existing record, it is far from clear that the Indian import statistics that Commerce used to calculate the surrogate value for cartons were the "best available information" in this case.

Commerce rejected the use of the domestic Indian box price quotes in part because the price quotes assertedly did not "represent a broad market average of prices for cartons." *See* Decision Memorandum at 40; *see also id*. at 38. Although Commerce conceded that the price quotes fell within the POR,[57] the agency speculated that – because the quotes were "obtained within one week of one another" – they might reflect "temporary market fluctuations." *See* Decision Memorandum at 40. Citing Shrimp from Vietnam, Commerce states that it has historically used surrogate values that reflect broad market averages and that cover a substantial time period over price data that is obtained within a limited timeframe. *Id*. (discussing Notice of Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination: Certain Frozen and Canned Warmwater Shrimp From the Socialist Republic of Vietnam, 69 Fed. Reg. 42,672 (July 16, 2004)). As the GDLSK Plaintiffs point

---

[57]The Government argues, at one point, that Commerce in this case was choosing between the Indian import statistics (on the one hand), and (on the other hand) "*noncontemporaneous* price quotes" proffered by the GDLSK Plaintiffs. *See* Def. Response Brief at 100 (emphasis added). The GDLSK Plaintiffs point out, however, that the Government's statement is "absolutely false." *See* GDLSK Reply Brief at 14. As Commerce conceded in the Final Results, the domestic Indian box price quotes were fully contemporaneous with the period of review. *See* Decision Memorandum at 40.

out, such a position may make sense where Commerce is deciding between two equally accurate surrogate values. *See* GDLSK Brief at 35. But, according to the GDLSK Plaintiffs, Commerce in this case was choosing between "four domestic, product-specific, contemporaneous price quotes and overly broad trade data which is inclusive of air freight." *Id.* Under such circumstances, they maintain, "the fact that all four price quotes fall within one month of the POR should not be outweighed by the accuracy of the values." *Id.*

Moreover, the facts of both of the cases that Commerce cited in support of its position – Shrimp from Vietnam, and Synthetic Indigo from the PRC – are readily distinguished from the facts of this case. *See* Decision Memorandum at 40 (*citing* Shrimp from Vietnam, 69 Fed. Reg. 42,672; Synthetic Indigo from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 53,711 (Sept. 12, 2003)); GDLSK Brief at 35. In Shrimp from Vietnam, Commerce rejected price quotes for shrimp which were from only one week of the period of investigation. *See* Shrimp from Vietnam, 69 Fed. Reg. at 42,684. But, as the GDLSK Plaintiffs note, the record in that case included affirmative evidence of price fluctuations. *See* GDLSK Brief at 35-36. There is no such evidence in this case. *Id.* Similarly, in Synthetic Indigo from the PRC, Commerce rejected price quotes for plastic bags. *See* Synthetic Indigo from the PRC, 68 Fed. Reg. 53,711 (discussed in Decision Memorandum at 40). As Commerce itself acknowledges, however, the price quotes in that case "were dated anywhere from *seven to ten months after the end of the [period of review]*." *See* Decision Memorandum at 40 (emphasis added); GDLSK Brief at 38. In contrast, the price quotes in this case were indisputably contemporaneous, entirely from within the period of review. *See* Decision Memorandum at 40; GDLSK Brief at 38.

Commerce also faulted the domestic Indian box price quotes on the ground that they did not "meet the criteria of public availability that the Department has historically relied upon when choosing appropriate surrogate values." *See* Decision Memorandum at 39; *see also* Def. Response Brief at 96-98, 100.  The GDLSK Plaintiffs fault Commerce for not defining its "criteria of public availability," but note that the agency has typically cited concerns about "public availability" in declining to use private market studies commissioned by interested parties.  *See* GDLSK Brief at 31-32.  In Writing Instrument Manufacturers, for example, the court sustained Commerce's rejection of a private study in favor of prices taken from a trade journal, for purposes of valuing basswood logs.  *See* Writing Instrument Mfrs. v. United States, 21 CIT 1185, 1202, 984 F. Supp. 629, 644 (1997), *aff'd*, 178 F.3d 1311 (Fed. Cir. 1998).  The court stated that the journal prices were preferable to the private study, because the journal prices provided accurate, market-based information and represented "a reliable source insulated from conflicts of interest."  *Id*., 21 CIT at 1202, 984 F. Supp. at 644.

The GDLSK Plaintiffs maintain that neither of the concerns identified in Writing Instrument Manufacturers is present in this case.  According to the GDLSK Plaintiffs, the domestic Indian box prices are "market based prices," and "there is no question about a conflict of interest."  *See* GDLSK Brief at 32.  The GDLSK Plaintiffs state that (unlike a private study, for example) the price quotes were not commissioned, but – rather – were "published [by the Indian vendors of packing boxes] in the ordinary course of business as a response to a request for prices."  *See* GDLSK Brief at 32.[58]

_____

[58]The GDLSK Plaintiffs also argue, in essence, that – even if the price quotes were not otherwise "publicly available" information – the domestic Indian box prices became publicly available information when the GDLSK Plaintiffs submitted them for inclusion in the administrative

In the Final Results, however, Commerce noted that "no detail on the parties that requested the prices, or whether or not an affiliation existed between the requester and the Indian companies, was ever placed on the record." Decision Memorandum at 39; *see also* Def. Response Brief at 97-98. The agency expressed reservations about the "possible manipulation . . . [inherent in] documents prepared specifically for use in trade remedy cases." Decision Memorandum at 39.

To be sure, as the GDLSK Plaintiffs underscore, Commerce has pointed to no evidence of any distortion or manipulation, or evidence of any affiliation tainting the domestic Indian box prices at issue here. *See* GDLSK Brief at 32-33. Absent any such evidence, the GDLSK Plaintiffs assert, Commerce is – in effect – improperly presuming distortion and affiliation. *See* GDLSK Brief at 32-33.

Finally, as the GDLSK Plaintiffs emphasize, Commerce's preference for publicly available information is simply that – a preference. *See* GDLSK Brief at 33-34. And, as the GDLSK Plaintiffs note, all other things being equal, a mere preference can never "trump" Commerce's paramount obligation under the statute – to use the best available information to calculate dumping margins as accurately as possible. *See* GDLSK Brief at 33-34 (*citing* Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 299, 366 F. Supp. 2d 1264, 1273-74 (2005)).[59] Accordingly, as the GDLSK

_____

record here. *See* GDLSK Brief at 32. By that logic, however, virtually *anything* (including, for example, the privately-commissioned study at issue in Writing Instrument Manufacturers) could be transformed into publicly available information simply by placing it on the record of an administrative proceeding.

[59]The GDLSK Plaintiffs note that Commerce expressly recognized the overriding precedence of the goal of accuracy in this context when the agency amended its regulations in 1997, revising

Plaintiffs point out, Commerce has used non-publicly available information in the past in situations where it constituted the best information available to the agency. *See* GDLSK Brief at 34 & n.10 (citing examples).

Against that backdrop, Commerce's rejection of the domestic Indian box prices in favor of the use of Indian import statistics must be considered in the context of the agency's overarching obligation to use the best available information to calculate dumping margins as accurately as possible. *See* Hebei Metals, 29 CIT at 295-96, 366 F. Supp. 2d at 1270-71 (explaining that "'best available information' standard set forth in [the statute] does not permit Commerce to choose between two unreasonable choices, *i.e.*, two surrogate coal values that have an unexplained relation to the coal used by [the respondent] . . . Commerce [is] required to obtain adequate evidence for the

---

the stated preference from "published information" to a preference for "publicly available information," to allow the agency greater flexibility to use the most accurate surrogate information available. *See* GDLSK Brief at 33-34. Commerce there explained:

> [P]aragraph (c)(1) drops the preference for published information, limiting the preference to publicly available information. The publicly available standard is aimed at promoting transparency, while the deletion of the published information standard enables the Department to achieve greater accuracy when information on the specific factor can be derived outside of published sources. . . . [This change] is intended to reflect the Department's preference for input specific data over the aggregated data that frequently appears in published statistics.

Notice of Proposed Rulemaking and Request for Public Comments, 61 Fed. Reg. 7308, 7344 (Feb. 27, 1996).

The GDLSK Plaintiffs sum up: "Thus, the preference for publicly available information was adopted to promote the Department's obligation to 'achieve greater accuracy' in its selection of surrogate values. The preference was never intended to act as a prohibition against using more accurate surrogate data." GDLSK Brief at 34 (*quoting* 61 Fed. Reg. at 7344; *citing* Horner v. Jeffrey, 823 F.2d 1521, 1531 (Fed. Cir. 1987)).

value it selected" ).

The GDLSK Plaintiffs maintain that "[n]ot only do the domestic [Indian box] prices . . .

satisfy [Commerce's] established criteria for surrogate value selection," but, moreover, "the Indian

Import Statistics are woefully distorted." *See* GDLSK Brief at 36. Indeed, the GDLSK Plaintiffs

assert that the Indian import statistics are so fatally flawed that Commerce did not even have "two

reasonable surrogate values to choose from" – that is, that the domestic Indian box price quotes were

the only reasonable source for surrogate value, and thus, by definition, the best information available

to the agency in this case. *See id*. at 37.

As a threshold matter, the GDLSK Plaintiffs correctly observe that – all other things being

equal – there is a preference for Commerce's use of domestic data, rather than import statistics such

as those that the agency relied on in this case. *See* GDLSK Brief at 33-34; Hebei Metals, 29 CIT

at 299-300, 366 F. Supp. 2d at 1273-74 ("A domestic price is preferred for the calculation of

surrogate values by prior practice, policy, and logic. All else being equal, tax- and duty-free

domestic data is clearly preferable over import data . . . . "); Rhodia, 25 CIT at 1287, 185 F. Supp.

2d at 1352 ("Commerce has a stated preference for the use of the domestic price over the import

price, all else being equal").[60]

---

[60]*See also*, *e.g.*, Ferrovanadium and Nitrided Vanadium from the Russian Federation: Notice of Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 65,656, 65,661 (Dec. 15, 1997) (Commerce has "articulated a preference for a surrogate country's domestic prices over import values"); Sulfanilic Acid From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 63,834, 63,838 (Nov. 17, 1998) ("domestic prices are preferred . . . if both domestic and import prices are available on a tax- and duty-exclusive basis, all else being equal"); *but see* Shanghai Foreign Trade Enters. Co. v. United States, 28 CIT 480, 493, 318 F. Supp. 2d 1339, 1350 (2004) ("Commerce has a preference for using import statistics to value material inputs because they are publicly available published information and do not include

Apart from the well-established general preference for domestic data (in lieu of import

statistics),[61] the GDLSK Plaintiffs highlight two basic problems specific to the Indian import

domestic taxes or subsidies.").

[61]Hebei Metals succinctly summarizes some of the policy underpinnings of the preference
for the use of domestic data, rather than import statistics:

> In addition to being a Commerce policy in accordance with precedent, the
> conditional preference for domestic data is a logical starting point for achieving the
> objective set by Congress. In a hypothetical world of [an] NME country as a market
> economy country from which taxes, duties, and other governmental interference have
> been excluded, it is reasonable to assume that a domestic price reflects the value of
> a factor of production more accurately than an import price. This assumption may
> be undermined by record evidence showing how an import price more accurately
> reflects the actual costs incurred by a producer of the relevant product, but this must
> be explained reasonably by Commerce.

Hebei Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274-75; *see also* Yantai Oriental Juice Co. v.
United States, 26 CIT 605, 617 (2002) (concluding that Commerce erred in using import data –
rather than domestic prices – in determining surrogate value for coal; faulting agency for failure to
explain "how the use of seemingly more expensive imported coal data is the best available
information establishing the actual costs incurred by Indian . . . producers [of the subject
merchandise]"; holding that, where a fungible commodity is available domestically, it is
unreasonable for agency to presume that domestic producers would use more expensive imports,
absent supporting evidence and explanation).

Consonant with both the policy underpinnings of the preference for domestic data in
determining surrogate values and the fundamental realities of the commercial world, the GDLSK
Plaintiffs take strong exception to "[Commerce's] implication that the . . . respondents would import
more expensive specialty boxes," noting that such action would not be "representative of business
realities in India." *See* GDLSK Brief at 31. Emphasizing that "the purpose of the statute is to
construct the . . . normal value [of a product] as it would have been if the NME country were a
market economy country," the GDLSK Plaintiffs pointedly observe that "Indian garlic companies
have no reason to buy more expensive imported boxes," since basic packing cartons such as those
used to pack and ship garlic "can be supplied domestically." *Id*.

The GDLSK Plaintiffs underscore their point:

The same is true in China; the GDLSK [Plaintiffs] source their packing boxes

statistics that Commerce used in this case.

First, the GDLSK Plaintiffs point out that it is undisputed that HTS subheading 4819.1001 (the subheading for which Commerce has Indian import statistics) covers gift, specialty, and other non-packing boxes, in addition to the sort of plain cardboard packing cartons that the respondents here used to ship their garlic. *See* GDLSK Brief at 3, 29, 36-38; GDLSK Supplemental Brief at 8; *see also* Decision Memorandum at 38 (admitting that "there are many different types of boxes covered by the Indian HTS category"). The GDLSK Plaintiffs argue that the Indian import statistics are thus "less specific" than the domestic Indian box prices vis-a-vis the product at issue (*i.e.*, the boxes actually used to ship garlic). *See* GDLSK Brief at 37; *see also* Def. Response Brief at 97 (conceding that domestic Indian box price quotes are "more specific" than Indian import statistics).

And, second, the GDLSK Plaintiffs note that it is similarly undisputed that the Indian import statistics that Commerce used include certain air freight charges, which – according to the GDLSK Plaintiffs – serve to further distort the average unit price reflected in those statistics. *See* GDLSK Brief at 3, 29, 31, 35-37; *see also* Decision Memorandum at 40 (acknowledging that Indian import statistics include boxes imported by air); Def. Response Brief at 99 (same). The ultimate effect, the GDLSK Plaintiffs note, is that "[Commerce] is imputing [to] the Chinese respondents . . . the costs

---

domestically. Logically, if the Chinese companies were in India, they would not buy the more expensive imported boxes and ship them by air to their factories.

*Id*. The GDLSK Plaintiffs conclude that, in effect, Commerce "is imputing the Chinese respondents with the costs of specialty boxes and air freight charges they would not incur were they in India." *Id*. According to the GDLSK Plaintiffs, "[Commerce's] decision to value cartons using more expensive imports which were shipped by air" is thus not only "contrary to established practice" and "Court[] precedent," it is also contrary to "obvious business realities." *Id*.

of specialty boxes and air freight charges they would not incur were they in India." GDLSK Brief

at 31.

Pointing to the trade intelligence data on the record, the GDLSK Plaintiffs emphasize that

"the great majority of the entries under HTS 4819.1001 cover boxes used for something other than

packing, and other packaging products, which bear no resemblance to the packing boxes used by

the [respondents in this case]." *See* GDLSK Brief at 36-37; GDLSK Reply Brief at 14-15; GDLSK

Supplemental Brief at 8. According to the GDLSK Plaintiffs, "[t]he prices of these other boxes are

driving up the value of HTS 4819.1001, making it an unrepresentative value for garlic packing

boxes." GDLSK Brief at 37.

In the Final Results, Commerce candidly conceded that "there are many different types of

boxes covered by [the Indian import statistics for HTS subheading 4819.1001]." *See* Decision

Memorandum at 38. But, incredibly, Commerce argued that "that fact alone does not undermine

the use of the value." *Id*. As the GDLSK Plaintiffs correctly observe, Commerce's claim simply

defies logic. *See* GDLSK Brief at 37.

Commerce sought to blunt the GDLSK Plaintiffs' attack on the "representativeness" of the

Indian import statistics, asserting that "the total quantity of gift boxes was less than ten percent of

the total carton imports." *See* Decision Memorandum at 38-39; *see also* Def. Response Brief at 99;

Def. Supplemental Brief at 27. The GDLSK Plaintiffs point out, however, that "that figure does not

account for 'TV Games spares 5500 PCS,' 'Fancy Box HD 4627 for Kettle,' or the many other types

of boxes that are included in HTS 4819.1001 and are categorically not used to pack garlic." *See*

GDLSK Brief at 36-38 (including list of wide range of gift and specialty boxes entered under HTS

subheading 4819.1001). The GDLSK Plaintiffs similarly dismiss Commerce's claim that "more than fifty percent of the entries . . . [made under HTS subheading 4819.1001] are simply categorized as boxes or cartons, with no other specifications." *See* Decision Memorandum at 39; GDLSK Brief at 38; *see also* Def. Response Brief at 99; Def. Supplemental Brief at 27. As the GDLSK Plaintiffs note, the trade intelligence data indicate that, quite to the contrary, "the vast majority of entries are for specialty products," including massive quantities of "premium cigarette cartons from Singapore," "envelopes from Japan," and something entered as "'LI 2 COLOR CUP SIZE ENV' from the United States." *See* GDLSK Brief at 38; GDLSK Reply Brief at 13-14. Commerce's glib conclusion – that "the fact that different boxes for different purposes have entered . . . under [HTS subheading 4819.1001] does not, in and of itself, call this value into question" – simply cannot be credited.

Compounding the situation is the undisputed fact that – besides including gift and specialty boxes and other products that "bear no resemblance to the packing boxes used by [the respondents]" – the Indian import statistics that Commerce used also include products that were shipped by air. *See* GDLSK Brief at 36; Decision Memorandum at 40 (conceding that Indian import statistics include cartons shipped by air); Def. Response Brief at 99 (same). The effect of these air freight charges, the GDLSK Plaintiffs note, is to further distort the Indian import statistics as a surrogate for the value of the cartons actually used by the respondents in this case. *See* GDLSK Brief at 3, 36-38.

It is telling that Commerce and the Government have avoided directly confronting the GDLSK Plaintiffs' claims that air freight charges distort the Indian import statistics. Commerce's analysis of this point in the Final Results totals a mere three sentences: "Some companies may

import cartons into the PRC by air, others may not . . . . This point alone, however, does not undermine the [agency's] rationale . . . . Furthermore, the respondents have not submitted on the record of this review anything that demonstrates that their own domestic carton suppliers did not import some [cartons] into the PRC by air." *See* Decision Memorandum at 40; *see also* Def. Response Brief at 99. Rather than grappling with the merits of the GDLSK Plaintiffs' concerns about the distortive effects of air freight charges, Commerce summarily dismissed them:

> Mere allegations of facts, absent any record evidence for support of such claims, cannot be a basis for undermining the use of publicly available, contemporaneous valuation data from Indian HTS categories in this case.

Decision Memorandum at 40.

Conspicuously absent from the record, however, is any evidence to support Commerce's suggestion that the GDLSK Plaintiffs (or, for that matter, any other respondent) used packing cartons that were *imported* – much less imported *by air*. Under the circumstances presented here, Commerce's bare speculation cannot be sustained. For reasons set forth above, "the preference for domestic data is most appropriate where [ – as here – ] the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process." Hebei Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274.

The GDLSK Plaintiffs emphasize that, logically, "Indian companies have no reason to buy more expensive imported boxes if these can be supplied domestically." GDLSK Brief at 31; GDLSK Reply Brief at 16. They further note that "[t]he same is true in China; the GDLSK [Plaintiffs] source their packing boxes domestically." GDLSK Brief at 31. Much as in Yantai Oriental, the record in this case is simply devoid of any indication as to why the respondents would

have used *imported* packing cartons (much less cartons imported *by air*), when such basic packaging materials were available domestically. *See* Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617 (2002) (*citing* Nation Ford, 166 F.3d at 1376). Commerce here has failed to reasonably approximate the carton cost incurred by a surrogate Indian garlic producer, and thus has not created an accurate hypothetical market.

Commerce's carton valuation analysis in this case suffers from the same basic kinds of infirmities as its carton valuation analysis in the eighth and tenth administrative reviews. *See generally* Jinan Yipin, 31 CIT at \_\_\_\_, 526 F. Supp. 2d at 1376-79; Zhengzhou Harmoni, 33 CIT at \_\_\_\_, 2009 WL 1321025 * 30-31; *see also* GDLSK Supplemental Brief at 7-9; GDLSK Supplemental Response Brief at 12-14.[62] In Jinan Yipin, for example, the court faulted Commerce for, *inter alia*, failing to adequately address "trade intelligence data" provided by the respondents which "indicate[d] that the tariff subheading [used in the import statistics on which Commerce there relied] is quite broad in scope." *Id*., 31 CIT at \_\_\_\_, 526 F. Supp. 2d at 1378. The court criticized Commerce's dismissive treatment of the trade intelligence data, and found that the import statistics on which the agency relied were "not reasonably representative of [the respondents'] packing cartons." *Id*., 31 CIT at \_\_\_\_, 526 F. Supp. 2d at 1378. The court similarly criticized Commerce for its rejection of Indian box price quotes proffered by the respondents, which the agency and the Government had dismissed as "not representative of a range of prices during the period of review" and "not derived from a public source." *Id*., 31 CIT at \_\_\_\_, 526 F. Supp. 2d at 1379. As the court

---

[62]As the GDLSK Plaintiffs observe, "[the] instant case contains the identical surrogate value for cartons that was at issue in Jinan Yipin." *See* GDLSK Supplemental Response Brief at 12.

emphasized, however, "[t]he price quotes . . . [were] vastly superior to the Indian import data in an important respect:  they are specific to the factor being valued."  *Id*., 31 CIT at ____, 526 F. Supp. 2d at 1379.  The  court therefore remanded the matter to Commerce:

> Because the data used by Commerce to calculate the surrogate value were not reasonably representative of [the respondents'] cartons and yielded a calculated result that was more than three times higher than the price quotes, the court cannot conclude that Commerce used the "best available information" or that it supported its choice with record evidence or adequate reasoning.

*Id*., 31 CIT at ____, 526 F. Supp. 2d at 1379 (*quoting* 19 U.S.C. § 1677b(c)(1)); *see also* Zhengzhou Harmoni, 33 CIT at ____, 2009 WL 1321025 * 29-31.  The same result is warranted here.

In short, as in Jinan Yipin (and Zhengzhou Harmoni), it appears that Commerce in this case *overstated* any *potential* concerns as to the reliability of the domestic Indian box price quotes that the agency rejected, at the same time that the agency significantly *understated* the *patent* flaws and defects in the Indian import statistics on which the agency relied.  Commerce failed to explain how the Indian import data is the "best available information," particularly in light of the domestic Indian price quotes which represent "values [that] are much more specific to the cartons used for garlic packing."  *See* GDLSK Supplemental Brief at 8-9; *see also* GDLSK Supplemental Response Brief at 12-14; Def. Response Brief at 97 (conceding that domestic Indian price quotes are "more specific" than Indian import statistics).  Further, Commerce failed to support its selection of the Indian import statistics by reference to substantial evidence in the record.  Commerce's determination on this matter therefore cannot be sustained.  This issue too must be remanded for further consideration.

H.  Valuation of Plastic Jars

The GDLSK Plaintiffs similarly take issue with the surrogate value that Commerce assigned for the plastic jars and lids used to pack the respondents' peeled garlic. *See generally* GDLSK Brief at 3, 40-41; GDLSK Reply Brief at 16-17; GDLSK Supplemental Brief at 9. *But see* Def. Response Brief at 102-05; Def. Rebuttal Brief at 3-4; Domestic Producers Response Brief at 8, 39.[63]

As with packing cartons, the GDLSK Plaintiffs argue that Commerce erred in using Indian import statistics as the basis for the surrogate value for plastic jars and lids. According to the GDLSK Plaintiffs, the Indian import statistics are distorted both by the inclusion of products that are very different from the jars that the respondents used to pack garlic, and by the inclusion of products which were shipped by air (inflating the average unit value accordingly). The GDLSK Plaintiffs maintain that Commerce therefore should have derived the surrogate value for jars and lids from the domestic Indian price quotes that the GDLSK Plaintiffs submitted for the agency's consideration. *See generally* GDLSK Brief at 40-41; GDLSK Reply Brief at 16-17.

Like the domestic Indian box prices that the GDLSK Plaintiffs provided, the domestic Indian price quotes that the GDLSK Plaintiffs submitted for plastic jars and lids were not without their flaws (as discussed in greater detail below). However, notwithstanding the problems with those price quotes, Commerce failed to adequately explain and support its determination that the Indian import statistics were the "best information available" for use as the basis for surrogate value in this case.

---

[63]The Domestic Producers did not brief the substantive merits of this issue, and simply urge that Commerce's determination be sustained.

The Domestic Producers placed on the record Indian import statistics for HTS subheading 3923.3000 (covering "carboys, bottles, flasks and similar plastic items"), and for HTS subheading 3923.5000 (covering "stoppers, lids, caps and other closures of plastics"), asserting that they should be used to determine the surrogate value of jars and lids. *See* Preliminary Factors Valuation Memorandum (Pub. Doc. No. 226), at 11; Def. Response Brief at 102. In the Preliminary Results, Commerce relied on the Indian import statistics that the domestic producers had provided. *See* Preliminary Results, 69 Fed. Reg. at 70,643.

Thereafter, the GDLSK Plaintiffs submitted trade intelligence data indicating that the Indian import statistics included a broad range of products that were very different from the jars used to pack the respondents' garlic. In addition, the trade intelligence data indicated that the Indian import statistics included products imported by air. Arguing that the values reflected in the Indian import statistics were thus inflated, the GDLSK Plaintiffs submitted four price quotes for jars and lids obtained from three Indian suppliers, urging Commerce to base surrogate value on those instead. *See generally* Decision Memorandum at 41.

In the Final Results, Commerce nevertheless continued to rely upon the Indian import statistics provided by the domestic producers, rather than using the domestic Indian price quotes submitted by the GDLSK Plaintiffs. *See generally* Decision Memorandum at 41-43. As illustrated below, Commerce's reasons for rejecting the domestic Indian price quotes for jars and lids paralleled its reasons for rejecting the domestic Indian box prices in several key respects. *See id*.; section III.G, *supra*.

Thus, for example, as with the domestic Indian box prices, Commerce rejected the domestic

Indian price quotes for jars and lids in part on the ground that they did not "meet the criteria for public availability . . . that the Department considers when choosing appropriate surrogate values." Decision Memorandum at 41; *see also* Def. Response Brief at 103; Def. Rebuttal Brief at 3. Commerce noted pointedly that "no detail on the identity of the party who requested the prices, or information as to whether or not an affiliation existed between the requester and the Indian companies, was ever placed on the record." Decision Memorandum at 42. Just as with the domestic Indian price quotes for boxes, however, here too there is no evidence whatsoever to suggest that the domestic Indian price quotes for jars and lids were in any way subject to manipulation or tainted by affiliation. *See* section III.G, *supra*; *see also* Zhengzhou Harmoni, 33 CIT at _____, 2009 WL 1321025 * 32 (addressing similar claim by Commerce in tenth administrative review).

As additional grounds for rejection, Commerce also emphasized that the domestic Indian price quotes for jars and lids fell outside the POR. *See* Decision Memorandum at 42; *see also* Def. Response Brief at 103-04; Def. Rebuttal Brief at 3.[64] But Yantai Oriental is instructive on this point. *See* GDLSK Reply Brief at 16-17 (discussing Yantai Oriental, 26 CIT at 616-18). In Yantai Oriental, neither the domestic nor the import prices were contemporaneous with the POR; but the domestic prices were less contemporaneous than the import prices by more than a year. The Yantai Oriental court nevertheless rejected Commerce's decision to rely on the more contemporaneous import data. Moreover, there was no evidence that the import data in Yantai Oriental were distorted. In contrast, the GDLSK Plaintiffs assert that the import data here are grossly distorted. *See* GDLSK

---

[64]The price quotes were dated October 8, 2004; November 6, 2004; and November 22, 2004. *See* Decision Memorandum at 42.

Reply Brief at 16-17. The contemporaneity of data is not as critical as Commerce has suggested in this case. *See*, *e.g.*, Hebei Metals, 29 CIT at 301, 366 F. Supp. 2d at 1275 (explaining that, "[w]hile the contemporaneity of data is one factor to be considered by Commerce . . . , three months of contemporaneity is not a compelling factor where the alternative data is only a year-and-a-half distant from the [period of investigation]"; moreover, contemporaneity is "insufficient to explain why an import price is the best available information for establishing the actual costs incurred by a producer"); Dorbest I, 30 CIT at 1695 n.14, 462 F. Supp. 2d at 1284 n.14 ("contemporaneity, in and of itself[,] should not be viewed as the sole reason to discard data; rather the quality of the data needs to be viewed in its totality").[65]

Commerce further stated that the price quotes in this case did not "represent a broad market average of prices," speculating that "[f]our price quotes from three different companies obtained within two months" could reflect "temporary market fluctuations." *See* Decision Memorandum at 42; *see also* Def. Response Brief at 104. As with the domestic Indian price quotes for boxes, Commerce again cited Shrimp from Vietnam as support for the proposition that it is preferable "to use surrogate values . . . that cover a substantial time period" rather than "price data that are obtained from so isolated a time frame." *See* Decision Memorandum at 42 (*citing* Shrimp from Vietnam, 69 Fed. Reg. 42,672). Section III.G above explains, however, that – while such a position may be entirely reasonable where Commerce is deciding between two equally accurate surrogate values – the situation is very different where, as here, one of the two values reflects significant distortions.

---

[65] *See also* Zhengzhou Harmoni, 33 CIT at _____ n.53, 2009 WL 1321025 * 32 n.3 (addressing similar issue, in context of tenth administrative review).

Moreover, as set forth in detail above, in Shrimp from Vietnam, Commerce rejected price quotes which were obtained within *a single week*. *See* Shrimp from Vietnam, 69 Fed. Reg. at 42,684; *see also* section III.G, *supra*. In contrast, the price quotes for jars and lids here at issue spanned a much more extended period – *approximately two months*. Further, the record in Shrimp from Vietnam included affirmative evidence of price fluctuations. But no party points to any such evidence in this case. *See generally* section III.G, *supra*.

In addition, Commerce stated in the Final Results that "[t]wo of the four price quotes do not indicate whether lids are included in the submitted price," and that "[t]he remaining two price quotes, which clearly include the price of the lid, do not separate between the price of the lid and the price of the jar." Decision Memorandum at 42; *see also* Def. Response Brief at 104. Commerce expressed concern that it "would not have a separate price to use for either jars or lids for those respondents for which only one of these factors is valued with a surrogate value." Decision Memorandum at 42; *see also* Def. Response Brief at 104; Def. Rebuttal Brief at 4.

Commerce's concerns were unwarranted. Indeed, the GDLSK Plaintiffs assert that, in fact, "it would have been easier for [Commerce] to use the values from the domestic prices than to use the import values." *See* GDLSK Reply Brief at 17. Apparently all Commerce would have had to do is to combine the jar and lid fields, and convert them from weight (kilograms of jars and lids per kilogram of garlic) to pieces (actual jars and lids per kilogram of garlic). *Id*. As for Commerce's concern that it is unclear whether certain of the domestic price quotes included lids, the GDLSK Plaintiffs note that "it is hard to imagine a company selling packing jars without lids." *See* GDLSK Reply Brief at 17. In any event, as the GDLSK Plaintiffs observe, there is no dispute that two of the

domestic price quotes clearly include lids. *See id.* The GDLSK Plaintiffs suggest that Commerce could average those two prices to derive a surrogate value for jars and lids. *Id.*; *cf.* Zhengzhou Harmoni, 33 CIT at ____ n.53, 2009 WL 1321025 * 32 n.53 (addressing similar issue, in context of tenth administrative review).

No doubt the various concerns that Commerce outlined in the Final Results diminish, at least to some limited extent, the utility of the domestic Indian price quotes for jars and lids. But, as the case law amply demonstrates, the mere fact that domestic data provided by a respondent are less than perfect does not necessarily warrant their rejection (in whole or in part). Nor do flaws in such data automatically justify resort to import statistics which are plagued by *other* infirmities which are equally, if not more, serious. *See generally* Zhengzhou Harmoni, 33 CIT at ____ n.53, 2009 WL 1321025 * 32 n.53.

The GDLSK Plaintiffs maintain not only that the domestic Indian price quotes reflect "domestic, product specific surrogate data," including domestic market prices for "plastic jars with similar characteristics and dimensions to the plastic jars" that the GDLSK Plaintiffs actually used to pack their peeled garlic, but – moreover – that the Indian import statistics provided by the domestic producers and relied on by Commerce are so grossly distorted by "other plastic products and [by] air freight [charges]" that the surrogate value derived from those statistics can only be described as "aberrational." *See* GDLSK Brief at 40-41; GDLSK Reply Brief at 17.

As an initial matter, the GDLSK Plaintiffs reiterate that there is a strong preference – all other things being equal – for Commerce's use of domestic data, rather than import statistics such as those relied on by the agency in this case. *See* GDLSK Brief at 41; Hebei Metals, 29 CIT at 299

*et seq.*, 366 F. Supp. 2d at 1273 *et seq.* ("A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic."); *see generally* section III.G, *supra* (and authorities cited there).

Besides pointing to the well-established, general preference for the use of domestic data (rather than import statistics), the GDLSK Plaintiffs also attack the use of import statistics here on fundamentally the same two case-specific grounds that they invoked in challenging the use of import statistics as the basis for the surrogate value for cartons.

First, the GDLSK Plaintiffs note, it is "irrefutable" that HTS subheading 3293.3000 is a "broad, basket" tariff provision which captures an extraordinarily wide range of plastic products, above and beyond the very basic plastic jars that the respondents used to pack garlic. *See* GDLSK Brief at 40-41; GDLSK Reply Brief at 17. The GDLSK Plaintiffs argue that the merchandise reflected in the Indian import statistics is thus not representative of, or sufficiently specific to, the product being valued by the surrogate (*i.e.*, the plastic jars that the respondents actually used).

And, second, the GDLSK Plaintiffs note that it is also undisputed that the Indian import statistics include certain air freight charges, which – according to the GDLSK Plaintiffs – further distort the average unit price reflected in the Indian import statistics. *See* GDLSK Brief at 40-41; GDLSK Reply Brief at 17; *see also* Def. Response Brief at 105 (acknowledging that Indian import statistics "were general and included exporters that used air freight"); Decision Memorandum at 43 (same). The GDLSK Plaintiffs therefore maintain that it is particularly appropriate to use domestic data in this case, given that the import data are distorted by air freight charges, and other plastic products "completely different from the plastic jars used by the GDLSK [Plaintiffs] to pack . . .

peeled garlic." *See* GDLSK Brief at 41.

In addition to the broad language of the tariff provision itself, the GDLSK Plaintiffs cite trade intelligence data to establish that HTS subheading 3923.3000 "is distorted by plastic products that do not resemble at all the plastic jars used by the GDLSK [Plaintiffs]." *See* GDLSK Brief at 40. To underscore their point, the GDLSK Plaintiffs cite a sampling of the vast array of products entered under HTS subheading 3923.3000, including "Empty cartridges (CANON 1215 C)," "Bottle polypropylene 500 ML package of 6," "Plastic emitters VCI 111," "5ML eye drop bottle," "Bobbins made of acrylonitrile," "Centrifuge tubes," "TPP Serolog Pipettes," "Tissue culture test plates," "Hari cosmetics hairdressing accessories lifetex tie," and "Single milk bottle warmer." *See* GDLSK Brief at 40-41. According to the GDLSK Plaintiffs, the effect of the myriad specialty products classified under HTS subheading 3923.3000 is to inflate the average unit values of the merchandise reflected in the Indian import statistics, thereby distorting Commerce's surrogate value for the simple, basic plastic jars at issue in this case. *See generally* GDLSK Brief at 40-41; GDLSK Reply Brief at 17.

Neither Commerce nor the Government has denied that the Indian import statistics for HTS subheading 3923.3000 included a very broad spectrum of other plastic products, in addition to the basic plastic jars at issue here. Nor could they reasonably do so. Similarly, Commerce and the Government concede – as they must – that the Indian import statistics reflect entries of merchandise that included air freight charges. *See* Decision Memorandum at 43; Def. Response Brief at 105. Much like the Indian import statistics used for the surrogate value of cartons, the GDLSK Plaintiffs assert that the effect of such air freight charges is to further distort the Indian import statistics as a

surrogate for the value of the jars actually used by the respondents in this case. *See* GDLSK Brief

at 41 (explaining that, "[g]iven that the Indian Import Statistics reflect a CIF price (Cost, insurance

and freight), the resulting average unit value is further distorted by . . . air freight charges").

Just as Commerce and the Government failed to directly confront the GDLSK Plaintiffs'

assertions that air freight charges distorted the Indian import statistics used to value cartons, so too

Commerce and the Government do not directly address the GDLSK Plaintiffs' claim here. Like its

analysis of cartons, Commerce's analysis of this point vis-a-vis jars and lids is a terse three

sentences in the Final Results: "Some companies import jars and lids into the PRC by air, others

do not, and the Indian HTS category reflects all of these experiences. This point alone, however,

does not undermine the fact that [the Indian import statistics are] the most contemporaneous and

accurate surrogate on the record. Furthermore, the respondents have not submitted any documents

on the record . . . demonstrating that their own domestic plastic jar and lid suppliers did not import

the products into the PRC by air." Decision Memorandum at 43; *see also* Def. Response Brief at

105.

Again, as with packing cartons, rather than squarely responding to the merits of the GDLSK

Plaintiffs' concerns about the distortive effects of air freight charges on the surrogate value of plastic

jars and lids, Commerce simply dismissed those concerns (using the exact same words that the

agency used to dismiss the GDLSK Plaintiffs' concerns about cartons):

> Mere allegations of facts, absent any record evidence for support of such claims,
> cannot be a basis for undermining the use of publicly available, contemporaneous
> valuation data from HTS categories in this case.

Decision Memorandum at 43. Here, too, however – as with cartons – the record is simply devoid

of evidence to support Commerce's suggestion that the GDLSK Plaintiffs (or any respondent) used plastic jars and lids that were *imported*, much less imported *by air*. And, as with cartons, Commerce's bare, unsubstantiated speculation cannot be sustained.

The GDLSK Plaintiffs emphasize that Indian garlic producers have no reason to buy more expensive imported jars, noting that "if the [respondents] were in [India] they would purchase the plastic jars domestically." *See* GDLSK Brief at 41. As in Yantai Oriental, the record in this case is silent as to any reason why the respondents would have used *imported* plastic jars and lids (much less jars and lids imported *by air*), when such basic packaging products were available domestically. *See* Yantai Oriental, 26 CIT at 617 (citation omitted); *see also* GDLSK Reply Brief at 17 (noting that "there is simply no record evidence indicating that Chinese garlic producers would import more expensive plastic jars rather than using the less expensive jars available domestically"). As explained in greater detail in section III.G above, "the preference for domestic data is most appropriate where [– as here –] the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process." Hebei Metals, 29 CIT at 300, 366 F. Supp. 2d at 1274.

In sum, just as it appears that Commerce overstated its concerns as to the reliability of the domestic box prices at the same time that it significantly understated the obvious flaws in the Indian import statistics on which it relied in determining a surrogate value for packing cartons, so too it appears that Commerce has done the same thing vis-a-vis the agency's valuation of plastic jars and lids. Commerce failed to adequately explain how the admittedly non-representative Indian import statistics constituted the "best available information," particularly in light of the availability of

product-specific, domestic Indian price quotes for plastic jars and lids comparable to those actually

used in this case. Nor did Commerce support its selection of the Indian import statistics by reference

to substantial evidence in the record.

Like Commerce's determination on the surrogate value for cartons, Commerce's

determination on this matter cannot be sustained. And, like Commerce's determination on the

surrogate value for cartons, this issue too must be remanded for further consideration.


I. Valuation of Ocean Freight

The GDLSK Plaintiffs also challenge Commerce's surrogate value for ocean freight,

claiming that the data on which Commerce based that value were not representative of the freight

expenses actually incurred by the respondents, and that Commerce erred in rejecting the alternative

data sources that were placed on the record. *See generally* GDLSK Brief at 4, 48-54; GDLSK Reply

Brief at 20-24. *But see* Def. Response Brief at 105-12; Domestic Producers Response Brief at 8,

39.[66] As discussed below, the GDLSK Plaintiffs' objections are well-founded.

In the Preliminary Results, Commerce calculated surrogate ocean freight costs using "the

actual market-economy freight rates that were paid for in a market-economy currency" for those

respondents that used market-economy suppliers for ocean freight. Decision Memorandum at 50;

*see also* Preliminary Results, 69 Fed. Reg. at 70,643. For the remaining respondents, Commerce

used "publicly ranged data for a market-economy purchase of ocean freight from the most recent

new-shipper review." Decision Memorandum at 50; *see also* Preliminary Results, 69 Fed. Reg. at

---

[66]The Domestic Producers did not brief the substantive merits of this issue, and simply urge that Commerce's determination be sustained.

70,643; GDLSK Brief at 48.[67]

The GDLSK Plaintiffs disputed Commerce's approach in the Preliminary Results, arguing that – because Harmoni and Linshu Dading had reported market-economy ocean freight costs – Commerce should weight-average all of the publicly ranged market economy ocean freight rates placed on the record, rather than use rates obtained from a single respondent reporting market economy freight from a sole carrier. Commerce subsequently informed the respondents that, for purposes of the Final Results, the agency intended to rely upon Maersk Sealand rate quotes that the agency had obtained independently from Maersk's website. The GDLSK Plaintiffs objected to Commerce's proposal, noting, *inter alia*, that the Maersk data reflected ocean freight rates from only a single carrier, for only one day of the POR.

The GDLSK Plaintiffs urged that Commerce instead use the publicly ranged data which were available for two respondents (*i.e.*, Harmoni and Linshu Dading) that had made multiple shipments using multiple market-economy carriers throughout the POR. In addition, the GDLSK Plaintiffs placed on the record quotes obtained from the Descartes database, reflecting rates for multiple carriers covering the entire POR. *See generally* Def. Response Brief at 106-07; GDLSK Brief at 48-49; Decision Memorandum at 49-50.[68]

Notwithstanding the GDLSK Plaintiffs' objections, Commerce used Maersk data to value

---

[67]Reported data are sometimes "ranged" (*i.e.*, adjusted) within 10% of their actual value to protect the proprietary information from which they are derived.

[68]The Descartes Carrier Rate Retrieval database is a web-based service, similar to the World Trade Atlas and accessible by subscription, which publishes the ocean freight charges of numerous carriers to destinations worldwide. *See generally* GDLSK Brief at 52; Def. Response Brief at 106-07.

ocean freight in the Final Results. *See* Decision Memorandum at 50-51. Commerce declined to use the public versions of the rates reported by Harmoni and Linshu Dading because the public versions of those rates were ranged, and thus "imprecise." Def. Response Brief at 107; *see also* Decision Memorandum at 50; GDLSK Brief at 50. And Commerce rejected the Descartes data, asserting that it could not be corroborated because the agency lacked access to Descartes (a subscription database). *See* Def. Response Brief at 107; Decision Memorandum at 51; GDLSK Brief at 50. Commerce concluded that Maersk data were the "best available information" because their use was consistent with past practice, and because the Maersk quotes were assertedly "the only publicly-available information to value ocean freight on the record of [the] review." Decision Memorandum at 51. However, Commerce conceded that the Maersk data that the agency had initially proposed did not reflect a period-wide average. Commerce therefore adjusted those data for use in the Final Results. *See* Decision Memorandum at 51; Def. Response Brief at 107.[69]

The GDLSK Plaintiffs attack Commerce's reliance on the Maersk data, emphasizing that the Maersk rates are inflated both by (1) the Qingdao-to-Hong Kong-to-U.S. shipping route that no respondent in this review actually used,[70] and by (2) the significant "inland arbitrary charges" for additional transportation that no respondent in this review actually incurred. *See* GDLSK Brief at

---

[69]Specifically, for purposes of the Final Results, Commerce "revisited [the Maersk website] and . . . pulled both east and west coast rates from each month of the POR," and "used a simple average of the east coast rates to value ocean freight to the east coast and a simple average of the west coast rates to value ocean freight to the west coast." Decision Memorandum at 51; *see also* Def. Response Brief at 107.

[70]As such, there would appear to be no truth to the Government's claim that the Maersk rates "represented actual rates from *actual routes used for the export of Chinese garlic*." *See* Def. Response Brief at 108 (emphasis added).

50-53; GDLSK Reply Brief at 24.[71]

The Government simply ignores the GDLSK Plaintiffs' argument concerning the "inland arbitrary charge." As for the GDLSK Plaintiffs' other argument, the Government seeks to make much of the fact that there is no evidence in the record to prove that no respondent used the shipping route on which the Maersk quotes are based. *See* Def. Response Brief at 108. But Commerce is not free to predicate its surrogate value determinations on unexplained and seemingly unreasonable assumptions.[72] In the case at bar, Commerce improperly failed to explain the bases for its questionable assumption that the respondents used such a long, circuitous, and more expensive route to ship their garlic to the United States. Nor did Commerce justify that assumption by reference to substantial evidence in the administrative record.

The GDLSK Plaintiffs similarly fault the Maersk data because it is exclusive to a single carrier – and one of the most expensive carriers at that. *See* GDLSK Brief at 50; GDLSK Reply Brief at 24. In addition, the GDLSK Plaintiffs note that, of the three data sources on the record of this review, the Maersk data are the only data that are not specific to the transportation of fresh garlic. *See* GDLSK Reply Brief at 22-24. Neither Commerce nor the Government offers any

---

[71]The "inland arbitrary charge" – also known as the "PRC arbitrary charge" – is a charge imposed for cargo that is transported through Hong Kong. *See* Zhengzhou Harmoni, 33 CIT at ____ n.33, 2009 WL 1321025 * 21 n.33.

[72]*See*, *e.g.*, Yantai Oriental, 26 CIT at 617 (concluding that Commerce erred in using import data – rather than domestic prices – in determining surrogate value for coal; faulting agency for failure to explain "how the use of seemingly more expensive imported coal data is the best available information establishing the actual costs incurred by Indian . . . producers [of the subject merchandise]"; holding that, where a fungible commodity is available domestically, it is unreasonable for agency to presume that domestic producers would use more expensive imports, absent supporting evidence and explanation).

response to these points.

Finally, the GDLSK Plaintiffs dispute the Government's broad assertion that Commerce has "consistently" used Maersk rates in non-market economy cases in the past. *See* Def. Response Brief at 107-08. Indeed, as the GDLSK Plaintiffs note, Commerce used publicly ranged rates (rather than Maersk rates) in valuing the Chinese garlic producers' shipping costs in the immediately preceding administrative review. *See* GDLSK Brief at 53; Issues and Decision Memorandum for the Administrative Review and New Shipper Reviews of the Antidumping Duty Order on Fresh Garlic from the PRC (Eighth Administrative Review), 2004 WL 3524395 (June 16, 2004) ("Eighth Garlic Review Memorandum"), at comment 5.

The GDLSK Plaintiffs contend that – in lieu of the Maersk rates – Commerce should have used either the Descartes data or the public, ranged versions of the rates reported by Harmoni and Linshu Dading. *See* GDLSK Brief at 4, 54. Commerce's bases for rejecting those two data sources are just as flawed as the agency's bases for selecting the Maersk data.

Like the Maersk data, the Descartes data encompassed the entire period of review. *See* GDLSK Brief at 51. But, in contrast to the Maersk data, the Descartes data had the advantage of reflecting the rates of multiple freight carriers. *See* GDLSK Brief at 51. The Descartes data also were not distorted by the aberrant Qingdao-to-Hong Kong-to-U.S. routing or "inland arbitrary charges." *See* GDLSK Brief at 52-53. Moreover, unlike the Maersk data, the Descartes data were specific to the shipment of fresh garlic. *See* GDLSK Reply Brief at 22-24.

Notwithstanding the facts outlined above, Commerce rejected the Descartes data. In the Final Results, Commerce failed even to acknowledge (much less address) the various advantages

of the Descartes data over the Maersk data, and stated simply that the agency "[did] not have access to the Descartes database and [could not] corroborate any information placed on the record from this source." *See* Decision Memorandum at 51; *see also* Def. Response Brief at 109. The GDLSK Plaintiffs dismiss Commerce's rationale as "mere pretext." *See* GDLSK Brief at 51.

Commerce has long relied upon surrogate values taken from the World Trade Atlas, an online fee-based database which is similar to the Descartes database, but "much more costly." *See* GDLSK Brief at 51-52 & n.12 (citing sampling of administrative determinations in which agency relied upon World Trade Atlas); GDLSK Reply Brief at 23-24. Given that fact, the Government's claim that Commerce could not use the Descartes database here since it requires "a nominal subscription fee" has a very hollow ring. *Id*. Even more to the point, Commerce has relied on information from the Descartes database in other cases in the past. *See* GDLSK Reply Brief at 23 (citations omitted).[73] The Government's assertion that Commerce "has never used [Descartes data] to value inputs in any prior nonmarket economy review" is thus "patently false." *See* Def. Response Brief at 109; GDLSK Reply Brief at 23 (emphasis omitted).

The GDLSK Plaintiffs also take issue with Commerce's assertion that the Descartes data are not publicly available information. *See* Decision Memorandum at 51 (asserting that the Maersk rates "are the only publicly-available information to value ocean freight on the record of this review");

---

[73]*See*, *e.g.*, Certain Non-Frozen Apple Juice Concentrate From the People's Republic of China: Preliminary Results of 2001-2002 Administrative Review and New Shipper Review, and Partial Rescission of Administrative Review, 68 Fed. Reg. 40,244, 40,248 (July 7, 2003) ("We used rates collected from the Descartes online system" to value respondents' international freight expenses); Certain Non-Frozen Apple Juice Concentrate From the People's Republic of China: Preliminary Results of New Shipper Review, 68 Fed. Reg. 44,741, 44,743 (July 30, 2003) (same).

GDLSK Brief at 51-52; GDLSK Reply Brief at 23-24.[74]  Ocean freight carriers use the Descartes

database to publish their rates in order to comply with a Federal Maritime Commission ("FMC")

regulation which requires all carriers to maintain *a public record* of their actual tariff rates for all

routes.  *See* GDLSK Brief at 52.  The GDLSK Plaintiffs argue that "[i]f these rates constitute a

public record by FMC's standards, it is difficult to understand how [Commerce] can claim that the[]

rates are not publicly available."  *Id*.[75]

Moreover, to the extent that the reliability of data is the true concern behind Commerce's

policy favoring publicly-available information, the nature of the Descartes data should go a long way

toward assuaging Commerce's fears.  *See* Decision Memorandum at 51 (expressing concern about

agency's ability to "corroborate" information in Descartes database).  As the GDLSK Plaintiffs note,

published rates must be accurate to the best of the carrier's knowledge in order to comply with the

Federal Maritime Commission's tariff publication regulations.  *See* GDLSK Brief at 52 n.13 (*citing*

46 C.F.R. § 520.1 *et seq*.).

The GDLSK Plaintiffs argue that, if Commerce nevertheless determined that the Descartes

---

[74]Public availability is merely one of a number of considerations to be weighed by Commerce in evaluating the relative merits of competing sources of data.  In valuing factors of production, Commerce must balance the interest in accurate information against the interest in publicly-available information, ever cognizant of its primary, overarching objective – to calculate dumping margins as accurately as possible.  *See* Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Allied Pacific Food (Dalian) Co. v. United States, 30 CIT 736, 760-61, 435 F. Supp. 2d 1295, 1316-17 (2006) ("Allied Pacific I") (explaining that statute "does not require Commerce to use publicly available information to value the factors of production"; agency "must balance the interests of transparency and verification that are served by public availability with other considerations, including the desirability of data that are as specific as possible").

[75]As the Government notes, "the Descartes database uses data pulled from the World Trade Atlas in its quotes."  Def. Response Brief at 109.

data were not the best information available in this case, "the most accurate and representative alternative surrogate values for ocean freight . . . [were] the public versions of the market economy ocean freight rates paid by other respondents to [the] review" – that is, the public, ranged versions of the rates reported by Harmoni and Linshu Dading. *See* GLDSK Brief at 53.

Like the Maersk data, the public, ranged versions of the rates reported by Harmoni and Linshu Dading encompassed the entire period of review. *See* GDLSK Brief at 53. But, in contrast to the Maersk data, the ranged Harmoni/Linshu Dading rates had the advantage of reflecting the rates of multiple freight carriers. *See* GDLSK Brief at 53. The ranged Harmoni/Linshu Dading rates also reflected respondents' actual shipping costs and actual routing, and thus were not distorted by the unusual Qingdao-to-Hong Kong-to-U.S. routing or "inland arbitrary charges." *See* GDLSK Brief at 53. Moreover, unlike the Maersk data, the ranged Harmoni/Linshu Dading rates were specific to the shipment of fresh garlic. *See* GDLSK Reply Brief at 22-24.

The Final Results failed to acknowledge any of the numerous advantages of the ranged Harmoni/Linshu Dading rates over the Maersk data. Instead, Commerce noted only that, because the precise rates that the respondents actually paid are proprietary information, the data on the record were "ranged within plus or minus ten percent." *See* Decision Memorandum at 50. Commerce therefore rejected the data, stating that the agency "[did] not have enough information to adjust the prices" to accurately reflect the "actual expenses charged by market-economy suppliers." *Id.* But Commerce's rationale makes no sense vis-a-vis its decision to use the Maersk data instead.

As the GDLSK Plaintiffs note, even assuming that the actual rates paid by the respondents were *10% higher than* (rather than, for example, 10% lower than) the ranged Harmoni/Linshu

Dading rates, "it is immediately evident that Commerce's selected surrogate freight rates [ – *i.e.*, the Maersk rates – ] are far in excess of a potential 10% distortion of the publicly ranged prices." *See* GDLSK Reply Brief at 21-22. In other words, the Maersk rates are orders of magnitude higher than even the highest rates that the respondents conceivably could have actually paid. *See* GDLSK Reply Brief at 21; *see also* GDLSK Brief at 54 (referring to "record evidence showing much larger distortions from the Maersk Sealand data actually applied by the Department"). In contrast, "the Descartes quotes are *within* 10% of the public versions of the actual ocean freight costs on the record." GDLSK Reply Brief at 21. As the GDLSK Plaintiffs observe, the foregoing analysis demonstrates conclusively that "it is impossible for the Maersk rates to be more accurate than the public versions of the actual ocean freight costs on the record." *Id*. The Maersk rates that Commerce used in the Final Results are by far the highest of the three available surrogate values, and are patently aberrational by comparison to the other two. *Id*. at 21-22.

Commerce enjoys a certain latitude in selecting the information that it relies upon in determining surrogate values, but that latitude is not unlimited. *See* Shangdong Huarong, 25 CIT at 838-39, 159 F. Supp. 2d at 719-20.[76] Commerce here has failed to adequately explain its reliance

----

[76]Shangdong Huarong succinctly summarized the relevant paradigm:

Despite the broad latitude afforded Commerce and its substantial discretion in choosing the information it relies upon, the agency must act in a manner consistent with the underlying objective of 19 U.S.C. § 1677b(c) – to obtain the most accurate dumping margins possible. This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.

Shangdong Huarong, 25 CIT at 838, 159 F. Supp. 2d at 719 (citation omitted).

on the Maersk data as the "best available information," or to justify its selection of those data by reference to substantial evidence in the record, particularly in light of indications that the Maersk data reflect a route that no respondent used, that the Maersk data reflect additional charges that no respondent incurred, that the Maersk data are limited to a single freight carrier, and that – unlike the other rates available on the record – the Maersk data are not specific to the shipment of fresh garlic. Commerce similarly failed to adequately consider the alternative sources of data on the record.

Accordingly, Commerce's determination cannot be sustained. This issue too must be remanded to Commerce for further consideration.

## J. Surrogate Financial Ratios

Dong Yun mounts three challenges to Commerce's calculation of the surrogate financial ratios, which Commerce based on the financial statements of three Indian tea producers – specifically, the 2003-2004 financial statements of Parry Agro Ltd. and Dhunseri Tea & Industries Limited, and the 2002-2003 and 2003-2004 financial statements of Moran Tea Company (India) Ltd.

Dong Yun first objects to Commerce's rejection of the financial statements of Limtex (India) Ltd. Next, Dong Yun argues that Commerce erred in its calculation of the surrogate profit ratio by failing to include Parry Agro's zero profit for 2003-2004. Finally, Dong Yun contends that Commerce's surrogate financial ratios, in effect, "charge" Dong Yun for certain specific expenses that the company did not incur. *See generally* Dong Yun Brief at 5-6, 20-22; Dong Yun Reply Brief at 13-14; Dong Yun Supplemental Brief at 5; Dong Yun Supplemental Response Brief at 5-6. *But see* Def. Response Brief at 82-87; Def. Supplemental Brief at 15-18; Def. Rebuttal Brief at 2, 4;

Domestic Producers Response Brief at 7, 38-39.[77]

For the reasons outlined below, each of Dong Yun's challenges to Commerce's calculation of the surrogate financial ratios must be rejected.

When constructing normal value for a foreign producer in an NME country, Commerce bases its determination on "the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1). However, valuing factors of production does not capture certain items, such as manufacturing overhead ("overhead"), selling, general and administrative expenses ("SG&A"), and profit. Commerce calculates those surrogate values using ratios derived from the financial statements of one or more companies that produce comparable merchandise in the surrogate market economy country. *See* 19 U.S.C. § 1677b(c)(1)(B); 19 C.F.R. § 351.408(c)(4); *see generally* Dorbest I, 30 CIT at 1715-16, 462 F. Supp. 2d at 1300-01.

Because information on financial ratios for Indian garlic companies is not available, Commerce here used the financial statements of Indian tea producers (as it has done in the past). The Indian tea industry "is comparable [to] and representative of the financial experience of the PRC respondent[s]," because – like the fresh garlic industry – the tea industry "'produce[s] and processe[s] a product that [is] not highly processed or preserved prior to its sale.'" *See* Decision Memorandum at 32 (*quoting* Preliminary Results).

In the course of the administrative review, the parties submitted a total of 16 financial statements from 11 different Indian companies. *See* Decision Memorandum at 32. In the

---

[77]The Domestic Producers did not brief the substantive merits of this issue, and simply urge that Commerce's determination be sustained.

Preliminary Results, Commerce valued financial ratios using the financial statements of Parry Agro,

a tea producer, and Mahabaleshwar Honey Production Cooperative Society Ltd. ("MHPC"), a honey

producer. *See* Decision Memorandum at 30, 33 n.33. With respect to the calculation of profit, the

Preliminary Results explained that "Parry Agro did not realize profit during its 2003 or 2004 fiscal

years," and stated that Commerce would only use "the profit ratio from [Parry Agro's] 2002 fiscal

year financial statements" in the agency's profit calculations. *See* Def. Response Brief at 83

(citation omitted). Significantly, Dong Yun did not dispute any aspect of Commerce's selection of

financial ratio surrogates in its case brief filed with the agency. *See* Def. Response Brief at 83.

In the Final Results, Commerce painstakingly reviewed all 16 financial statements and

modified its calculations, valuing expenses and profits using the 2003-2004 financial statements for

Parry Agro and Dhunseri, as well as the 2002-2003 and 2003-2004 financial statements for Moran.

*See* Decision Memorandum at 32. Commerce decided not to use the other financial statements on

the record for a variety of reasons, detailed in the Final Results. *See generally* Decision

Memorandum at 32-35.

For example, Commerce decided against using the financial statements of Limtex and several

other companies based on Commerce's conclusion that, as a practical matter, "each of the[ ]

companies is processor of an intermediate product . . . rather than both a grower and processor." *See*

Decision Memorandum at 33. As Commerce explained:

> Unlike most of the PRC respondents in this review, these companies do not grow
> their own product (*i.e.*, they are not fully integrated-producers). Thus, the financial
> statements of non-integrated companies may not accurately reflect the costs
> associated with more fully-integrated producers that grow their own product and then
> further process it.

Decision Memorandum at 33. In addition, as in the Preliminary Results, Commerce determined not

to "include the negative profit reflected in the 2003-2004 financial statement of Parry Agro,"

consistent with the agency's practice of "exclud[ing] from the profit calculation information from

companies that reported losses." *See* Decision Memorandum at 35-36.

Dong Yun contends that – in addition to the financial statements of Parry Agro, Dhunseri,

and Moran – Commerce also should have included Limtex's financial statements in the agency's

calculation of surrogate financial ratios. *See* Dong Yun Brief at 5, 20; Dong Yun Reply Brief at 14;

Dong Yun Supplemental Brief at 5; Dong Yun Supplemental Response Brief at 5-6. Dong Yun

acknowledges that Commerce limited its use of financial statements to those of fully-integrated

producers – companies that grow the tea that they process. *See* Decision Memorandum at 33; Dong

Yun Brief at 21; Dong Yun Reply Brief at 14; Dong Yun Supplemental Brief at 5; Dong Yun

Supplemental Response Brief at 5. Moreover, Dong Yun concedes that Limtex grew a mere 10%

of its tea. *See* Dong Yun Brief at 21; Dong Yun Reply Brief at 14; Dong Yun Supplemental

Response Brief at 5; *see also* Decision Memorandum at 31, 33. But Dong Yun asserts that it was

arbitrary for Commerce to reject the financial statements of Limtex while using those of Moran –

a producer which, according to Dong Yun, only "grew 20% of the tea it processed." *See* Dong Yun

Reply Brief at 14; Dong Yun Supplemental Response Brief at 5.

Dong Yun simply has its facts wrong. Nowhere does the record indicate that Moran *grew*

20% of the tea that it processed. Quite to the contrary, as the Final Results note, Moran *purchased*

20% of its tea. *See* Decision Memorandum at 31. Moran thus actually grew 80% of its tea

requirements. *See id*. As such, Commerce did not unreasonably distinguish between Moran and

Limtex.

As noted above, Commerce concluded that the financial statements of companies that grow very little of their own product do not accurately reflect the costs associated with more fully-integrated producers that grow most (if not all) of their own product. *See* Decision Memorandum at 33. Although Commerce here found that each of the selected surrogate companies – Parry Agro and Dhunseri, as well as Moran – purchased some of the tea that the company processed, the agency determined that the relatively small volume of their purchases was not significant enough to distort their costs. *See* Decision Memorandum at 33. On the other hand, Commerce rejected Limtex because the volume of its tea purchases meant that its costs were not representative of those of more fully-integrated producers. *See* Decision Memorandum at 33.

Simply stated, Commerce reasonably distinguished the companies that *purchased* the majority of their tea requirements from the companies that *grew* most of their own tea, because the agency determined that data from the latter companies would yield the most representative surrogate values for more fully-integrated garlic producers, such as Dong Yun and the other respondents here. *See* Decision Memorandum at 33; *see generally* Def. Response Brief at 84-85. Commerce's determination to disregard Limtex's financial statements in the agency's calculation of its surrogate financial ratios must therefore be sustained.

Dong Yun fares no better on its challenge to Commerce's policy of excluding from its profit calculations information from surrogate companies that reported losses in their financial statements. In an argument that totals less than half a double-spaced page (a mere ten sentences), Dong Yun objects to the fact that Commerce did not consider Parry Agro's 2002-2003 financial statements in

calculating surrogate values for the respondents' profits. *See* Dong Yun Brief at 5, 21-22.

The Government points out that Dong Yun failed to raise this issue at the administrative level. Even though the Preliminary Results made it clear that Parry Agro's financial statement was being excluded from Commerce's profit calculations, Dong Yun failed to lodge any objection in its case brief filed with the agency. *See* Def. Response Brief at 85-86 (arguing that Dong Yun's objection is barred by doctrine of exhaustion of administrative remedies).[78] Under these circumstances, it is eminently reasonable to apply the doctrine of exhaustion of administrative remedies to preclude Dong Yun from making its argument in this forum for the first time. *See* 28 U.S.C. § 2637(d); Rhone Poulenc, 899 F.2d at 1189-90.

In any event, as the Government notes, reaching the merits of Dong Yun's claim would not change the outcome. *See* Def. Response Brief at 86. In the Final Results, Commerce referenced its longstanding "no zero profit" practice, citing to another review in which Commerce's policy was upheld by the court. *See* Decision Memorandum at 35-36; Rhodia, Inc. v. United States, 26 CIT 1107, 1111-15, 240 F. Supp. 2d 1247, 1252-55 (2002) (sustaining Commerce's use of only positive figures with respect to profit in agency's calculations as "supported by language in the [Statement of Administrative Action] and the dictionary definition of profit"); Statement of Administrative Action, H.R. Doc. No. 103-316, at 839-40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4176 (1994) (recognizing that "in most cases Commerce would use profitable sales as the basis for calculating profit for purposes of constructed value").

Dong Yun fails even to acknowledge, much less seek to distinguish, the authorities

---

[78]Dong Yun failed to respond to the Government's exhaustion argument.

supporting Commerce's longstanding practice. And Dong Yun cites no authority to support its own position. Nor does Dong Yun offer any evidence that Commerce's practice yields erroneous results. Accordingly, even if Dong Yun's argument were not barred by the doctrine of exhaustion, it would nonetheless be doomed to fail.

Dong Yun also claims now, for the first time, that Commerce cannot use surrogate value data that reflect expenses that a respondent did not incur. In another pithy, ten-line argument, Dong Yun accuses Commerce of "invent[ing] costs to value," emphasizing that the expenses reflected in Parry Agro's financial statement included factory rent, but that Dong Yun did not rent such facilities. *See* Dong Yun Brief at 5-6, 22. As the Government puts it, Dong Yun contends, in effect, "that Commerce is required to scour the financial statements of each surrogate company and remove overhead and SG&A expenses that are not reflected in each respondent's production experience." Def. Response Brief at 86.

Once again, Dong Yun's failure to exhaust its administrative remedies bars its claim. As the Government points out, during the administrative review Dong Yun was well aware that Commerce was not conducting individual, respondent-specific microscopic analyses of the financial statements of each of the surrogate financial companies as part of the agency's calculation of surrogate financial ratios. Dong Yun nevertheless did not avail itself of the opportunity to address Parry Agro's factory rental expenses in its case brief filed with Commerce, and otherwise failed to put the agency on notice of its objection. *See* Def. Response Brief at 86-87 (asserting that "the Court should reject Dong Yun's challenge for failure to exhaust its administrative remedies").[79] Having failed to raise

_____

[79]Again, Dong Yun elected not to respond to the Government's exhaustion argument.

its claim in the course of the administrative review, Dong Yun should not now be heard to complain. By its failure to timely object, Dong Yun waived its claim. *See* 28 U.S.C. § 2637(d); Rhone Poulenc, 899 F.2d at 1189-90.

In any event, though, Dong Yun's argument lacks merit. As the Government observes, Dong Yun cites no case in which Commerce has been required to conduct the sort of needle-in-a-haystack analysis of surrogate overhead and SG&A expenses that Dong Yun apparently contemplates. *See* Def. Response Brief at 87. Indeed, the Court of Appeals has expressly rejected the notion that Commerce is obligated to "duplicate the exact production experience of the Chinese [respondents]" by undertaking an item-by-item accounting in determining expenses. Nation Ford, 166 F.3d at 1377 (citation omitted); *see also* Sigma Corp. v. United States, 117 F.3d 1401, 1408 (Fed. Cir. 1997) (same).

Moreover, the Government points out that, if Commerce were required to conduct the detailed analyses that Dong Yun advocates, the agency would also have to account for any expenses incurred by respondent companies that were not incurred by the surrogates (and thus were not reflected in the surrogates' financial statements). *See* Def. Response Brief at 87. In the words of the Government, any such exercise would be "burdensome, time consuming, and futile," because – for example – there will obviously always be *some* differences between overhead expenses in the production of Chinese garlic and overhead expenses in the production of Indian tea.

Dong Yun fails to address any of the relevant decisions of the Court of Appeals and this court. Further, Dong Yun cites no authority of its own to buttress its position. Nor does Dong Yun offer any evidence to substantiate its implication that the ultimate effect of Commerce's use of Parry

Agro's financial statement (including the factory rental expense) was to inflate Dong Yun's dumping margin. Thus, even assuming that Dong Yun had not waived its argument, Dong Yun still would not prevail. Like Dong Yun's other two arguments (discussed above), this challenge to Commerce's calculation of the surrogate financial ratios also must fail.

## IV. <u>Conclusion</u>

For all the reasons set forth above, the Motion for Judgment on the Agency Record filed by Ziyang must be denied. Likewise, FHTK's Motion for Judgment on the Agency Record is denied as to Commerce's use of adverse facts available. Similarly, the GDLSK Plaintiffs' Motion for Judgment on the Agency Record must be denied as to the valuation of cold storage; and Dong Yun's Motion for Judgment on the Agency Record must be denied as to Commerce's calculation of surrogate financial ratios.

In contrast, FHTK's Motion for Judgment on the Agency Record is granted as to the valuation of garlic seed. Dong Yun's Motion is granted as to the valuation of both leased land and water, as well as Commerce's wage rate calculation. And the GDLSK Plaintiffs' Motion is similarly granted as to the valuation of garlic seed, water, cardboard cartons, plastic jars, and ocean freight, as well as Commerce's wage rate calculation.

This matter is remanded to the Department of Commerce for further action not inconsistent with this opinion. A separate order will enter accordingly.

/s/ Delissa A. Ridgway
Delissa A. Ridgway
Judge

Dated: June 29, 2009
     New York, New York